AMY R. ATWOOD (OSB #060407)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: (971) 717-6401
atwood@biologicaldiversity.org

*Lead Attorney for Plaintiffs*


# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION


| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al, | Case No: 3:18-cv-01035-MO |
| Plaintiffs, | |
| v. | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |
| DAUGHERTY, et al, | |
| Defendants. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ................................................................................. 1

III.    LEGAL BACKGROUND ..................................................................................... 8

IV.     STANDARDS OF REVIEW .............................................................................. 11

        A.      Rule 12(b)(6) .......................................................................................... 11

        B.      Rule 12(b)(1) .......................................................................................... 11

        C.      Rule 12(e) ............................................................................................... 12

        D.      Rule 12(f) ............................................................................................... 12

V.      ARGUMENT ..................................................................................................... 13

        A.      Plaintiffs' Complaint Identifies Defendants' Activities that Are
                Ongoing and Cause of Take of Coho Salmon in the Tillamook and
                Clatsop State Forests. ............................................................................ 14

        B.      Defendants Have Presented No Legal or Logical Basis for Dismissing
                Plaintiffs' Well-Pled, Detailed, and Specific Complaint. ....................... 20

                1.      The Court Should Deny the Motion to Dismiss on Sovereign
                        Immunity Grounds ....................................................................... 20

                        a.      *Ex parte Young* permits suits for declaratory and injunctive
                                relief against state officials for ongoing violations of
                                federal law ...................................................................... 21

                        b.      Plaintiffs properly pled their prayers for declaratory
                                 and injunctive relief. ...................................................... 22

                        c.      Plaintiffs may rely upon past actions to establish liability
                                and craft prospective relief. ............................................ 24

                2.      The Motion to Dismiss on Mootness Grounds Should Be Denied. .......... 26

        C.      Defendants Have Not Met Their Burden to Strike Allegations. ............... 29

                1.      Allegations Regarding HCPs Are Material and Relevant. ..................... 29

                2.      Allegations Regarding Stream Buffers Are Material and Relevant. ......... 32

                3.      Allegations Regarding the Coho Salmon Recovery Plan Are
                        Material and Relevant. .................................................................. 33

        D.      The Complaint Adequately Identifies Defendants' Conduct Alleged to
                Cause Take. ............................................................................................ 34

VI.     CONCLUSION .................................................................................................. 35

TABLE OF AUTHORITIES

## CASES

*Adias Am., Inc. v. Ecco USA, Inc.*, No. 3:16-cv-684-SI, 2017 U.S. Dist. LEXIS 17558 (D. Or. Feb. 8, 2017) ................................................................................................................ 30, 34

*Alden v. Maine*, 527 U.S. 706 (1999) ................................................................................ 20

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CV 14-3053-MWF(VBKx), 2015 U.S. Dist. LEXIS 176869 (C.D. Cal. Feb. 12, 2015) .............................. 32

*Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn. 2008) ...................................... 9, 18

*Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009) ............. 10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016) ................................ 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 10, 24

*Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*, 515 U.S. 687 (1995) ...... 8, 10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 24, 25

*Bell v. Hood*, 327 U.S. 678 (1946) ............................................................................................... 11

*Brooks v. Harlon Rip Caswell*, No. 3:14-cv-01232-AC, 2016 U.S. Dist. LEXIS 26832 (D. Or. Mar. 2, 2016) ................................................................................................................ 11, 33

*Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850 (N.D. Cal. 2014) ...................... 12

*Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075 (D. Or. 2012) ................... 6, 8, 9, 10, 24

*Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305 (9th Cir. 1993) ... 23, 30

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242 (9th Cir. 1990) .... 24

*Davison v. Santa Barbara High Sch. Dist.*, 48 F. Supp. 2d 1225 (C.D. Cal. 1998) ..................... 12

*Day v. United Parcel Serv.,* 829 F. Supp. 2d 969 (D. Or. 2011) ................................................. 10

*Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085 (E.D. Wash. 2006) .................................... 27, 30

*Defs. of Wildlife v. Admin'r, Envtl. Prot. Agency*, 882 F.2d 1294 (8th Cir. 1989) ........................ 9

*Defs. of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 1999) ............................................................ 12

*Envtl. Prot. Info. Ctr. v. Tuttle*, No. C 00-713 SC, 2001 U.S. Dist. LEXIS 1154 (N.D. Cal. Jan. 22, 2001) ............................................................................................................................ 24

*Ex parte Young*, 209 U.S. 123 (1908) ......................................................................................... 20

*Fed. Sav. & Loan Ins. Corp. v. Musacchio*, 695 F. Supp. 1053 (N.D. Cal. 1988) ....................... 35

*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) .................... 3

*Fund for Animals v. Babbitt*, 903 F. Supp. 96 (D.D.C. 1995) .................................................... 32

*German v. Chloe Eudal Y*, No. 3:17-cv-2028-MO, 2018 U.S. Dist. LEXIS 109151 (D. Or. June 29, 2018) ............................................................................................................................ 10

*Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018) ................................................. 10

*In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955 (C.D. Cal. 2000) .............................. 12

*In re Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762 (N.D. Cal. 2010) ................................. 33

*Kandra v. United States*, 145 F. Supp. 2d 1192 (D. Or. 2001) ..................................................... 3

*L.A. Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir. 1992) .................................................................... 22

*Leeson v. Transam. Disability Income Plan*, 671 F.3d 969 (9th Cir. 2012) ................................ 11

*Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187 (D. Or. 2008) ................... 12

*Loggerhead Turtle v. City Council of Volusia Cnty.*, 148 F.3d 1231 (11th Cir. 1998) ............ 9, 34

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 896 F. Supp. 1170 (M.D. Fla. 1995) ....... 18

*Media.net Adver. FZ-LLC v. Netseer, Inc.*, 156 F. Supp. 3d 1052 (N.D. Cal. 2016) .................. 11

*Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835 (9th Cir. 2002) ...................................................... 22

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994) ........................ 8, 23, 27

*Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010) ......................................... 18
*Pac. Rivers Council v. Brown*, No. 02-243-BR, 2002 U.S. Dist. LEXIS 28121 (D. Or. Dec. 23, 2002) ............................................................................................................................... passim
*Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048 (N.D. Cal. 2004) ........................... 12
*Porter v. Jones*, 319 F.3d 483 (9th Cir. 2003) ............................................................................. 25
*San Bernardino Pub. Employees Ass'n v. Stout*, 946 F. Supp. 790 (C.D. Cal. 1996) ................. 11
*Seattle Audubon Soc'y v. Sutherland*, No. CV06-1608MJP, 2007 U.S. Dist. LEXIS 31880 (W.D. Wash. May 2, 2007) .................................................................................................... 16, 21
*Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991) .................................................................. 18
*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ..................................................................... passim
*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................................................... 3
*Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495 (9th Cir. 2001) .......................... 11
*United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011) ....................... 10
*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ................................. 20, 21
*Yufa v. Met One Instruments, Inc.*, No. 1:08-cv-3016-CL, 2012 U.S. Dist. LEXIS 186358 (D. Or. Dec. 20, 2012) .............................................................................................................. 35

## STATUTES

16 U.S.C. § 1532 ......................................................................................................................... 7, 8
16 U.S.C. § 1533(d) .......................................................................................................................... 7
16 U.S.C. § 1538(a) ...................................................................................................................... 5, 7
16 U.S.C. § 1539 .............................................................................................................................. 6
16 U.S.C. § 1540(c) ........................................................................................................................ 10
16 U.S.C. § 1540(g) .................................................................................................................... 6, 10
16 U.S.C. §§ 1531–1544 .......................................................................................................... passim

## OTHER AUTHORITIES

56 Fed. Reg. 58,612 (Nov. 20, 1991) ............................................................................................. 2
60 Fed. Reg. 38,011 (July 25, 1995) ....................................................................................... 2, 3, 5
62 Fed. Reg. 24,588 (May 6, 1997) ................................................................................................. 4
69 Fed. Reg. 33,102 (June 14, 2004) .......................................................................................... 1, 4
73 Fed. Reg. 7816 (Feb. 7, 2008) ................................................................................................ 4, 5
75 Fed. Reg. 29,489 (May 26, 2010) .............................................................................................. 4
76 Fed. Reg. 35,755 (June 20, 2011) ...................................................................................... passim
H.R. REP. NO. 93-412 (1973) ........................................................................................................... 8
NMFS, Final ESA Recovery Plan for Oregon Coast Coho Salmon (*Oncorhynchus kisutch*) (Dec. 2016) ................................................................................................................................. 7
S. REP. NO. 93-307 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989, 2995 ............................... 8

## RULES

Federal Rule of Civil Procedure 8 ............................................................................................ 1, 17
Federal Rule of Civil Procedure 12(b)(1) ............................................................................... passim
Federal Rule of Civil Procedure 12(b)(6) ............................................................................... passim
Federal Rule of Civil Procedure 12(e) .................................................................................... passim
Federal Rule of Civil Procedure 12(f) ..................................................................................... passim
Federal Rule of Civil Procedure 65(d) ......................................................................................... 17

<u>REGULATIONS</u>

50 C.F.R. § 17.3 ........................................................................................................... 9
50 C.F.R. § 223.102 ................................................................................................. 6, 8
50 C.F.R. § 223.203 ................................................................................................. 5, 7

I.    <u>INTRODUCTION</u>

In a jumbled set of motions under Federal Rules of Civil Procedure 12(b), (e), and (f), the "State Foresters" (including State Forester Peter Daugherty and District Foresters Katherine Skinner, Michael Cafferata, and Daniel Goody) ("State" or "Foresters"), and the Intervenors (the Oregon Forest Industries Council and Tillamook County) ("Intervenors") (collectively "Defendants"), complain about Plaintiffs' inclusion of certain facts in the Complaint. Compl., ECF No. 1. This relevant material undergirds the issue of proximate causation, but it paints the Foresters in an unflattering light and they seek to eliminate it from the Court's purview. Defs' Mot. to Dismiss, ECF No. 22 ("MTD") Defendant-Intervenors' Notice of Joinder, ECF No. 26. Yet the State claims that it cannot defend Plaintiffs' Claim for Relief. ECF No. 22, at 30.

Defendants cannot have it both ways. As shown in the Complaint and below, Plaintiffs allege that the State Foresters routinely plan and authorize logging and associated activities that cause unlawful take of coho salmon in the State Forests. Plaintiffs' Complaint easily surpasses the requirements of Federal Rule of Civil Procedure 8(a)(2) and pleads a valid Claim for Relief pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531–1544 ("ESA" or "the Act"). Defendants' specious efforts to remove this important context from Plaintiffs' Complaint should be denied and this case should proceed to discovery.

II.    <u>FACTUAL BACKGROUND</u>

Native cultures, fishermen, and Oregonians have long revered the salmonids of the Pacific Northwest. Chinook, chum, sockeye, pink and coho salmon and rainbow, cutthroat, and steelhead trout were once abundant sources of food and remain critical components of the freshwater ecosystems to which they are uniquely adapted. Their decline due to myriad threats is well-documented. *See*, *e.g*., 69 Fed. Reg. 33,102, 33,141-33,142 (June 14, 2004) [hereinafter

<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>          Page 1

"Proposed Listing (2004)"]; 60 Fed. Reg. 38,011, 38,012 (July 25, 1995) [hereinafter "Proposed Listing (1995)"] ("During [the 20th] century, indigenous, naturally-reproducing populations of coho salmon are believed to have been extirpated in nearly all Columbia River tributaries and to be in decline in numerous coastal streams" in the Pacific Northwest); Compl. ¶¶ 36, 37.

This case concerns coho salmon (*Oncorhynchus kisutch*)—specifically, the population of coho salmon that migrates from the rivers and streams of Oregon's steep, silty coastal mountain range to the Pacific Ocean, between the Oregon towns of Seaside and Port Orford. Compl. ¶ 1. The population known as the Oregon Coast Evolutionary Significant Unit ("ESU") of coho salmon—i.e., the "Oregon Coast ESU"—is uniquely adapted to the cold freshwater rivers and streams that drain the mountains and basins of the Oregon Coast Range. 60 Fed. Reg. at 38,013 (Proposed Listing (1995)) (noting "highly significant differences between Columbia River and Oregon coastal coho salmon"). The Oregon Coast ESU is substantially reproductively isolated from other coho salmon populations and "an important component in the evolutionary legacy of the species." 56 Fed. Reg. 58,612, 58,618 (Nov. 20, 1991).

In the early 1900s, up to two million Oregon Coast coho salmon returned to their natal streams annually, but by the 1960s that number had declined by more than 90 percent to just 45,000-150,000 fish. Compl. ¶¶ 36–37. By 1997 the Oregon Coast coho population numbers had dropped even lower, to less than 30,000 fish, or just five percent of their historic abundance, due to myriad threats in all parts of their migratory range. *Id.* ¶ 52; 76 Fed. Reg. 35,755, 35,765 (June 20, 2011) (codified at 50 C.F.R. § 223.102 (2017)) [hereinafter "Listing Rule"]. A primary reason for this decline included poor logging practices and associated road construction, including on State forestlands. 60 Fed. Reg. at 38,023 (Proposed Listing (1995)) (logging and

associated roads "often result in soil erosion and stream sedimentation such that spawning habitat is seriously degraded"); Compl. ¶¶ 52–53.

Meanwhile, growing public concern about the extinction of fish, wildlife, and plants caused by "economic growth and development untampered by adequate concern and conservation," *Forest Conservation Council v. Rosboro Lumber Co*., 50 F.3d 781, 783 (9th Cir. 1995), led to passage of the ESA in 1973. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174–180 (1978) [hereinafter "*TVA v. Hill*"] (detailing Congress's desire "*to devote whatever effort and resources were necessary* to avoid further diminution of national and worldwide wildlife resources").[1] After enactment of the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *TVA v. Hill*, 437 U.S. at 180, alarm over plummeting salmon stocks led the federal government to propose to list four coho salmon ESUs as "threatened" species under the ESA in 1995, including the Oregon Coast ESU. 60 Fed. Reg. 38,011 (Proposed Listing (1995)); 16 U.S.C. §1532(20) (defining "threatened species").

However, it would be 15 years of court rulings, remands, findings, status reviews, peer reviews, and listing determinations before the National Marine Fisheries Service ("NMFS")—the federal government's "expert agency" on marine species, *Kandra v. United States*, 145 F. Supp. 2d 1192, 1206 (D. Or. 2001)—would issue the final Listing Rule for the Oregon Coast ESU. 76 Fed. Reg. at 35,769–70 (Listing Rule) (describing history); Compl. ¶ 40. In 2011, based on the "best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), NMFS found that (1) the ESU will continue to decline and, within the foreseeable future, come to the brink of extinction, and (2) protection for the ESU as a "threatened" species is warranted. 75 Fed. Reg.

---

[1] Internal quotation marks and citations are omitted from all citations unless otherwise noted.

29,489 (May 26, 2010) [hereinafter "Proposed Listing (2010)"] (summarizing listing of Oregon

Coast ESU); *accord*, 73 Fed. Reg. 7816 (Feb. 7, 2008).

Since 1995, NMFS has consistently emphasized that logging and associated activities,

including road construction, is a primary threat to the ESU. 76 Fed. Reg. at 35,766 (Listing Rule)

(noting that "[h]istoric and ongoing timber harvest and road building have reduced stream shade,

increased fine sediment levels, reduced levels of instream large wood, and altered watershed

hydrology"); Compl. ¶ 52. Clear-cutting and road construction trigger landslides and accelerate

the delivery of fine organic sediments to freshwater habitats in the Tillamook and Clatsop State

Forest that coho salmon require during their first phases of life. Compl. ¶ 52; 69 Fed. Reg. at

33,142 (Proposed Listing (2004)) ("Sedimentation from extensive and intensive land use

activities" including logging and road construction "is recognized as a primary cause of habitat

degradation throughout the range of West Coast salmon and *O. mykiss*."). Removal of trees from

the riparian zones of coastal streams raises summer water temperatures, eliminates the potential

for trees to fall into streams, and alters basins' natural hydrographs. Compl. ¶¶ 52–53, 122. The

reduction in woody material means the loss of cover, shade, and pools—all features of the stream

complexity that juvenile coho salmon require. Compl. ¶ 53; 62 Fed. Reg. 24,588, 24,592-24,593

(May 6, 1997).

Additionally, NMFS concluded that the Oregon Department of Forestry's Northwest

State Forests Management Plan ("FMP") does not sufficiently conserve Oregon Coast coho

habitat. 76 Fed. Reg. at 35,767 ("Although the Oregon Forest Practices Act and the Forest

Practice Rules generally have become more protective of riparian and aquatic habitats over time,

significant concerns remain over their ability to adequately protect water quality and salmon

habitat."); *accord*, 75 Fed. Reg. at 29,499 (Proposed Listing (2010)); 73 Fed. Reg. at 7829-7830

(codified at 50 C.F.R. § 223.203 (2017)) [hereinafter "Special Rule"] (noting that although "[f]orest practices on state and private land includes some improvements over historically harmful practices," "there are also offsetting practices that are expected to degrade habitat conditions and complexity, such as shorter harvest rotations, road construction, and logging on unstable slopes and along debris flow paths"); Compl. ¶¶ 92, 100. NMFS's concerns were unalleviated upon the State's revision of the FMP in 2010. Compl. ¶¶ 86–102 (noting that the 2010 [FMP] failed to "resolve NMFS's concerns about increased delivery of fine sediment to coho-bearing streams from logging and roads, or the lack of stream shade and large woody debris from inadequate and nonexistent riparian buffers"); 76 Fed. Reg. at 35,767 (Listing Rule); ODF, NORTHWEST OREGON STATE FORESTS MANAGEMENT PLAN REVISED PLAN (2010).

To address these concerns and to facilitate state and private landowners' development of conservation plans, NMFS also promulgated a Special Rule in 2008 that extends the take prohibition in section 9 of the ESA to the Oregon Coast ESU. 73 Fed. Reg. at 7828-7830; 50 C.F.R. § 223.203(a), (b) (Special Rule) (applying the take prohibition in 16 U.S.C. § 1538(a)(1) to threatened West Coast salmon ESUs and steelhead populations); Compl. ¶¶ 41–42. In explaining the Special Rule, NMFS noted that "logging on unstable slopes and along debris flow paths," construction of logging roads in riparian areas and areas that are susceptible to landslides, and the "removal of large woody debris and 'sinker logs' or riparian shade canopy" from streams "would likely be subject to the section 9 take prohibition." 73 Fed. Reg. at 7830. Since 1995, NMFS has advised persons engaging logging activities either to cease these activities or obtain an ITP pursuant to section 10(a)(1)(B) of the ESA. 60 Fed. Reg. at 38,026 (Proposed Listing (1995)) ("NMFS encourages nonfederal landowners to assess the impacts of their actions on

potentially threatened or endangered salmonids."); *id.* at 38,027 (offering technical guidance); 73

Fed. Reg. at 7828 (calling ITPs "an important step."); *see also* 50 C.F.R. § 223.203(b)(1) ("The

exceptions of section 10 of the ESA (16 U.S.C. § 1539) and other exceptions under the Act

relating to endangered species, including regulations in part 222 of this chapter implementing

such exceptions, also apply to the threatened West Coast salmon ESUs . . . listed in § 223.102.").

In the absence of an ITP, persons engaged in these activities expose themselves to liability and

enforcement by NMFS and/or citizens. 16 U.S.C. § 1540(g)(1)(A).

Notwithstanding NMFS's repeated concerns and its promulgation of the Special Rule a

decade ago, the Foresters continue to plan and auction off about three dozen timber sales from

the Tillamook and Clatsop State Forests each year, pursuant to State authorities and the

Foresters' three-tiered management plans. Compl. ¶ 80. On average, these sales cover about

8,000 acres of the Forests, about 5,500 acres of which are planned and sold to be clear-cut. *Id.*

These approvals usually involve clear-cutting on the most unstable, landslide-prone slopes of the

Oregon Coast range, with little or no buffers along small perennial and intermittent headwater

streams; miles of construction of new roads and/or rehabilitation of old ones; and haul routes for

logging trucks that are hydrologically connected to coho-bearing streams. Compl. ¶¶ 13–16, 47,

51, 65–85, 99, 103–115, 124–125; *Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075,

1079 (D. Or. 2012) (describing the Foresters' three-tiered management plan structure).

Unsurprisingly, the result is more frequent landslides and chronic sediment deposition.

Compl. ¶¶ 2, 80–81, 84, 98, 105, 108–109, 116–122. Oregon Coast coho salmon evolved with

the steep slopes and fine sediments of the Oregon Coast range, but the Foresters' routine

authorization of logging activities, particularly clear-cutting, accelerates the natural rate of

landslides and stream sedimentation ten-fold, overloading the watersheds' ability to adjust.

Compl. ¶ 109. Landslides bury pools and gravel spawning beds with fine sediment, killing fish, suffocating eggs, and depriving young coho salmon of the essential habitat features they require. Compl. ¶¶ 105, 109–113, 126. Forester-authorized logging and associated roads also cause chronic stream sedimentation. Compl. ¶¶ 52, 103–104, 106–108, 114–119. Heavy trucks transporting logged timber along Forester-authorized haul routes that are hydrologically connected to coho-bearing streams increase the basins' sediment loads. Compl. ¶¶ 103, 114–119. Clear-cutting without buffers along small perennial and intermittent headwater streams depletes the source of large woody debris—the fallen trees, branches, vegetation, and snags that end up in stream channels—depriving coho of the complex stream structures they require to spawn, forage, and shelter. Compl. ¶¶ 2, 52–53, 59, 62–63, 75, 84, 89, 98, 100, 120–122, 127. These effects may not occur for years after the timber is sold, logged, felled, yarded, and transported.

These facts, which the Foresters do not dispute, are supported by decades of scientific studies data that reveal a clear causal link between the Forester's business-as-usual forestry management in the Tillamook and Clatsop State Forests and the overburdening of the affected watersheds' (or basins') sediment loads. Compl. ¶¶ 128–130; *see also* NMFS, Final ESA Recovery Plan for Oregon Coast Coho Salmon (*Oncorhynchus kisutch*) 33–34 (Dec. 2016); Compl. ¶¶ 54, 63; Defs' Mot. to Dismiss, ECF No. 25 ("MTD").

III.    <u>LEGAL BACKGROUND</u>

NMFS finalized the Special Rule in 2008. 76 Fed. Reg. at 35,770; 50 C.F.R. § 223.203(a); Compl. ¶ 41. The Special Rule and sections 9(a)(1)(B) and (a)(1)(G) of the Act make it unlawful for any "person"—including "any officer, employee, agent, department, or instrumentality of . . . any State" or "any other entity subject to the jurisdiction of the United States," 16 U.S.C. § 1532(13)—to "take" any coho or "violate any regulation pertaining . . . to

any threatened species of fish . . . promulgated by [NMFS] pursuant to" section 4(d) of the Act. *Id.* § 1538(a)(1)(B), (G); *id.* § 1533(d); 50 C.F.R. § 223.203(a); Compl. ¶ 42.

To "take" means "to harass, harm, . . . wound, [or] kill" members of the species "or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19), and it is defined in the "broadest possible manner to include every conceivable way" that a person can take wildlife, intentionally or not. S. REP. NO. 93-307, at 2 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989, 2995; *see also* H.R. REP. NO. 93-412, at 11 (1973) ("'Take' is defined broadly" and "includes harassment, whether intentional or not"); *Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*, 515 U.S. 687, 704 (1995) [hereinafter ("*Sweet Home*")]. Moreover, "[p]ast takings are indeed instructive, especially if there is evidence that future similar takings are likely." *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994).

NMFS's implementing regulations define "harm" within the meaning of "take" to mean "an act which actually kills or injures fish or wildlife." 50 C.F.R. § 222.102. The agency's definition describes how "[s]uch an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." *Id.*; *cf. Sweet Home*, 515 U.S. at 708 (holding that Secretary of Interior "reasonably construed the intent of Congress in defining 'harm' . . . to include 'significant habitat modification or degradation where it actually' killed or injured protected wildlife").[2] The U.S. Fish and Wildlife Service (NMFS's sister expert agency for terrestrial species) defines "harass" as "an intentional

---

[2] As Justice Sandra Day O'Connor explained in her concurring opinion in *Sweet Home*, "to make it impossible for an animal to reproduce is to impair its most essential physical functions and to render that animal, and its genetic material, biologically obsolete. This, in my view, is actual injury." 515 U.S. at 618.

or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

The take prohibition applies to a governmental entity's otherwise-lawful authorization of third party activity, but those activities may be exempted from the prohibition if they are in accordance with an ITP or other legal permission. *See Strahan v. Coxe*, 127 F.3d 155, 163-64 (1st Cir. 1997) (state agency caused take of right whale where it "licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in violation of [the ESA]"); *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn. 2008) (state agency liable for its licensing and regulation of trapping that resulted in the incidental take of Canada lynx); *Cascadia Wildlands*, 911 F. Supp. 2d 1075 (granting in part and denying in part motion to dismiss in ESA suit challenging take from State authorization of logging the habitat of endangered marbled murrelets in Elliot State Forest); *Pac. Rivers Council v. Brown*, No. 02-243-BR, 2002 U.S. Dist. LEXIS 28121 (D. Or. Dec. 23, 2002) (denying State and Intervenors' motions to dismiss ESA suit challenging take of coho salmon on private forestlands).[3]

The Act authorizes courts "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of th[e] Act or

---

[3] *See also Loggerhead Turtle v. City Council of Volusia Cnty.*, 148 F.3d 1231, 1246 (11th Cir. 1998) (county's inadequate regulation of beachfront artificial light sources may constitute unlawful take of turtles); *Defs. of Wildlife v. Admin'r, Envtl. Prot. Agency*, 882 F.2d 1294, 1300-01 (8th Cir. 1989) (agency caused take of black-footed ferret through its "decision to register pesticides" even though other persons distributed or used pesticides).

regulation issued under the authority thereof." 16 U.S.C. § 1540(c), (g)(1)(A). District courts are authorized "to enforce any such provision or regulation." *Id*. § 1540(g)(1)(C).[4]

IV.    STANDARDS OF REVIEW

A.    RULE 12(B)(6)

"The focus of any rule 12(b)(6) dismissal . . . is the complaint." *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011). As Judge Aiken has explained, "to state a plausible claim for relief, the complaint 'must contain sufficient allegations of underlying facts' to support its legal conclusions." *Cascadia Wildlands*, 911 F. Supp. 2d at 1079 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). "If the Complaint does contain such supporting factual allegations, we assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Corinthian Colleges*, 655 F.3d at 991 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A court "accept[s] as true all well-pleaded allegations of material fact, and construe[s] them in the light most favorable to the non-moving party." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018). "When evaluating a motion to dismiss under Rule 12(b)(6), courts are to accept the well-pleaded factual allegations of a complaint as true and construe all inferences in favor of the nonmoving party." *German v. Chloe Eudal Y*, No. 3:17-cv-2028-MO, 2018 U.S. Dist. LEXIS 109151, at *7-8 (D. Or. June 29, 2018) (citing *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016)).

---

[4] Ordinarily, district courts conduct a bench trial and apply a preponderance-of-the-evidence standard in assessing the merits of section 9 allegations. *See Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 563–64 (D. Md. 2009). Under this standard, plaintiffs must establish "a direct relation between the injury asserted and the injurious conduct alleged." *Cascadia Wildlands*, 911 F. Supp. 2d at 1085 (citing *Day v. United Parcel Serv.*, 829 F. Supp. 2d 969, 975 (D. Or. 2011)); *Sweet Home*, 515 U.S. at 708 (proximate causation for "harm" under ESA is addressed "through case-by-case resolution and adjudication").

B.    RULE 12(B)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows motions to dismiss for lack

of subject matter jurisdiction. *Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 499

(9th Cir. 2001) (citing FED. R. CIV. P. 12(b)(1)). As the Ninth Circuit explained, a claim should

not be dismissed under Rule 12(b)(1) if 'the right of the petitioners to recover under their

complaint will be sustained if the Constitution and laws of the United States are given one

construction and will be defeated if they are given another.'" *Leeson v. Transam. Disability*

*Income Plan*, 671 F.3d 969, 975 (9th Cir. 2012) (quoting *Bell v. Hood*, 327 U.S. 678, 685

(1946)). A court "may dismiss a federal question claim for lack of subject matter jurisdiction

only if: (1) 'the alleged claim under the Constitution or federal statutes clearly appears to be

immaterial and made solely for the purpose of obtaining jurisdiction'; or (2) 'such a claim is

wholly insubstantial and frivolous.'" *Id.* (quoting *Bell*, 327 U.S. at 682–83).

C.    RULE 12(E)

Federal Rule of Civil Procedure 12(e) allows a party to "move for a more definite

statement of a pleading to which a responsive pleading is allowed but which is so vague or

ambiguous that the party cannot reasonably prepare a response." Rule 12(e) motions are

"disfavored and [are] proper only if the complaint is so indefinite that the defendant cannot

ascertain the nature of the claim being asserted." *Media.net Adver. FZ-LLC v. Netseer, Inc.*, 156

F. Supp. 3d 1052, 1075 (N.D. Cal. 2016). A 12(e) motion "attacks unintelligibility in a pleading,

not simply mere lack of detail." *Brooks v. Harlon Rip Caswell*, No. 3:14-cv-01232-AC, 2016

U.S. Dist. LEXIS 26832, *5–6 (D. Or. Mar. 2, 2016). Courts deny a 12(e) motion if the

complaint sufficiently puts the defendant on notice of the substance of the claim. *San Bernardino*

*Pub. Employees Ass'n v. Stout*, 946 F. Supp. 790, 804 (C.D. Cal. 1996). A court should deny a

motion for a more definite statement if the detail sought is obtainable through discovery.

*Davison v. Santa Barbara High Sch. Dist.*, 48 F. Supp. 2d 1225, 1228 (C.D. Cal. 1998).

    D.    <u>RULE 12(F)</u>

        Federal Rule of Civil Procedure 12(f) allows a court to strike "any redundant, immaterial, impertinent, or scandalous material." Rule 12(f) motions to strike "are disfavored and infrequently granted." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008). When considering a 12(f) motion, a court "must view the pleadings in a light most favorable to the pleading party." *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000); *see also Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014) ("Motions to strike are regarded with disfavor because of the limited importance of pleadings in federal practice and because they are often used solely to delay proceedings."); *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) ("If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion.").

    V.    <u>ARGUMENT</u>

        Plaintiffs will prove—by a preponderance of the evidence, *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1999)—that the Foresters are authorizing and will continue to authorize timber sales on the Tillamook and Clatsop State Forests that are likely to kill, injure, harm, harass, or otherwise take Oregon Coast coho salmon. Even if incidental to logging and road construction that may be lawful under State law, the Foresters are liable for unlawful take of coho salmon as long as they continue authorizing logging and associated activities that cause take unless these activities are covered by an exception to the take prohibition, *see* 50 C.F.R. § 223.203(b), or are carried out pursuant to the terms of an HCP and ITP. 16 U.S.C. §

1539(a)(1)(B); Compl. ¶¶ 80, 103–122. Hoping to avoid these allegations, the State moves to strike or dismiss all allegations of past activities from the Complaint.[5] But as demonstrated below, the Complaint identifies the Foresters' specific activities that take coho salmon in the Tillamook and Clatsop State Forests. Defendants present no legal basis for dismissal of Plaintiffs' well-pled, detailed Complaint.

A.   PLAINTIFFS' COMPLAINT IDENTIFIES DEFENDANTS' ACTIVITIES THAT ARE ONGOING AND CAUSE OF TAKE OF COHO SALMON IN THE TILLAMOOK AND CLATSOP STATE FORESTS.

Plaintiffs' Complaint sufficiently alleges that the Foresters' ongoing activities in the Tillamook and Clatsop State Forests are more likely than not to cause take of coho salmon. *See, e.g.*, Compl. ¶¶ 80, 103–122. The Foresters manage the Tillamook and Clatsop State Forests according to a series of regulations and plans: from the Forest Practice Regulations ("FPRs"), Compl. ¶¶ 69–75, to Forest Management Plans ("FMPs"), *id.* ¶¶ 76–77, to district-specific implementation and operation plans ("IPs"), *id.* ¶¶ 78, and annual operation plans ("AOPs") that plan, describe, and select specific timber sales. *Id.* ¶ 79. Specific timber sales may only take place with the Foresters' authorization. Or. Admin. R. 629-035-0020(4).

There can be little doubt that allegations of past take are material to Plaintiffs' Complaint. They inform Plaintiffs' request for relief; establish injury and causation; and demonstrate that the Foresters' activities cause take. The State somehow construes factual allegations of past take as claims seeking retrospective relief, but it is mistaken, as no such claims are found in the

---

[5] It is unclear which specific allegations the State seeks to strike or the specific grounds on which those allegations are "redundant, immaterial, impertinent, or scandalous." FED. R. CIV. P. 12(f). At times, the State appears to request that this Court strike all allegations regarding past activities. MTD at 17. Yet, the State provides no authority for the proposition that a court may strike specific allegations on Eleventh Amendment grounds. This would be inappropriate here since any allegations regarding past activities relate to Plaintiffs' claim for prospective relief.

Complaint. The Complaint makes clear that the Foresters' activities will continue to result in take of coho salmon, and the relief Plaintiffs seek will redress this violation. *See, e.g.*, Compl. ¶¶ 124–130. Plaintiffs must have an opportunity to prove the facts underlying their case; dismissing or striking specific allegations or claims at this time would be premature and prejudicial, placing unwarranted restrictions on the ability of Plaintiffs to prove their claim in a court of law.

The Foresters' authorize activities pursuant to the FPRs that take Oregon Coast coho salmon in the State Forests. Compl. ¶ 72. The FPRs also allow for clear-cutting, road construction, and road reconstruction on "erosion-prone" and "very steep" slopes, and "in high landslide hazard locations." *Id.* ¶¶ 72, 74. The FPRs do nothing to ameliorate the lack of adequate amounts of large woody debris in fish-bearing streams to improve conditions for coho salmon. *Id.* ¶ 75. The currently operative 2010 FMP similarly authorizes activities that result in take of coho salmon. If anything, activities the Foresters authorized that negatively impacted coho increased in the 2010 FMP from the 2001 FMP as "ODF reduced targets for layered, complex forests, *id.* ¶ 95; "reduced or eliminated protections" by removing a cap on clear-cutting in certain watersheds that coho occupy, *id.* ¶ 96; adopted inadequate stream buffers. *Id.* ¶¶ 97– 98. The result is "an increase in clear-cutting and consequent road-building and log-hauling in watersheds where coho salmon live. . . ." *Id.* ¶ 99. Defendants continue to operate—and authorize activities—currently under the 2010 FMP.

Nothing in the Oregon Department of Forestry's ("ODF") yearly AOPs ameliorates the negative impacts of the activities the Foresters authorize either. Rather, the AOPs routinely authorize "clear-cutting on erosion- and landscape-prone slopes in proximity to coho-bearing streams, and/or construction and hauling of logs on roads that are, in many areas, 'hydrologically connected' to coho-bearing streams." *Id.* ¶ 103 (citing Table 1); *see also id.* ¶¶ 104–08. In fact,

while ODF recognizes that coho are impacted by the "lack of large wood in streams, increased fine sediment in riffles, a lack of complex pool habitat, and a need for more off-channel habitat," the 2018 AOP for the Forest Grove District states that "0 stream enhancement projects will be completed" in 2018. *See, e.g.*, OR. DEPT. OF FORESTRY, FOREST GROVE DISTRICT 2018 ANNUAL OPERATIONS PLAN 31, 32 (2017), https://www.oregon.gov/ODF/Documents/AboutODF/Forest%20Grove%20District%202018%20Annual%20Operations%20Plan.pdf (incorporated by reference at Compl. ¶ 62).

Taken together, the Foresters' activities accelerate the "number and frequency of landslides" that occur in a given basin. Compl. ¶ 84. These activities also reduce "the quantity and size of large woody debris delivered to streams," a necessary habitat requirement for coho salmon. *Id.* Moreover, the Foresters "authorize[ ] the addition of dozens of miles of new road construction every year." *Id.* ¶ 107. The Foresters' continual building and maintenance of roads "increase[s] sediment to coho streams by triggering landslides and direct discharge." *Id.* ¶¶ 106–111. These impacts have "led to increases in fine sediment in coho-bearing streams and reduced stream complexity, creating a legacy of negative impacts to coho habitat and coho." *Id.*

The Foresters' authorization of "clear-cutting on erosion- or landscape-prone slopes in proximity to coho-bearing streams—and/or construction and hauling of logs on roads that are, in many areas, 'hydrologically connected' . . . to coho-bearing streams"—is not a thing of the past. *Id.* ¶ 103. Rather, it happens "every year under the 2010 FMP, [IPs], and [AOPs] for the Tillamook, Forest Grove, and Astoria districts." *Id.* ¶¶ 103, 124, 126. The Foresters' authorization of "logging, log-hauling, road construction, and/or road improvements" in these

state forests will continue to "cause take by killing, injuring, harassing, or harming coho salmon." *Id.* ¶ 128; *see also id.* ¶¶ 103–122, 124–130; Table 1.[6]

Yet, Plaintiffs are not challenging the FPRs, FMP, or other plans or policies. Instead, these allegations show that the FPRs and various plans *fail to prevent take. See, e.g.*, Compl. ¶¶ 92, 100 (noting NMFS's concern that the state FMPs fail to provide habitat capable of supporting viable Oregon Coast coho salmon populations); *see also id.* ¶¶ 124–130. At the motion to dismiss stage, it suffices that the Complaint adequately alleges a claim for prospective relief against the Foresters' activities that authorize third parties to engage in action that results in the take of coho salmon. *See, e.g.*, *Strahan*, 127 F.3d at 163 (finding that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA"); *Seattle Audubon Soc'y v. Sutherland* ("*Seattle Audubon Soc'y*"), No. CV06-1608MJP, 2007 U.S. Dist. LEXIS 31880, at *27 (W.D. Wash. May 2, 2007) (finding that "[c]ourts have repeatedly held government officers liable for violating the take prohibition when the officers authorized activities undertaken by others that caused take").

All the allegations in Plaintiffs' Complaint, taken as true, support the allegation that "[u]nless enjoined, Defendants will continue to authorize logging, log-hauling, road construction, and/or road improvements on high-risk and erosion-prone slopes," the effects of which will result in take of coho salmon. *Id.* ¶ 130. On that basis, Plaintiffs seek declaratory relief that the Foresters have violated—and are violating—the ESA, and prospective relief to "enjoin Defendants from engaging in the activities that are violating the ESA's take prohibition."

---

[6] Although the State focuses only on allegations regarding "harm" in Plaintiffs' complaint, Plaintiffs' complaint alleges several forms of take including death, injury, harassment, and harm.

Compl., Prayer for Relief ¶ 2. Despite the State's protestations, *see* MTD at 17–20, such relief is not barred by the Eleventh Amendment. *See. e.g.*, *Pac. Rivers Council,* 2002 U.S. Dist. LEXIS 28121, at *18 ("conclud[ing] the Eleventh Amendment does not bar Plaintiffs' claim for declaratory relief" "that the State Forester has violated the ESA").

Perhaps realizing the Eleventh Amendment provides no shield, the State attempts to restate Plaintiffs' claim for relief by arguing that Plaintiffs have not asked for "programmatic" relief and that prospective relief must be based upon the consideration of individual timber sales. *See* MTD at 20–21. But this argument misunderstands Plaintiffs' theory of liability and the case law regarding a state agency's authorization of individual activities that result in take.

It is not that the FPRs, FMPs, IPs, or AOPs result in take of coho salmon (although they do nothing to prevent it). It is the *Foresters'* authorization of logging, log-hauling, road construction, and/or road impairments on high-risk and erosion-prone slopes resulting in erosion and landslides that leads to unauthorized take of coho salmon. *See, e.g.*, Compl., Prayer for Relief ¶¶ 1–2; Compl. ¶¶ 24–130 (Plaintiffs' sole claim for relief). To the extent that the State attempts to argue that Plaintiffs' claim for relief lacks specificity and amounts to asking this Court to enjoin individual sales that "cause take," MTD at 22, Plaintiffs' claim for relief and supporting allegations reasonably define the scope of the Foresters' unlawful activities at issue.[7]

The State's desire to proceed on a sale-by-sale approach—which would be unnecessarily burdensome on the Court and the parties—has no basis in binding case law, but rather seeks to

---

[7] Defendants cite Federal Rule of Civil Procedure 65(d) for the proposition that an injunction must state its terms specifically and describe in reasonable detail the act or acts restrained or required. But the standard of specificity required in an injunction this Court may ultimately issue has no bearing on the specificity required in Plaintiffs' complaint, which must contain simply "a demand for the relief sought." Federal Rule of Civil Procedure 8(a)(3). The Court may address the specifics of any potential future injunction later, after making a finding regarding the Foresters' liability.

restate and undermine Plaintiffs' theory of liability by forcing Plaintiffs to prove that each individual sale will result in take of coho salmon. But Plaintiffs need only prove that the Foresters' authorize *activities* that are likely to take coho salmon. *See* 16 U.S.C. § 1539(a)(1)(B) (NMFS may authorize any taking "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful *activity*") (emphasis added).

For instance, in the seminal *Strahan* case, the First Circuit upheld an injunction requiring a state agency to apply for an ITP, develop and prepare a proposal to address the harm to Northern right whales caused by fixed fishing gear, and engage in talks concerning measures to minimize harm to the whales. 127 F.3d at 158, 170. At issue there was not the agency's issuance of specific permits, but Massachusetts's *commercial regulatory scheme* at large. *Id.* at 163–164. While the plaintiff in that case put forth evidence of harm to specific Northern right whales, the First Circuit found that liability ran to the state's administration of commercial fishing as "the state ha[d] licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in a violation of federal law." *Id.* at 164.[8] Likewise, the Foresters' routine authorization of timber sales on high-risk and erosion-prone slopes violates the ESA. Regardless, Plaintiffs' allegations regarding 67 specific timber sales demonstrate that the

---

[8] Numerous courts have based section 9 liability on programmatic regulatory authority or activity rather than specific permits, sales, or other acts. *See, e.g.*, *Sierra Club v. Yeutter*, 926 F.2d 429, 438–39 (5th Cir. 1991) (finding Forest Service's "practice of even-aged management" of timber stands resulted in the taking of red-cockaded woodpeckers in violation of the ESA); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 896 F. Supp. 1170, 1180–81 (M.D. Fla. 1995) (holding that county's authorization of vehicular beach access during turtle mating season exacted a taking of turtles in violation of the ESA); *Holsten*, 541 F. Supp. 2d at 1080 (finding that state agency's licensure of trapping, and the regulations concerning trap uses, caused the take of Canada Lynx); *Pac. Rivers Council,* 2002 U.S. Dist. LEXIS 28121, at *11 (finding that an Oregon state forester's authorization of logging operations could be a cause of take); *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1005 n.8 (D. Or. 2010) (finding "that [the] Forest Service may be held liable for authorizing grazing that results in unlawful take").

Foresters' ongoing activities likely cause take of coho salmon through increased sediment

delivery and reduction of large woody debris to coho bearing streams. *See* Compl., Table 1.

Plaintiffs' Complaint makes specific and detailed allegations that are more than sufficient

at the pleading stage to establish their claim that the Foresters have authorized—and continue to

authorize—activities on erosion- or landslide-prone slopes, including logging, road construction,

and log hauling in places that are hydrologically connected to coho-bearing streams.

B. <u>DEFENDANTS HAVE PRESENTED NO LEGAL OR LOGICAL BASIS FOR DISMISSING PLAINTIFFS' WELL-PLED, DETAILED, AND SPECIFIC COMPLAINT.</u>

Having laid the groundwork for the specific and detailed allegations in Plaintiffs'

Complaint and how they interrelate with the statutory and regulatory framework, *see supra* at

12–18, below are point-by-point responses to each of the State's misplaced arguments in favor of

its motion to dismiss or, in the alternative, its motion to strike.

The State moves to dismiss for want of jurisdiction over "allegation[s] or claims of past

activities." MTD at 16, 17. It present the motion on sovereign immunity and mootness grounds.

*Id.* at 17–20, 22–23. Although the State seeks to dismiss "[c]laims seeking to review or remedy

past sales or other activities," *id.* at 20, Plaintiffs have not asserted any such claims. Plaintiffs'

requested relief is forward-looking, and in support of its position, Plaintiffs properly raise the

State's past conduct as probative evidence of ongoing and/or future violations. Because Plaintiffs

do *not* seek any retrospective relief, the Court should deny the motion.

1. <u>The Court Should Deny the Motion to Dismiss on Sovereign Immunity Grounds.</u>

The State's position primarily rests on a straw-man argument premised on an erroneous

characterization of Plaintiffs' lawsuit, namely, that Plaintiffs seeks declaratory relief for wholly

past violations of the ESA. That is not a fair reading of Plaintiffs' Complaint, which alleges

liability only for *ongoing and future* actions. The State concedes, as it must, that a forward-looking injunction is an available remedy, but then attempts to rewrite Plaintiffs' Complaint. Simply put, Plaintiffs are only seeking forward-looking declaratory and injunctive relief.

> a.    Ex parte Young *permits suits for declaratory and injunctive relief against state officials for ongoing violations of federal law.*

Although a state's Eleventh Amendment sovereign immunity generally protects it from suit, such immunity does not extend to suits involving actions against state officials, sued in their official capacities, alleging violations of federal law.[9] Under the doctrine of *Ex parte Young*, suits against state officials for prospective relief are generally cognizable, whereas claims for retrospective relief (such as damages) are not. *See Ex parte Young*, 209 U.S. 123 (1908). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

As noted above, in carrying out this inquiry, several courts have determined that state officials are not immune from ESA Section 9 suits. *See Strahan*, 127 F.3d at 166–67 (finding the Eleventh Amendment did not bar suit against Massachusetts's regulatory licensing scheme for authorizing fishing nets likely to result in take of Northern right whales); *Holsten*, 541 F. Supp. 2d at 1073 (declaratory and injunctive relief granted against regulatory trapping scheme likely to

---

[9]  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. While the plain text of the Amendment refers only to suits against a state brought by citizens of a different state or foreign state, the phrase "Eleventh Amendment immunity" is used as shorthand for the broader concept of sovereign immunity. *See Alden v. Maine*, 527 U.S. 706, 712–13 (1999).

take Canada lynx); *cf. Seattle Audubon Soc'y,* 2007 U.S. Dist. LEXIS 31880, at **11–12 (Eleventh Amendment does not bar claims seeking prospective relief against state officials). As the First Circuit observed, "Congress clearly envisioned that a citizen could seek an injunction against a state's violations of the ESA." *Strahan*, 127 F.3d at 166.

Indeed, in 2002, Judge Brown squarely rejected the State's argument that the Eleventh Amendment barred an ESA section 9 suit against the Oregon State Forester. *Pac. Rivers Council*, 2002 U.S. Dist. LEXIS 28121. The plaintiffs there sought an order declaring that the State Forester violated the ESA by approving clearcutting and other logging operations on private lands and an injunction to prohibit the State Forester from approving private logging operations in certain circumstances. *Id.* at **3–5. Judge Brown determined that the Eleventh Amendment did not bar the plaintiffs' action. *Id.* at **14–29. Given the similarity of the allegations in both cases, the same outcome is warranted here.

> b.  *Plaintiffs properly pled their prayers for declaratory and injunctive relief.*

Defendants in this case are state officials sued in their official capacity. Compl. ¶¶ 13–16. Therefore, the only inquiry for this Court is whether Plaintiffs allege an "ongoing violation of federal law and seek[ ] relief properly characterized as prospective." *Verizon*, 535 U.S. at 645. Plaintiffs' request for declaratory and injunctive relief satisfies this standard.

Plaintiffs properly pled a request for declaratory relief establishing liability for "authorizing logging, log-hauling, road construction, and/or road maintenance on high-risk and erosion-prone slopes where the effects of the ensuing landslides reach coho salmon habitat, and/or on areas that are hydrologically connected to coho-bearing streams or waterbodies." Compl., Prayer for Relief ¶ 1. The "ongoing" nature of this alleged violation is apparent from the plain language of the Complaint. *See* Compl. ¶ 128 (Defendants' activities "are reasonably

certain *to cause* take" (emphasis added)); *id.* ¶ 129 (Defendants' authorization of timber sale

activities "*violates*" the ESA (emphasis added)); *id.* ¶ 130 ("Unless enjoined, Defendants will

*continue to*" engage in activities that cause take (emphasis added)).

According to the Complaint, the source of liability is Defendants' "planning and selling"

of timber sales and logging operations in certain areas. *Id.* ¶ 125. Use of the present participle for

the verbs "to plan" and "to sell" further signals an ongoing or continuing condition. Indeed, as

the Complaint plainly spelled out, Defendants "have approved and are continuing to approve"

these timber sales and logging operations. *Id.* ¶ 124. The Eleventh Amendment "presents no

barrier" to a "request for declaratory relief against an alleged ongoing violation of federal law."

*L.A. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992); *see also Nat'l Audubon Soc'y v. Davis*,

307 F.3d 835, 847–48 (9th Cir. 2002) (explaining nexus between Eleventh Amendment and

declaratory relief and concluding there was no Eleventh Amendment bar to suit against Director

of California Department of Fish and Game).

The State similarly attempts to cabin Plaintiffs' request for injunctive relief by making

inferences that are untethered to the plain language of the Complaint. *See* MTD at 20 ("if"

Plaintiffs seek to hold the State liable for failing to "improve or correct" certain issues, such

relief is not permissible). The State's efforts to read backward-looking relief into Plaintiffs'

Complaint cannot withstand scrutiny, as the prayer for injunctive relief is prospective: "Enjoin

Defendants from engaging in the activities that are violating the ESA's take prohibition until and

unless Defendants obtain an HCP/ITP pursuant to an enforceable timeline." Compl. ¶ 2.[10]

---

[10] The State seizes on the phrase "unless and until Defendants obtain an HCP/ITP pursuant to an
enforceable timeline," and once again reading into the Complaint language that is not actually
there, suggest Plaintiffs improperly seek an order requiring the State to obtain an ITP. *See* MTD
at 26. This clause of the Prayer for Relief merely emphasizes that Defendants' ongoing and

The phrase "the activities that are violating the ESA's take prohibition" refers to the claim for relief, which does not discuss, e.g., "the mere ongoing existence of roads built in the past." *Contra* MTD at 20. Rather, Plaintiffs allege that the ongoing use and maintenance of certain roads is causing take and seek to enjoin such activities. The State appears to concede this relief is permissible. *Id.*

> c.   *Plaintiffs may rely upon past actions to establish liability and craft prospective relief.*

The State strains to reshape Plaintiffs' request for declaratory relief as "retrospective," and in so doing, misquotes the Complaint. *See* MTD at 19 (alleging that Plaintiffs seek declaratory relief for timber sales in the past that "caused" take). That is not what the Complaint says; not once is the term "caused" referenced in the claim or prayer for relief. Properly viewed, Plaintiffs are not referring to past actions to support a declaration that State officials "have violated federal law in the past." *Id.* Rather, Plaintiffs rely on facts relating to past activities as probative evidence of liability for ongoing and future activities. As explained, this easily crosses any hurdle of the Eleventh Amendment and motion to dismiss.

Indeed, the Ninth Circuit has held that evidence of past misconduct is admissible for proving section 9 liability, so long as the effects of past actions are reasonably certain to recur in the future. *See Nat'l Wildlife Fed'n*, 23 F.3d at 1511 ("Past takings are indeed instructive, especially if there is evidence that future takings are likely."); *Pac. Rivers Council*, 2002 U.S. Dist. LEXIS 28121, at *18 (the "Eleventh Amendment does not bar a district court from considering defendants' past conduct as it relates to ongoing or future violations") (citing *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309–10 (9th Cir. 1993)).

---

future activities that cause take are unpermitted. Ongoing and future take violates section 9 "unless and until" the proper permit—an ITP—is acquired or the State ceases the activities.

The State baselessly calls into question whether *Pacific Rivers* remains good law because it pre-dates the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See* MTD at 22. At issue in *Pacific Rivers* was not some far-fetched theory of liability, but "three discrete types of logging practices," 2002 U.S. Dist. LEXIS 28121, at *26, that the State Forester authorized that the plaintiffs alleged resulted in take of threatened salmon. *Id.* at *35. The State has not pointed to anything—legally or factually—about the allegations in *Pacific Rivers* that would not survive the *Twombly* test, and in fact, courts within this district have expressly cited *Pacific Rivers* as good law in the post-*Twombly* legal landscape. *See, e.g.*, *Cascadia Wildlands*, 911 F. Supp. 2d at 1087.[11]

Nor is it clear how the State's argument that a "sale by sale approach to litigating this case" provides a basis for dismissal. MTD at 20. Its argument appears to be that Plaintiffs have not sufficiently pled facts regarding the site-specific dimensions of individual timber sales.[12] At the pleading stage, Plaintiffs only need to state "enough facts to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 697. A claim is facially plausible when the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

---

[11] The State's reliance on *Envtl. Prot. Info. Ctr. v. Tuttle* ("*EPIC*"), No. C 00-713 SC, 2001 U.S. Dist. LEXIS 1154 (N.D. Cal. Jan. 22, 2001) is problematic. Not only was that case decided on summary judgment, distinguishing it from the instant proceedings, but unlike here, the plaintiffs in that case specifically sought relief for past approvals of timber sale activities. At summary judgment, the plaintiffs abandoned those claims. *Id.* at *9–11. *EPIC* simply does not stand for the proposition that a plaintiff—at the pleading stage—must identify each and every timber sale, and each feature of such sales, that lead to actual injury or death of coho in identified streams. If that were the standard, there would be no occasion for discovery, trial, and remedy briefing in a section 9 case. That, of course, is not the law.

[12] The State's *Twombly* argument is no basis for dismissal because, as the State appears to concede, Plaintiffs *could* plead additional facts to support their claim for relief. *See Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (if pleadings can be cured by allegations of additional facts, plaintiff should be allowed to amend).

As the State acknowledges, Plaintiffs have identified "particular past, present, and future potential sales." MTD at 21. These sales are representative examples of the State's ongoing and future activities, which Plaintiffs allege cause take of coho because they cause landslides, Compl. ¶ 126, are conducted in areas without sufficient riparian buffers, *id.* ¶ 127, and/or take place in areas that are hydrologically connected to coho-bearing streams. *Id.* ¶ 128. This is sufficient information to put the State on notice of its alleged liability; the State has cited no case law for the proposition that a plaintiff must *prove* its section 9 case at the pleading stage. *Twombly*, 550 U.S. at 548 ("Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of claim elements).

At bottom, the State's arguments conflate *evidence of liability* with *remedy*. *See Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) ("Although Plaintiffs' allegations are rooted in events that occurred in the past, the injunctive and declaratory relief that they seek would prevent future and ongoing illegality. The Eleventh Amendment poses no bar to Plaintiffs' claims for prospective relief."). Plaintiffs have properly framed their claim for relief to address and remedy ongoing and future take of coho salmon. The Eleventh Amendment does not bar this Court from considering past activities as evidence of ongoing future harm to listed species. Judge Brown rejected that argument in 2002, and this Court should reject that argument again in this case.

2.    The Motion to Dismiss on Mootness Grounds Should Be Denied.

In a related argument, the State asks this Court to dismiss any claim for relief stemming from 24 timber sales, identified in Table 1 of the Complaint, where logging operations allegedly have been completed. MTD at 23. The State misunderstands the purposes for which Table 1 is being used. The mootness arguments should be denied because Plaintiffs do not seek a "remedy"

for already completed timber sales. Rather, once again, the evidence of the State's past and
ongoing activities, which Plaintiffs allege have and continue to result in take—an allegation this
Court must accept as true at this stage of the proceedings—are relevant for establishing liability
and fashioning relief for future and ongoing take. The State's mootness argument—based on two
cases that did not involve ESA section 9—is little more than a red herring.

Table 1 of the Complaint lists "sixty-seven timber sales planned and sold on the
Tillamook and Clatsop State Forests that occur in areas at high risk of landslide or use haul
routes on hydrologically connected roads in close proximity to coho bearing streams." The State
requests to dismiss "any claim for relief stemming from" 24 of these timber sales, MTD at 23,
but does not specify which claim or claims to which its motion refers.

Plaintiffs have pled one claim for relief, and it cannot be dismissed on mootness grounds.
Plaintiffs' allege that the Foresters "regularly plan, approve, and sell timber sales that are
reasonably certain to cause take by killing, injuring, harassing, or harming coho salmon." Compl.
¶ 129. The timber sales listed in Table 1 are used to illustrate that the Foresters are "authorizing
logging, log-hauling, road construction, and/or road improvements on locations or slopes that are
prone to [or] at high risk of landslides on the Tillamook and Clatsop state forests where the
ensuring landslides reach coho salmon habitat, and/or on areas that are hydrologically connected
to coho-bearing streams. *Id.*; *see also id.* ¶ 103 ("These sales frequently involve clear-cutting on
erosion- or landscape-prone slopes in proximity to coho-bearing streams, and/or construction and
hauling of logs on roads that are, in many areas, 'hydrologically connected' ('HCR') to coho-
bearing streams, meaning that when it rains, surface water flows directly from the roads to
streams."); *id.* ¶ 105 ("Since 2015, Defendants have planned and sold 42 timber sales in areas
with the steep slopes that are at a high risk of landslides in the Tillamook and Clatsop state

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS          Page 26

forests."); *id.* ¶ 115 ("Since 2015, Defendants have planned and sold at least 67 timber sales on the Tillamook and Clatsop state forests that use haul routes on hydrologically connected roads.").

These allegations, and the evidence Plaintiffs will later develop to support them, are permissible in this section 9 case. Moreover, the timber sales are used to provide background and context for the State's "management scheme." *Id.* ¶ 80. Although relief in section 9 cases is forward-looking, courts regularly rely upon evidence from past activities to establish liability and fashion prospective relief. *See Nat'l Wildlife Fed'n*, 23 F.3d at 1511 ("Past takings are indeed instructive, especially if there is evidence that future takings are likely.").

For example, the District of Minnesota in *Holsten* ordered both declaratory and injunctive relief after reviewing evidence of reported past takings of Canada lynx. 541 F. Supp. 2d at 1081. The court relied, in part, on this evidence to establish that the plaintiffs had met their burden to demonstrate additional takes will occur in the future. *Id.* at 1080. In *Defenders of Wildlife v. Martin*, the Western District of Washington weighed evidence of past takings to help determine whether to enjoin future actions. 454 F. Supp. 2d 1085, 1098–99 (E.D. Wash. 2006). In granting an injunction, the court reviewed scientific evidence of caribou displacement from prior snowmobile use, and direct evidence of a specific instance of harassment. *Id.*

Likewise, in *Strahan*, the First Circuit found no error with respect the district court's injunction against the Commonwealth of Massachusetts. 127 F.3d at 164–67. The district court had found that entanglement with fishing gear caused injury or death to Northern right whales. In so finding, the court reviewed documentation of past entanglements over a 17-year period and affidavits from three scientists that entanglements had harmed, injured, or killed the whales. *Id.* After reviewing this evidence, the First Circuit concluded that the district court "properly applied

the ESA to the facts and presented and was correct in enjoining the Commonwealth so as to prevent the taking of Northern right whales in violation of the ESA." *Id.* at 165–66.

The State's efforts to piecemeal the litigation at this early stage are unsupported. The 67 listed sales are representative examples of the State's activities under its management scheme that Plaintiffs allege causes take of coho salmon. Plaintiffs may, after taking discovery and developing evidence, rely upon some or all the "completed" 24 timber sales, and potentially others, to establish liability. And Plaintiffs may rely upon some or all the ongoing and future 43 sales, and potentially others, in crafting a request for injunctive relief.

C.    DEFENDANTS HAVE NOT MET THEIR BURDEN TO STRIKE ALLEGATIONS.

1.    Allegations Regarding HCPs Are Material and Relevant.

Defendants move to strike nine paragraphs containing references to the ESA section 10 ITP/HCP process and requirements, stating that Plaintiffs "make clear that their overall goal in this case is to force the State to obtain HCP/ITP" and "section 9 does not require any person to obtain an HCP/ITP." MTD at 26. Defendants' characterization is at odds with the Complaint's language, which in fact defines Plaintiffs' "overall goal" (i.e., the requested remedy) as enjoining the State's unlawful conduct to protect coho salmon. *See* Compl., Prayer for Relief ¶ 2 ("Enjoin Defendants from engaging in the activities that are violating the ESA's take prohibition *until and unless* Defendants obtain an HCP/ITP pursuant to an enforceable timeline.") (emphasis added). Plaintiffs do not ask the Court to order State Defendants to prepare an HCP, but instead, request injunctive relief prohibiting take of coho salmon and ask that such relief remain in place "until and unless" the State prepares a valid HCP and receives a section 10 permit from NMFS (or, of course, it ceases all unlawful activities).

This claim for relief is entirely consistent with the statute, which prohibits the State from taking coho salmon without a section 10 permit. It is also well within the Court's broad equitable powers to fashion appropriate relief in the context of the statute before it. *See, e.g., Strahan*, 127 F.3d at 170 ("The ESA does not limit the injunctive power available in a citizen suit, and, thus, we understand the Act to grant a district court the full scope of traditional equitable powers."). Rather than forcing the State to obtain an ITP, Plaintiffs are merely acknowledging for the Court and the State that federal law allows for the State to cause take of Oregon coast coho if, and only if, the State obtains a permit and implements a Habitat Conservation Plan.

Plaintiffs agree with the State that, in the event the Court finds the Foresters liable under section 9, the choice will be left to the State whether to cease those actions causing take, or to comply with the terms of an HCP and ITP issued pursuant to section 10. The existence of this choice, however, does not come close to rendering the Complaint's descriptive references to HCPs and ESA section 10 as immaterial, or appropriate to strike under Rule 12(f). There is nothing in Plaintiffs' Complaint that forecloses that option for the State; rather, the Complaint highlights that choice and then crafts the request for injunctive relief to conform to federal law.

Defendants' arguments in support of striking allegations regarding "what might be required for an ITP" are equally flawed. MTD at 27. For example, the "conservation and recovery obligations a state would assume in an HCP in order to obtain an ITP" do not, as the State asserts, "go beyond those required by section 9." MTD at 29. Section 9 does not contain *requirements*, but rather establishes a *prohibition* on the take of listed species. 16 U.S.C. § 1538 (titled "Prohibited acts"). Defendants' objection to the mere mention of HCPs is perplexing, since Congress created the section 10 HCP process as an *exception* to section 9's otherwise strict prohibition on take. As stated by one commenter:

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS          Page 29

> Most courts view the take prohibition as a strict ban on an activity and are quite concerned about the severe consequences on a defendant of finding a take. However, habitat owners seeking to proceed with a harm-causing activity have an attractive option: apply for an incidental take permit. Section 9 serves as a gatekeeper for incidental take permits. Indeed, the piecemeal nature of habitat fragmentation means that some coordination in the geographic range of a listed species is needed for recovery. Incidental take permits can help promote this through both mitigation programs as well as multi-party plans.

Robert L. Fischman, The divides of environmental law and the problem of harm in the Endangered Species Act, 83 Ind. L.J. 661, 691 (Spring 2008).

The State also moves to strike HCP references involving past events. *See* MTD at 27–28 (the Foresters' past efforts to obtain ITPs are "not material and litigation over the facts and implications of the decades-old HCP development process would be a time-consuming distraction."). Providing historic context, however, is not only a permissible but an essential facet of pleading. *Adias Am., Inc. v. Ecco USA, Inc.*, No. 3:16-cv-684-SI, 2017 U.S. Dist. LEXIS 17558, at *8 (D. Or. Feb. 8, 2017) ("Here, [a previous agreement not directly at issue in the lawsuit] and the [complaint] allegations referring to it may provide background and historical context that contribute to a fuller understanding of the relationship between the parties and the [complaint] as a whole."). This will often include references to a defendant's past conduct. *See Comm. to Save Mokelumne River*, 13 F.3d at 309–310 (Eleventh Amendment does not bar a district court from considering defendants' past conduct as it relates to ongoing or future violations); *Martin*, 454 F. Supp. 2d at 1098 ("When considering the possibility of a violation, evidence of past takings is instructive to the Court, particularly if there is evidence that future similar takings are likely."). Defendants' motion to strike HCP references should be denied.

2.    Allegations Regarding Stream Buffers Are Material and Relevant.

Defendants seek to strike 18 paragraphs from the Complaint that contain references to stream buffers, calling such references "immaterial and impertinent" based on their assertion that "plaintiffs ultimately do not seek any relief with respect to stream buffers." MTD at 23.

A simple reading of the Complaint's plain language shows otherwise.

First, the Complaint plainly alleges that the Foresters' authorization of logging, log-hauling, and road construction and maintenance "cause landslides and debris flows, deliver harmful sediment pollution to coho-bearing streams, and limit the supply of large woody debris, which is a necessary component of coho habitat." Compl. ¶ 2. The Complaint also identifies how inadequate riparian buffers contribute to these harmful results and take of coho salmon, particularly by limiting large woody debris. *See*, *e.g.*, *id.* ¶ 122 ("Riparian buffers established by the State Forester and ODF do not adequately protect coho habitat from these causes of take on the Tillamook and Clatsop state forests. By eliminating logs along or above coho-bearing streams that would otherwise deliver woody debris, ODF is depriving coho of habitat, directly contributing to reduced fitness, survival, and reproduction of [coho]"); *id.* ¶ 127 ("Weak riparian buffers established by the Defendants eliminate logs along streams that would otherwise deliver woody debris, thereby reducing or eliminating complex streams and contributing to reduced fitness, survival, and reproduction of [coho]"; *id.* ¶ 100 ("With the adoption of the 2010 FMP, the State Forester and ODF did not resolve NMFS's concerns about . . . the lack of stream shade and large woody debris from inadequate and nonexistent riparian buffers.").

As inadequate riparian buffer protections are one link in a chain of proximate cause, the State's motion to strike references to those buffers is without merit. However, even if Plaintiffs were not seeking such relief, the Complaint's allegations regarding the relative lack of stream

buffer protections on the Tillamook and Clatsop State Forests are unquestionably relevant to plaintiffs' ESA section 9 claim, and the State's arguments fall far short of meeting the standard for granting a highly disfavored motion to strike. *See, e.g.*, *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CV 14-3053-MWF(VBKx), 2015 U.S. Dist. LEXIS 176869, at *11 (C.D. Cal. Feb. 12, 2015) (noting that "a court must deny the motion to strike if any doubt exists whether the allegations in the pleadings might be relevant to the action.").

　　　　　　　3.　　Allegations Regarding the Coho Salmon Recovery Plan Are Material and Relevant.

　　The State also moves to strike references in three paragraphs to the recently finalized Recovery Plan, positing that the plan provisions "are not an analysis of whether or not a particular activity causes 'take' within the meaning of section 9," and thus, the Complaint's references to the such provisions "are immaterial at best and should be stricken." MTD at 29. Here again, the State falls far short of the high bar Rule 12(f) establishes.

　　The ESA requires that NMFS develop and implement a recovery plan "for the conservation and survival" of the coho salmon. 16 U.S.C. § 1533(f). Under the ESA, the recovery plan serves as "a basic road map to recovery, i.e., the process that stops or reverses the decline of a species and neutralizes threats to its existence." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 103 (D.D.C. 1995). In accord with that statutory requirement, NMFS finalized its recovery plan for coho salmon in 2016. As detailed in Plaintiffs' Complaint, the plan includes several provisions that are directly relevant to Plaintiffs' section 9 claim, including a determination that the State's plans and rules are inadequate to conserve coho salmon; recognition of sedimentation and reduction of large woody debris as threats to coho habitat based on the best available scientific evidence; and a recommendation that ODF should submit a

Forestry HCP to protect and restore coho salmon.[13] Regardless of whether these plan provisions help directly establish a section 9 violation, they are in no way "immaterial" to this case, and the State's motion to strike should be denied. *In re Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762, 773 (N.D. Cal. 2010) ("[A]llegations which contribute to a full understanding of the complaint as a whole need not be stricken.").

> D.    THE COMPLAINT ADEQUATELY IDENTIFIES DEFENDANTS' CONDUCT ALLEGED TO CAUSE TAKE.

The State contends that the Court should direct Plaintiffs "to more definitively state which sale, or group of sales, they allege is reasonably certain to deliver sufficient sediment to a coho stream and actually kill or injure listed fish," and that it does not "know[ ] which sale or sales plaintiffs are talking about." MTD at 30. The specificity of the allegations in support of Plaintiffs' single ESA take claim far exceed that required to survive a Rule 12(e) motion, which "should not be granted unless a defendant literally cannot frame a responsive pleading." *Brooks*, 2016 U.S. Dist. LEXIS 26832, at * 6; *see also* FED. R. CIV. P. 8(a)(2) (a complaint need simply include a "short and plain statement of the claim showing that the pleader is entitled to relief").

Nevertheless, Plaintiffs identified 67 specific timber sales that, due to the presence of certain attributes—including their location, proximity to coho-bearing streams, and use of road segments that are hydrologically connected streams—are more likely than not to accelerate the delivery of sediments and reduce the delivery of large woody debris to coho bearing streams, and hence, to cause take of coho salmon. Compl. ¶¶ 115–122. These allegations comport with NMFS's identification of "logging" and "road construction in riparian areas" and on steep slopes

---

[13] The State's specific attack on paragraph 64, based on its objection that the HCP recommendation reference is applicable to a different stratum within the coastal Oregon coho salmon ESU, still does not come close to rendering that statement "immaterial."

as activities that will result in section 9 violations. 73 Fed. Reg. at 7830. At least 20 of these specific sales "have already been auctioned and work has begun." Boyd Decl. ¶ 3.

However, these 67 timber sales are examples of the kind of timber sales that cause take. These 67 sales are not the full universe of such sales—rather, they are examples of sales that, Plaintiffs will prove, entail logging and associated activities that are more likely than not to cause take. Courts have allowed similar claims to proceed. *Pac. Rivers Council*, 2002 U.S. Dist. LEXIS 28121, at *35 ("Plaintiffs allege the State Forester's approval is a prerequisite to certain logging operations, and the State Forester has repeatedly approved logging operations that result in take of threatened salmon. The Court concludes, therefore, that Plaintiffs' allegations are sufficient to state a claim against the State Forester for violation of the ESA."); *see also Strahan*, 127 F.3d at 163–166 (state officials violated ESA for issuing licenses that authorized practices shown to take Northern right whale); *Holsten*, 541 F. Supp. 2d at 1077–80 (state officials violated ESA by authorizing third parties to engage in trapping and snaring activities shown to take Canada lynx); *Loggerhead Turtle*, 148 F.3d at 1258 (finding that take resulting from state officials' regulation of beachfront artificial lighting was not covered by an ITP).

Finally, the State objects that Plaintiffs' Complaint provides inadequate detail regarding the presence of coho salmon in sale areas; the causal chain of take; and whether Plaintiffs are asserting that every sale authorized, regardless of compliance with state rules, results in harm to coho salmon. MTD at 30–31. None of these statements genuinely asserts that the Complaint is completely "unintelligible" as required to sustain a Rule 12(e) motion, but instead the State seeks through these statements to prematurely narrow or resolve factual or legal questions that are appropriately addressed at later stages of litigation. *Adias Am., Inc.*, 2017 U.S. Dist. LEXIS 17558, at *8 (rejecting motion for more definite statement while noting that "any potential

confusion can appropriately be addressed at summary judgment, in ruling on motions *in limine*, or in the jury instructions."); *Yufa v. Met One Instruments, Inc.*, No. 1:08-cv-3016-CL, 2012 U.S. Dist. LEXIS 186358, at *8 (D. Or. Dec. 20, 2012) ("Courts have noted that Rule 12(e) motions attack the intelligibility of the complaint, not the lack of detail, and are properly denied where the complaint notifies the defendant of the substance of the claims asserted."); *Fed. Sav. & Loan Ins. Corp. v. Musacchio*, 695 F. Supp. 1053, 1060 (N.D. Cal. 1988) ("The proper avenue for eliciting additional detail is discovery, not a Rule 12(e) motion.").[14]

In sum, the State has not carried its heavy burden to establish that the Court should dismiss or strike any portion of Plaintiffs' well-pled Complaint.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny the State's motion, consistent with other courts that have entertained similar arguments at the pleading stage in ESA section 9 litigation. In the event that the Court determines there is any defect in Plaintiffs' Complaint, Plaintiffs should receive 21 days to seek leave to amend their Complaint. *See supra* note 11.

DATED: October 5, 2018                     Respectfully submitted,

                                             */s/ Amy R. Atwood*
                                             Amy R. Atwood (OSB #060407)
                                             atwood@biologicaldiversity.org
                                             Tel: (971) 717-6401
                                             Brian P. Segee, admitted *pro hac vice*
                                             bsegee@biologicaldiversity.org
                                             Tel: (802) 750-8852
                                             P.O. Box 11374
                                             Portland, OR 97211
                                             CENTER FOR BIOLOGICAL DIVERSITY

---

[14] Plaintiffs affirm that they allege section 9 take of coho salmon independent of operator compliance with State forestry plans, rules, regulations, and policies.

Christopher G. Winter (OSB# 984355)
chris@crag.org
Tel: (503) 525-2725
Oliver J. H. Stiefel (OSB# 135436)
oliver@crag.org
Tel: (503) 227-2212
917 SW Oak Street, Suite 417
Portland, OR 97205
CRAG LAW CENTER

*Attorneys for Plaintiffs*


Nicholas Cady (OSB #113463)
nick@cascwild.org
Tel: (541) 434-1463
P.O. Box 10455
Eugene, OR 97440
CASCADIA WILDLANDS

*Attorney for Plaintiff Cascadia Wildlands*