AMY R. ATWOOD (OSB #060407)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
(971) 717-6401
atwood@biologicaldiversity.org


*Lead Attorney for Plaintiffs*


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION


| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL, | Case No: 18-CV-1035 (MO) |
| Plaintiffs, | PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE |
| v. | DEFENDANTS' MOTION TO STAY |
| DAUGHERTY, ET AL, | |
| Defendants, | |
| and | |
| OREGON FOREST INDUSTRIES COUNCIL, ET AL, | |
| Defendant-Intervenors. | |

## Table of Contents

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I. The history of ODF's HCP efforts provides a cautionary tale for accepting at face value State Defendants' estimated timelines moving forward............................................................. 2

    III. Plaintiffs steadily built this case at a pace commensurate with the enormous task of acquiring the resources and expertise to prosecute a Section 9 take case and in deference to ODF's initial representations about the HCP process. ................................................. 5

    III. State Defendants' estimated timeframe for the HCP federal review process is arbitrary and unrealistic. ................................................................................................................. 7

ARGUMENT ....................................................................................................................... 9

    I. Legal Standards ......................................................................................................... 9

    II. State Defendants have not carried their burden of showing that Plaintiffs would not be prejudiced by a stay of six months, or longer............................................................. 10

        A. Plaintiffs would be harmed by a stay of the litigation while logging operations continue unchecked. ................................................................................................................. 11

        B. Plaintiffs have no obligation to prove that this case would be resolved in the next six months; rather, it is State Defendants' burden to demonstrate that the result of a stay will contribute to and simplify the ultimate issues in this litigation....................................... 12

    III. Any hardship to state Defendants from the COVID-19 pandemic would be mitigated by a Motion to Suspend Discovery Deadlines; State Defendants cannot credibly claim "hardship" from their normal business activities. ......................................................... 16

        A. A six-month (or longer) stay is not commensurate with the need caused by the pandemic. ................................................................................................................. 16

        B. The normal press of business is not grounds for a stay.................................................. 18

    IV. The orderly course of justice will be served by denying the stay....................................... 20

    V. *Center for Biological Diversity v. Henson* is not on point.................................................. 23

    CONCLUSION.................................................................................................................... 26

Table of Authorities

16 U.S.C. § 1536 ............................................................................................................. 8

16 U.S.C. § 1539 ...................................................................................................... 2, 8, 9

16 U.S.C. §§ 470 ............................................................................................................. 8

16 U.S.C. §§ 1536, 1539(a) ........................................................................................... 8

40 C.F.R. § 1501.7 .......................................................................................................... 8

42 U.S.C. §§ 4321 .......................................................................................................... 7

50 C.F.R. § 223.203 ....................................................................................................... 4

73 Fed. Reg. 7816, 7830 (Feb. 11, 2008) ..................................................................... 4

75 *Fed. Reg.* at 29,500 (NMFS explaining that it has "yet to reach an agreement with Oregon Department of Forestry on completing a Habitat Conservation Plan for the Elliot State Forest Habitat Conservation Plan.") ......................................................................................... 25

*Am. Rivers, Inc. v. NOAA Fisheries*,
   No. CV-04-0061, 2004 U.S. Dist. LEXIS 18928 (D. Or. Sept. 14, 2004) ................. 21-22, 22

*Cal. Trout, Inc. v. U.S. BOR*,
   115 F. Supp. 3d 1102 (C.D. Cal 2015) ................................................................... 21

*Center for Biological Diversity v. Henson*, No. 08-946-TC, 2009 U.S. Dist. LEXIS 55709 (D. Or.) ....................................................................................................................... passim

*City of Las Vegas v. FAA*,
   570 F.3d 1109 (9th Cir. 2009) ................................................................................. 7

*Clinton v. Jones*,
   520 U.S. 681 (1997) ................................................................................................ 10

*CMAX, Inc. v. Hall*,
   300 F.2d 265 (9th Cir. 1962) ............................................................................... 9, 10

*Colo. River Water Conserv. Dist. v. United States*,
   424 U.S. 800 (1976) ................................................................................................ 10

*Conserv. Council for Haw. v. Nat'l Marine Fisheries Serv.*,
   97 F. Supp. 3d 1210 (D. Haw. 2015) ...................................................................... 21

Fed. R. Civ. P. 201 ......................................................................................................... 7

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ............................................................................................ 10, 16

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ................................................................... 9, 10, 12, 19

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*,
　No. 3:12-cv-00431-HA, 2013 U.S. Dist. LEXIS 201613 (D. Or. Aug. 8, 2013) ............ 15-16

*Nicholson v. REI Energy, L.L.C.*,
　370 F. Supp. 3d 1199 (D. Or. 2019) ............................................................................ 10, 23

*NRDC v. Norton*,
　No. 1:05-CV-01207 OWW LJO, 2006 U.S. Dist. LEXIS 94689 (E.D. Cal. Dec. 29, 2006)
　.................................................................................................................................... 11, 13, 14

*Sequoia Forestkeeper v. U.S. Forest Serv.*,
　CASE NO. CV F 07-1690 LJO DLB, 2008 U.S. Dist. LEXIS 40922 (E.D. Cal. May 21,
　2008) ................................................................................................................................ 22

*Sierra Club v. Dombeck*,
　161 F. Supp. 2d 1052 (D. Ariz. 2001) .................................................................................. 23

## INTRODUCTION

Plaintiffs, in their earlier filed *Motion to Suspend Discovery Deadlines* ("Mot. to Suspend"), ECF82, and herein propose a solution for moving this case forward consistent with principles of judicial economy and fairness. Plaintiffs acknowledge the difficulties created by the current COVID-19 pandemic and propose an approach for relieving the parties of near-term obligations while continuing to move this case forward. Plaintiffs' solution is commensurate with the need created by what State Defendants label as the "immediate trigger" for a suspension of current deadlines. Motion for Stay ("Stay Mot.") at 2, ECF77.

State Defendants, on the other hand, seek a six-month stay intended to extend into an indefinite one, tied to the process for completing a Habitat Conservation Plan ("HCP"). The relief sought by State Defendants is disproportionate to their stated need for an immediate stay. In reality, State Defendants are seeking an end-run around having to defend against this litigation; they effectively are seeking to dismiss this action without having secured any judicial imprimatur that they are the prevailing party or that this case is moot. Their request is premature at best.

Plaintiffs respectfully request that this Court grant their *Motion to Suspend Discovery Deadlines* and deny State Defendants' *Motion for Stay*. Plaintiffs' proposed approach would allow the parties to move this case forward without undue burden in the near-term. State Defendants' requested stay is a thinly veiled attempt to avoid having to defend against a Section 9 lawsuit while continuing unchanged—for at least several more years—the very activities at the root of this case: logging practices that are likely to cause take of Oregon Coast coho salmon.

## BACKGROUND

State Defendants invoke ODF's ongoing HCP planning process and Plaintiffs' actions in pursuing this litigation as foundation for their argument in support of a stay. Plaintiffs offer a more comprehensive overview of the factual and procedural background below to aid the Court's consideration of State Defendants' motion.

**I.    The history of ODF's HCP efforts provides a cautionary tale for accepting at face value State Defendants' estimated timelines moving forward.**

Since the Oregon Coast coho salmon was first protected as a "threatened" species under the Endangered Species Act ("ESA") in 1998, ODF has attempted but failed to produce a final, adequate Habitat Conservation Plan ("HCP") that would result in a decision by the National Marine Fisheries Service ("NMFS") to grant ODF an Incidental Take Permit ("ITP") pursuant to section 10 of the ESA, *i.e.*, the legal authority that the State Defendants require in order to lawfully authorize and conduct their forestry activities in the Tillamook and Clatsop State Forests. 16 U.S.C. § 1539(a)(2)(B).

This is not the first time ODF has pursued an HCP to protect coho salmon from logging practices in the State Forests. *See* First Declaration of Noah Greenwald (Apr. 17, 2020) (ECF 86). ODF's first HCP process lasted about 10 years, and never reached the stage of a draft HCP or draft EIS. *Id.* ¶ 14. This effort failed because ODF ultimately would not satisfy concerns raised by NMFS scientists about the lack of sufficient protections for coho salmon during development of the draft HCP, including by buffering the small, intermittent headwater streams in the farthest reaches—the inner gorges—of the Oregon Coast Range and other protections from the sedimentation of stream channels caused by ODF-authorized forestry activities. *Id.*

Acquiescing to the basic premise that coho salmon would require special management attention, ODF declared that it would simply issue a revision to the 2001 Forest Management

Plan ("FMP") that incorporated certain conservation measures to protect coho salmon. *See* Ex.

13 (2010 FMP (excerpts). This culminated in ODF's April 2010 release of the final, Board-

approved, revised FMP in 2010. *Id.*

  Thus, with the revised FMP, ODF adopted a "take-avoidance strategy" – *i.e.*, a strategy to

avoid take of endangered and threatened species that is known to result from forestry activities in

the State Forests. *Id.* As it pertained to Oregon Coast coho salmon, this included a "Salmon

Anchor Habitats" strategy – coho salmon strongholds where ODF would impose an across-the-

board limit of the total percentage of acres subject to clear-cutting. ODF's revised FMP included

a "Species of Concern" policy, certain "performance measures" adopted by ODF in 2010, and

standards for riparian buffers for perennial streams. *Id.*; Greenwald Decl. ¶ 14. It also included

new standards for riparian buffers along perennial streams. Ex. 13 (2010 FMP) at Appendix J.

Yet, within a few years of adopting this strategy, ODF rolled back or ceased implementing those

measures by 2014. Greenwald Decl. ¶ 14. For several years, ODF has continued to authorize

dozens of timber sales in the three districts each year, without a final HCP or ITP and even

without the minimal measures it committed to undertake in order to "avoid" take – indeed, all

take – of coho salmon in the revised FMP.

  After Plaintiffs first notified ODF in February 2014 of their intent to bring suit under the

citizen-suit provision of the ESA, ODF began to discuss the possibility of embarking on a new

effort to obtain an HCP, through another "alternative" FMP revision process. ODF explained this

process would take nine years under ODF's projected timeframe and culminate in an HCP—

which, according to the State Defendants' plans, would guide and allow incidental take of

endangered and threatened species, including the Oregon Coast coho salmon, resulting from the

department's forestry activities on all state forestlands west of the Cascades. Greenwald Decl. ¶ 20.

In November 2014, the Board of Forestry approved ODF's proposal and thus, ODF began the first phase of its three-phase process—*i.e.*, development of a "business-case analysis" (in essence, a cost-benefit analysis) of the merits of proceeding toward preparation of an HCP, to take the place of the previously-adopted "take-avoidance strategy." ECF86-11. That analysis culminated with a final analysis that was released in October 2018. *Id.* With the Board's support, ODF embarked on Phase 2, the phase during which it would develop "strategies" for an HCP for the entire western side of Oregon, including state forestlands and covering coho salmon as well as northern spotted owls, marbled murrelets, and other imperiled species. ODF is still in Phase 2 today, with its completion still a half-year away.

Thus, State Defendants anticipate that they will produce a draft HCP this fall and, in effect, have moved the Court to stay this case—initially, for six months, through October 2020, as they complete Phase 2 of their three-phase process and turn to commence Phase 3. If ODF does produce the draft HCP by this October, however, State Defendants will still lack legal authority to engage in activities that incidentally cause take of coho salmon. 50 C.F.R. § 223.203; 73 Fed. Reg. 7816, 7830 (Feb. 11, 2008) ("[a]ctivities that . . . could potentially 'harm' salmon" include logging, "road construction in riparian areas" and areas that are "susceptible to mass wasting and surface erosion," and the "removal of large woody debris and 'sinker logs' or riparian shade canopy"). Thus, Defendants admit that they intend to seek more delay after this initial six-month period expires, to extend the stay pending completion of a final HCP and procurement of an ITP. State Defendants acknowledge that they have no control over the pace at which Phase 3 of the HCP process moves forward, but they are "hopeful" that it will be

completed in 12-18 months. Stay Mot. at 10. As explained below, State Defendants' aspirational timeline is highly unrealistic and it is likely to be years before ODF obtains an ITP, if at all. *See infra* Sec. III.

Meanwhile, it has become abundantly clear during the discovery process that State Defendants' logging activities will continue to cause take of coho salmon. Even if the draft HCP is in fact completed in October, State Defendants will nonetheless continue the status quo of their logging activities—without implementing the conservation measures identified by NMFS biologists in 2008—unless and until the HCP is finalized and an ITP is issued. Greenwald Decl.

## II.    Plaintiffs steadily built this case at a pace commensurate with the enormous task of acquiring the resources and expertise to prosecute a Section 9 take case and in deference to ODF's initial representations about the HCP process.

Plaintiffs are conservation organizations who advocate for conservation of Oregon's native fish and aquatic species. *See* Amd. Cmpl. ¶¶11-13, ECF61. As such, Plaintiffs have long been aware of the threats to native coho salmon from harm to their freshwater spawning and rearing habitats.

The Center for Biological Diversity's Portland-based staff member, Noah Greenwald, first became concerned with the management of Oregon's coastal state forestlands while surveying for northern spotted owls in the northwestern Coast Range as a seasonal field biologist for the U.S. Forest Service in the early 1990s. Greenwald Decl. ¶ 3. By the time he became director of the Center's endangered species program, Mr. Greenwald had developed a thorough understanding of issues surrounding coho salmon by attending meetings and obtaining documents through the Freedom of Information Act. *Id*. Mr. Greenwald tracked developments leading to ODF's abandonment of the HCP process in 2008-2010, the department's decision to issue a revised version of the 2001 FMP with take-avoidance strategies in lieu of an ITP, which

occurred in April 2010, and ODF's subsequent rollbacks of those strategies starting in 2011. *Id.* ¶ 14, 15.

Meanwhile, Mr. Greenwald began procuring the funding and other resources, partner organizations, attorneys, and expert witnesses necessary to adequately (yet efficiently) prosecute the State Defendants' ongoing violations of the ESA's take prohibition without an HCP and ITP. *Id.* ¶ 4. After years of laying the groundwork for an ESA Section 9 lawsuit, the Center sent ODF a Notice of Intent to Sue ("NOI") in February 2014. *Id.* ¶ 16. Litigation was stalled, however, because ODF began making representations that it was moving forward with a process to develop and HCP while pursuing protections for the species in the interim. *Id.*

At a meeting between the parties that took place at ODF's Salem Headquarters after the department's receipt of Plaintiffs' February 2014 NOI, ODF told Plaintiffs it was preparing to embark on a new HCP planning process. *Id.* ODF represented that in the interim, the department would be assembling a group of stakeholders to help the agency identify ways to better protect coho salmon. *Id.*

Several years later, when the new HCP planning process was appearing to slow down, and the stakeholder process failed to produce any results, Plaintiffs supplemented their 2014 notice of intent to sue under the ESA in April 2017 and April 2018. *Id.* ¶ 17. Through the NOIs, Plaintiffs put State Defendants on notice that its operations were causing unlawful take of coho salmon. Despite the repeated attempts to spur State Defendants into compliance with the ESA without having to resort to resource-intensive litigation, ODF has continued to plan and auction timber sales in coho habitat at the same pace. *Id.* ¶¶ 13-27. Though ODF has made continued overtures about the long-term HCP process, it has refused to consider any suspension or modification of any timber sales within coho salmon habitat in the interim. *Id.* ¶¶ 16, 21.

Plaintiffs filed this case less two years ago in June 2018, and since the Court denied most of the State Defendants' *Motion to Dismiss* in January 2019, the parties have engaged in a robust discovery process. That process is slated to wrap up, under the schedule currently in place as negotiated between the parties, in late August 2020.

### III.    State Defendants' estimated timeframe for the HCP federal review process is arbitrary and unrealistic.

State Defendants report that ODF is "hopeful" that the federal NEPA review process for the HCP can be completed in 12-18 months. Stay Mot. at 10. This projected timeframe is arbitrary and entirely unsupported. Plaintiffs herein provide additional background the process for completing an HCP and securing an ITP—a process that, using a conservative estimate, takes over three years.

If ODF completes its draft HCP by October 2020, *and* the Board of Forestry approves the draft and directs ODF to proceed to planning "Phase 3" (both of which are speculative at this time), the draft HCP will be submitted to the federal agencies, National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service ("FWS") (collectively, the "Services") for review. According to the Services' Habitat Conservation Planning and Incidental Take Permit Processing Handbook ("HCP Handbook"), "[d]uring phase 3, the Services begin the HCP review and permit decision process."[1] This includes review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and attendant public comment periods.

---

[1] The HCP Handbook is available at: "https://www.fws.gov/endangered/what-we-do/hcp_handbook-chapters.html"https://www.fws.gov/endangered/what-we-do/hcp_handbook-chapters.html. It is judicially noticeable under Fed. R. Civ. P. 201(b) because it is a federal agency record and matter of public record. *See City of Las Vegas v. FAA*, 570 F.3d 1109 (9th Cir. 2009).

The NEPA process begins with scoping, 40 C.F.R. § 1501.7, with a public comment period of 30 days. HCP Handbook at 13-9. The Service will then begin preparation of a draft Environmental Impact Statement ("EIS"), a process that culminates with a notice of availability of the proposed HCP and draft EIS published in the Federal Register. *See id.* For a large-scale, multi-species HCPs that are exceptionally complex and precedent-setting—like the one proposed by ODF, which is the first of its kind in Oregon—the Services recommend a 90-day comment period for the draft EIS. *Id.* at 14-14. The final EIS and Record of Decision are subject to another public review period of 30 days. *Id.* at 13-9.

While State Defendants focus exclusively on the "NEPA process," there are many other review and compliance documents that must be prepared by the Services, including a Cultural Resources Report pursuant to the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.*, as well as ESA-related reviews. Under the ESA, the Services must undergo "consultation" pursuant to Section 7, 16 U.S.C. § 1536, and prepare Biological Opinions ("BiOps") in accordance with the best scientific and commercial data available. *Id.* §§ 1536(a)-(d), 1539(a). Here, separate BiOps will need to be prepared by NFMS for anadromous salmonids and by FWS for terrestrial species. Before issuing an ITP, the Services also must prepare a set of findings pursuant to Section 10, 16 U.S.C. § 1539, that, *inter alia*, the applicant for the ITP will minimize and mitigate the impacts of the proposed taking "to the maximum extent practicable."

The length of Phase 3 depends on the level of required environmental compliance (i.e., NEPA categorical exclusion, environmental assessment, or environmental impact statement) and the time required to resolve any remaining issues with the HCP. HCP Handbook 2-2. Although State Defendants do not mention it, there can be no doubt that ODF's HCP will be reviewed in an EIS, given its scope and complexity. The Services in the HCP Handbook provide a

hypothetical timeline for the HCP process, which represents an "idealized timeframe" that assumes "every step proceeds perfectly." *Id.* For an EIS, the Services estimate that the federal process, beginning with the "NEPA Draft" and ending with the "Final Decision Package," takes 42 months or 3.5 years. *See* id. 2-11 (with the NEPA Draft for an EIS beginning in month six and the Final Decision Package ending in month 48).

ODF's estimate of a "12-18 month" federal review process is thus dangerously unrealistic. It cuts the Services' "idealized timeframe" by more than half. And it fails to recognize that the length of time to complete Phase 3 also turns on "the time required to resolve any remaining issues with the HCP." HCP Handbook at 2-2. As discussed, ODF and NMFS have disagreed about the required scope of protections for coho salmon for the past 10-20 years. *See* Greenwald Decl. ¶¶ 7-13. There is simply no basis to assume that the disagreement between ODF and NMFS will be magically resolved over a short timeframe. Accordingly, if Phase 3 of the HCP process begins in October 2020, a final package with an ITP should not be expected until April 2023, if ever. In the interim, ODF will continue planning and auctioning timber sales in coho salmon habitat without any lawful authority to cause take.

## ARGUMENT

### I.      Legal Standards

Defendants must carry their burden to prove that a stay is warranted. A district court has "inherent power to control the disposition of causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). This includes the discretionary power to stay proceedings. *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936))). To warrant

a stay, however, a movant "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which [it] prays will work damage to someone else." *Id.* at 1109–10. This is because federal courts have "a virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817–18 (1976). Accordingly, "the burden of making out the justice and wisdom of a departure from the beaten track [lies] heavily on the [moving party]." *Landis v. N. Am. Co.*, 299 U.S. 248, 248 (1936); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The proponent of a stay bears the burden of establishing its need.").

In evaluating a motion for stay, courts weigh the competing interests at stake, including "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of which could be expected from a stay." *CMAX, Inc.*, 300 F.2d at 268. Other factors courts consider include whether the resolution of independent proceedings which bear on the case "will be concluded within a reasonable time in relation to the urgency of the claims, and the nature of the relief sought." *Nicholson v. REI Energy, L.L.C.*, 370 F. Supp. 3d 1199, 1207 (D. Or. 2019) (citations omitted).

## II.     State Defendants have not carried their burden of showing that Plaintiffs would not be prejudiced by a stay of six months or longer.

A six-month stay (with the intention to extend indefinitely) would prejudice Plaintiffs' interests in the timely resolution of their claims and in obtaining essential declarations of law as to whether State Defendants' activities cause take of coho salmon and corresponding injunctive relief. State Defendants callously assert that the potential for prejudice to Plaintiffs is low, Stay Mot. at 6, but fail to address the overarching issue in this case for which Plaintiffs' seek redress:

Take of coho salmon caused by State Defendants' ongoing and future logging activities. Moreover, State Defendants' argument that a stay should issue because this case will not be fully resolved in the next six months is impossible to reconcile with the overarching relief they seek: A long-term stay tied to the completion of the HCP process.

### A. Plaintiffs would be harmed by a stay of the litigation while logging operations continue unchecked.

Conspicuously absent from State Defendants' recitation of ODF's current and upcoming docket, *See* Stay Mot. at 8–10 (role in the State's COVID-19 response, preparation for wildfire season, work on the draft HCP), is any mention of ODF's ongoing work to plan, authorize, and implement timber sales on the State Forests—the very root of this lawsuit.

A brief survey of ODF's "Schedule Books," which indicate the monthly timber sale schedule, shows that the department's work to prepare and advertise timber sales continues apace. According to the March 2020 Schedule Book, the following sales were scheduled for auction in the Tillamook and Clatsop State Forests: Lost Mountain, The Big Noisy, Hindsight, and Prime Stein. See Greenwald Decl. ¶ 21; Ex. 09 (MAR. 2020 SCHEDULE BOOK) According to the April 2020 Schedule Book, the "Fertile Gnat" sale was scheduled for auction on April 14, 2020. Greenwald Decl. ¶ 21, Ex. 10 (Apr. 2020 Schedule Book). "Hindsight" is one of the sales identified by Plaintiffs as having characteristics likely to cause take of coho salmon. Greenwald Decl. ¶ 21.

State Defendants seek to "have it both ways" "by being permitted to continue to operate," while "maintaining that all litigation" regarding its operations should cease. *NRDC v. Norton*, No. 1:05-CV-01207 OWW LJO, 2006 U.S. Dist. LEXIS 94689, at *12 (E.D. Cal. Dec. 29, 2006) (rejecting this argument). Given State Defendants' continuing operations, there is a "fair

possibility" of prejudice to Plaintiffs if this lawsuit does not move forward. *Lockyer*, 398 F.3d at 1109–10.

**B. Plaintiffs have no obligation to prove that this case would be resolved in the next six months; rather, it is State Defendants' burden to demonstrate that the result of a stay will contribute to and simplify the ultimate issues in this litigation.**

State Defendants further seek to minimize any prejudice to Plaintiffs by oscillating between arguments tied to a six-month stay and ones tied to State Defendants' true objective, an indefinite stay. First, State Defendants erroneously suggest that Plaintiffs' singular "goal" in this litigation is to see ODF submit an HCP and obtain and ITP. Stay Mot. at 6. Here, State Defendants' true objective for a long-term stay becomes obvious. As the argument goes, because any work to defend this litigation detracts from the ability to work on the HCP, ODF should be able to work on its HCP unimpeded. *Id.* at 7. The problem with this argument is that Plaintiffs' litigation objectives are broader than State Defendants' reductionist characterization.

Plaintiffs seek declaratory relief that State Defendants are violating the ESA by authorizing logging activities on landslide-prone slopes, areas that are hydrologically connected to coho salmon-bearing streams, and riparian areas above or adjacent to coho salmon-bearing streams, and injunctive relief preventing State Defendants from engaging in such activities until and unless Defendants obtain an HCP/ITP "or otherwise cease the activities resulting in take." Amd. Complaint at 40, "Prayer for Relief," ECF61. If Plaintiffs' objectives in this litigation could be reduced to a singular "goal," it would be the cessation of logging activities that are causing unlawful take of coho salmon. As discussed above, State Defendants are multiple years away from obtaining an ITP, if at all. *See supra* Background, Sec. III. Meanwhile, with history as a guide, State Defendants will plan and auction off about three dozen timber sales within the Tillamook and Clatsop State Forests each year. Amd. Complaint ¶ 81. State Defendants cannot credibly assert that a multiple-year stay, while ODF continues carrying out the very activities

that Plaintiffs allege, are causing take of coho salmon certainly does not carry even a "fair possibility" of prejudice to Plaintiffs.

State Defendants mistakenly try to analogize this case to *Center for Biological Diversity v. Henson*, No. 08-946-TC, 2009 U.S. Dist. LEXIS 55709 (D. Or. June 30, 2009), where the court granted a stay to allow for the completion of reinitiated consultation and completion of a new biological opinion ("BiOp"). As discussed in more detail below, there are far more differences than similarities between the instant case and *Henson*, but a key distinction is that the likelihood for harm to the plaintiffs during the pendency of the stay in *Henson* was low because there were no planned timber sales in the operative area. *Id.* at *6.

More closely on point is *NRDC v. Norton*, where the plaintiffs opposed a stay sought by federal agencies while they conducted a multiple-year re-consultation over a series of BiOps that plaintiffs had challenged. *No. 1:05-CV-01207 OWW LJO*, 2006 U.S. Dist. LEXIS 94689, at *42-49 (E.D. Cal. Dec. 29, 2006). According to the plaintiffs, a stay would harm their interests because it would "permit the defendants to implement the challenged BiOps without observing the requirements of the ESA," allowing certain activities to continue that would likely result in harm to the species. *Id.* The court agreed with the plaintiffs, holding that they "are entitled to have their complaint decided on the merits, particularly given the fact that Defendants continue to rely on the challenged BiOps as if they were lawfully enacted." *Id.* at *49. A similar result is warranted here, where State Defendants are poised to continue carrying out, indefinitely, the very activities that Plaintiffs allege are violating the ESA.[2]

---

[2] It would be a different story if State Defendants agreed to certain interim measures to guide ongoing and future logging activities during a stay. During conferral over this motion, Plaintiffs raised such a possibility and provided State Defendants with a set of terms and conditions that would allay concerns over harm to coho salmon before ODF secures an ITP. State Defendants have not responded to Plaintiffs' proposal.

Second, State Defendants switch back to a six-month stay to argue that Plaintiffs cannot seek "rapid resolution" of this case in light of alleged "delays" in initiating and prosecuting this case. Stay Mot. at 7. They further claim that the likelihood for "significant progress" in the litigation in the next six months is low. *Id.* It is unclear why Plaintiffs would need to show cause for "rapid resolution" of this case to prevent a stay. Plaintiffs have prosecuted this case at a steady pace. The case was filed in 2018, with the operative pleading (ECF61) filed less than a year ago following the resolution of State Defendants' Motion to Dismiss. During that time, the case has progressed substantially through a complex discovery process which has included multiple rounds of written discovery, production of tens of thousands of pages of documents, and preparation of expert reports. Under the current schedule, the discovery process is coming to a close and Plaintiffs are poised to move the case into the next phase--summary judgment--within the next six months.

It is also far from clear why this case would need to reach "trial and judgment" within the next six months, Stay Mot. at 8, while ODF works on its draft HCP. The key metric is when ODF will secure an ITP, and therefore come into compliance with the ESA. Tellingly, State Defendants do not suggest that reaching trial and judgment before they secure an ITP is unlikely. As discussed in detail above, ESA compliance is years away, if at all.

Indeed, Phase 3 can be the most intensive of the HCP development process. According to NMFS's 2016 HCP Handbook, it is during Phase 3 that the public is first afforded an opportunity to provide comment on the proposed HCP, and it is during Phase 3 that "fatal flaws" can result in a decision not to issue an ITP, as nearly occurred with the HCP planning process for the State Forests that ended by 2010. It is also during Phase 3 that NMFS undertakes the NEPA

analysis and engages in Section 7 consultation, culminating with the preparation of a biological opinion.

Under a hypothetical, "idealized timeframe," completion of Phase 3 can take up to about 3 and a half years. HCP Handbook at 2-10 – 2-11. ODF's "hopeful" timeframe (12-18 months), Stay Mot. at 10, has NMFS completing scoping, draft EIS, and final EIS and final BiOp in less than two years, and that assumes NFMS and ODF stay on track with the timeline they are currently working under and actually embark on Phase 3 in late 2020.

The goal of completing a draft HCP by October is aspirational and, if past is prologue, unrealistic. Regardless, ODF is still at least two (by its own optimistic estimate), and more likely at least three years or more away from obtaining a final HCP, final EIS, final BiOp, and an independent permitting decision from NMFS.[3] Holding up this case to cater to ODF's aspirational and long-term process for securing ESA compliance, while logging activities continue according to a take-avoidance strategy that clearly is not being implemented, would prejudice Plaintiffs. *Cf. Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, No. 3:12-cv-00431-HA, 2013 U.S. Dist. LEXIS 201613 (D. Or. Aug. 8, 2013) (declining to issue stay where federal and state agencies' stay request was tied to a proffered timeline for creating a new plan, and such timeline likely was unrealistic and thus an "indeterminate delay has the potential to cause plaintiffs substantial harm").

///

///

---

[3] Again, this assumes that NMFS will approve ODF's HCP and issue an ITP to authorize ODF's ongoing logging practices. If history is any guide, it is speculative at best to assume that NMFS will deem ODF's draft HCP adequate to protect coho salmon and proceed to issuing an ITP. *See supra* Background, Sec. I.

PLAINTIFFS' RESPONSE IN OPPOSITION
TO STATE DEFENDANTS' MOTION TO STAY                    Page 15

III.    **Any hardship to state Defendants from the COVID-19 pandemic would be mitigated by a Motion to Suspend Discovery Deadlines; State Defendants cannot credibly claim "hardship" from their normal business activities.**

Because there is a "fair possibility" of prejudice to Plaintiffs, State Defendants "must make out a clear case of hardship or inequity." *Landis*, 299 U.S. at 255. State Defendants' "immediate trigger" for a stay is the hardship caused by the COVID-19 pandemic, but a six-month stay (and beyond) is disproportionate to any hardship created by the pandemic. Plaintiffs' *Motion to Suspend Discovery Deadlines* is a more narrowly tailored solution for addressing the immediate need. State Defendants' other claims of hardship amount to little more than a desire to avoid having to defend against this lawsuit while ODF conducts its normal business operations.

A.    **A six-month (or longer) stay is not commensurate with the need caused by the pandemic.**

As noted, the "immediate trigger" for State Defendants' requested stay is the COVID-19 pandemic and the resulting impacts on ODF's operations, specifically, adjusting to the practicalities of operating under the Governor's stay-at-home order and ODF's role in the State's emergency response. Stay Mot. at 2. Other than linking their requested stay to the anticipated completion of the draft HCP, State Defendants have not provided any explanation for why a *six-month* stay of all proceedings is warranted in light of the COVID-19 pandemic. Given the rapidly changing circumstances around the pandemic nationally as well as locally, and the measures and recommendations being implemented to respond to the public health crisis, a six-month stay is both premature and disproportionate to the current situation. Impacts on State Defendants' ability to defend this litigation as a result of the pandemic can be adequately addressed through a more narrowly tailored stay of discovery deadlines, as proposed by Plaintiffs. *See* ECF82.

Governor Brown issued her "Stay Home, Save Lives" Executive Order 20-12 on March 23, 2020, less than one month ago. While the Governor's Order will remain in effect until it is

terminated and thus has no foreseeable end date, State Defendants do not provide any support for a stay that assumes the pandemic—and related response measures—will continue at the current level for another six months. It is well understood that one of the primary purposes for such restrictive measures is to put an end to the pandemic as quickly as possible so that our society and economy may resume operating. State Defendants' requested six-month stay is disproportionate to the need created by the COVID-19 pandemic as it is currently understood.

Additionally, Chief Judge Hernández has issued several standing orders to address court operations and case proceedings during the pandemic. While the standing orders implement continuances for many civil and criminal proceedings in the District of Oregon, Judge Hernández has not specifically restricted or limited proceedings in civil matters that do not require in-court appearances or jury trials, such as this case. *See* Standing Order 2020-04. For those matters that have been continued (*i.e.,* set out to a later date), Judge Hernández's most recent Standing Order 2020-09 extends only to those proceedings that were scheduled to take place prior to June 1, 2020. State Defendants' requested six-month stay extends five months beyond June 1, 2020.

State Defendants' requested stay is overly broad to address the "immediate trigger" of the COVID-19 pandemic. It is too soon for the parties or this Court to determine whether the impacts of the pandemic on State Defendants' day-to-day operations will be ongoing for six months, or longer. Plaintiffs' proposal to suspend the discovery deadlines for 90 days is more in line with the immediate impacts of the pandemic and provides a more measured approach to address State Defendants' near-term concerns while allowing this litigation to proceed to the extent possible during the current public health crisis.

According to State Defendants, ODF employees who are involved in the defense of this litigation are necessary to the department's COVID-19 duties. Dent Decl. (ECF 78) ¶ 3(b). In

addition to disruptions caused by ODF staff's transition to working from home, State Defendants assert that the department's additional obligations related to COVID-19 have had a significant impact on ODF's capacity to effectively respond to this litigation. Dent Decl. ¶¶ 2, 3. Concerning ODF's obligations in responding to this litigation, State Defendants state,

> ODF staff have invested and continue to invest substantial efforts in assisting in responses to written and document discovery, preparing expert reports, reviewing discovery from plaintiffs, reviewing expert reports, and assisting in the preparation of rebuttal expert reports and other work product to aid the trial preparation effort.

Dent Dec. ¶ 6.

Plaintiffs' alternative proposal to suspend all discovery deadlines for 90 days adequately addresses State Defendants' immediate concerns regarding the impacts of the pandemic. As stated in Plaintiffs' *Motion to Suspend Discovery Deadlines*, the parties are engaged in ongoing conferral on various discovery disputes, which are largely confined to issues regarding the scope of discovery and the parties' obligations under the Federal Rules. Mot. to Suspend at 4. These disputes can be addressed primarily, if not entirely, by the parties' counsel. State Defendants have not made any representation that Oregon Department of Justice ("DOJ") counsel or support staff are unable to continue to carry out their duties related to defending this litigation during the pandemic. Indeed, State Defendants' recently filed *Motion to Strike* (ECF75) demonstrates DOJ's capacity to continue to dedicate staff time and resources to resolving the ongoing discovery disputes in this case.

**B. The normal press of business is not grounds for a stay.**

State Defendants' do not try to disguise their true objective in seeking a stay: Dismissal from any obligation to defend against this lawsuit. Outside of the hardship created by the COVID-19 pandemic, however, State Defendants' claims of hardship are simply tied to their obligations in litigating this matter. "[B]eing required to defend a suit, without more, does not

constitute a clear case of hardship or inequity." *Lockyer*, 398 F.3d at 1112. State Defendants' two non-COVID-19 grounds for a stay are related to their normal business activities. And the argument that ODF lacks sufficient resources to defend against this lawsuit rings particularly hollow where the department is continuing to plan and auction timber sales in coho salmon habitat—the very activities that Plaintiffs are seeking to prevent.

For one, granting a stay based on an open-ended "wildfire season" would give ODF an almost impenetrable shield. If State Defendants got their way, ODF would be immune from suit each spring, summer, and early fall. To the extent that preparation for the wildfire season will require more time than usual this season in light of the COVID-19 pandemic, a three-month suspension of discovery deadlines will help mitigate the burden. But beyond any impact created by COVID-19, the commitment of resources to the fire season cannot be seen as a "hardship" on ODF—it is part of the department's normal course of business. *See* Stay Mot. at 2 ("Each spring ODF plans for the variable and unpredictable needs of forest fire response."). If ODF believes it does not have sufficient resources to devote to the fire season, that is an issue reserved for the Oregon legislature, it is not a "hardship" worthy of a stay of litigation. In any event, it is difficult to reconcile State Defendants' position that it does not have sufficient resources to commit to litigation with the fact that ODF is continuing full speed ahead in its appeal of *County of Linn v. State of Oregon and State Forestry Department*, Linn County Case No. 16CV07708, Court of Appeals Case No. A173658. *See* Greenwald Decl. ¶¶ 21-27.

Moreover, that ODF also is working towards an HCP, to bring its ongoing operations into compliance with the ESA, cannot be construed as a "hardship." Implicit in State Defendants' argument that ODF should be unencumbered in its progress in completing a draft HCP is that the draft HCP will pave the way for completion of a final HCP and issuance of an ITP, thereby

mooting this case. State Defendants' hope that Plaintiffs' claims will become moot, at some uncertain point in the future, does not support a stay, but rather, timely resolution of those claims.

State Defendants mischaracterize *Center for Biological Diversity v. Henson*, No. 08-946-TC, 2009 U.S. Dist. LEXIS 55709 (D. Or. June 30, 2009) and the instant case's similarities to it in arguing that the mere "potential to delay an ongoing HCP process has been recognized as a compelling reason for a stay." Stay Mot. at 10. As discussed in more detail below, *Henson* involved an inapposite situation where the federal agency represented to the court that it was six months away from the final HCP package. Importantly, the court found that "the result of a stay of this action will likely moot and/or simplify most, if not all of this action." *Henson*, 2009 U.S. Dist. LEXIS 55709, at *11. Here, in contrast, the result of a six-month stay would, at best, be the completion of a *draft* document and the commencement of the multi-year Phase 3. Accordingly, the result of a stay here simply would be a windfall for State Defendants to continue planning and auctioning timber sales without having to defend against claims that such actions are violating the ESA, with no prospect for mootness in the foreseeable future.

IV.     **The orderly course of justice will be served by denying the stay.**

State Defendants assert that a stay to allow the HCP process to play out "has the potential to vastly simplify" the issues in this case. Stay Mot. at 11. In making this assertion, State Defendants' appear to be relying on an assumption that the Court will grant an indefinite stay of this litigation until the HCP process is completed and an ITP is obtained. See id. ("if the Services approve Oregon's HCP for the forests at issue in this case, they will issue an ITP and this case will be moot."). As discussed above, this process for the Services to issue an ITP will take several years, at best. *See supra* Background, Sec. III. State Defendants do not explain how

judicial economy would be served by letting this case sit idle on the docket for an indeterminate number of years after the parties and the Court have already invested substantial time and resources towards a resolution to this litigation.

Turning to the proposed six-month stay, which is the only request that is properly presented in State Defendants' motion, State Defendants' argument again assumes too much. State Defendants claim, by staying this case for six months, the Court will avoid having to resolve numerous stages of this litigation including discovery disputes, motions for summary judgment, and trial. Stay Mot. at 11. This argument inexplicably assumes that ODF's completion of a draft HCP will somehow resolve Plaintiffs' claims. State Defendants are effectively asking the Court to put the brakes on this litigation so they can free up the staff and resources needed to moot Plaintiffs' claims at some undetermined date.

As a general matter, this Court is under no obligation to grant a stay based on "anticipatory mootness." *Conserv. Council for Haw. v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1231 (D. Haw. 2015) (declining agency's request for a stay during reinitiation of consultation on grounds that a "court is not required to dismiss or stay a live controversy simply because it may become moot in the future"); *Cal. Trout, Inc. v. U.S. BOR*, 115 F. Supp. 3d 1102, 1117 (C.D. Cal 2015) (declining request for stay pending the completion of Section 7 consultation); *Am. Rivers, Inc. v. NOAA Fisheries*, No. CV-04-0061, 2004 U.S. Dist. LEXIS 18928, at *13-16 (D. Or. Sept. 14, 2004) (declining to stay the action on grounds of economy and fairness, despite reinitiated consultation). More specifically, because the potential for State Defendants to come into compliance with the ESA is still years away (if at all), staying this case at the present juncture would be gravely premature. *Contra Sequoia Forestkeeper v. U.S. Forest Serv.*, CASE NO. CV F 07-1690 LJO DLB, 2008 U.S. Dist. LEXIS 40922, at *16 (E.D. Cal.

May 21, 2008) (staying the proceedings for a time of "reasonable length," because release of final revised environmental assessment was likely to occur within a month).

Even if ODF is able to complete the draft HCP within the next six months, State Defendants do not explain how the existence of a *draft* HCP will result in ODF achieving compliance with the ESA—the relief that Plaintiffs seek. *Accord Am. Rivers*, 2004 U.S. Dist. LEXIS 18928, at *14 (denying stay after finding defendant "offered the court no guidance to suggest the new biological opinion will substantially alter the approach NOAA Fisheries has taken in the current or previous biological opinions or fundamentally change the scope of BOR's Operations"). In reality, at the end of the requested six-month stay, the status of Plaintiffs' claims—and the issues that remain to be resolved—will be largely, if not entirely, unchanged. The parties and this Court will have avoided nothing and Plaintiffs will have been substantially prejudiced in the process.

Plaintiffs have invested significant resources in pursuing this litigation. The parties have completed a large amount of fact discovery and retained and prepared expert witnesses, and had begun preparing for depositions prior to the filing of State Defendants' motion. Moreover, the Court has already resolved a dispositive motion and has thus become familiar with the issues and the nature of Plaintiffs' claims. Granting State Defendants' requested stay would disrupt the significant progress already made in this case and will merely defer to a later date the proceedings necessary to bring this case to completion. Greenwald Decl. ¶¶ 5, 22, 28.  Such a stay will not conserve judicial resources or support the orderly course of justice. *Accord Nicholson*, 370 F. Supp. 3d at 1207 (denying stay in case that had been pending for just over one year, finding "further delay will not promote the orderly course of justice").

Judicial efficiency in this case is best served under Plaintiffs' measured proposal to relieve the parties of their discovery obligations on account of the COVID-19 pandemic while still moving forward toward resolution of Plaintiffs' claims. This is particularly true where ODF's HCP process, which will continue for at least the next several years, would benefit from additional clarity regarding the agency's obligations under the ESA. *Accord Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1062 (D. Ariz. 2001) (finding "judicial economy" would be served by issuing opinion and "allowing the parties to take the Court's opinion into consideration while undertaking further analysis"). Indeed, State Defendants' position in this litigation is that their current logging activities are fully compliant with the ESA, a position obviously disputed by Plaintiffs, but also the expert federal agency that will be reviewing the HCP and deciding whether to issue an ITP. *See* Greenwald Decl. ¶ 14. It necessarily follows that ODF's HCP process is, and will continue to be, guided by the department's view that it is avoiding all take of coho salmon. Timely resolution of Plaintiffs' claims will help inform the HCP process and provide critical guidance to the parties as to key questions regarding State Defendants' liability under the ESA.

## V.    *Center for Biological Diversity v. Henson* **is not on point.**

State Defendants' sole authority cited in support of their motion is *Henson*, but they extend that case well beyond its breaking point. Although that case involved one of the same plaintiffs, a draft HCP, and state forest land in Oregon, the similarities quickly begin to fade when reviewing the details. State Defendants' surface-level comparison is unavailing; given the significant differences between the instant case and *Henson*, that case actually cuts against State Defendants' position and counsels against a stay, for at least four reasons.

For one, *Henson* involved a challenge against a federal agency, the U.S. Fish and Wildlife Service ("FWS"), under Section 7 of the ESA for failure to reinitiate consultation over an existing (1995) Habitat Conservation Plan and Incidental Take Permit. The instant case involves a challenge under Section 9 of the ESA against a State department where there is no existing HCP and ITP in place. Unlike in *Henson*, State Defendants do not currently have any take coverage.

Second, the scope of the *Henson* plaintiffs' requested relief was directly subsumed within work that was ongoing and which FWS represented would be completed during the pendency of a stay. There, the plaintiffs sought renewed consultation over new information, but "acknowledge[d] the assertion by FWS that it is engaged in producing a new biological opinion and the assertion by FWS that this consultation shall include consideration of the best scientific data available, including the documents plaintiffs cite in this lawsuit." *Henson*, 2009 U.S. Dist. LEXIS 55709, at *5. In other words, the action that plaintiffs sought was ongoing or imminently forthcoming.

Here, in contrast, the intersection between Plaintiffs' requested relief and the work during the pendency of a stay is limited at best. As described above, Plaintiffs' requested relief is not as simplistic as State Defendants would have this Court believe. If reduceable to a single issue, it is not the completion of an HCP, but rather, the cessation of activities that cause unlawful take of coho salmon. There are many ways in which this result could be achieved, including halting the planning and authorization of new timber sales in certain areas and the modification of existing timber sales. Securing an ITP is one way in which State Defendants could carry out their ongoing timber sale activities in compliance with the ESA, but that is not something that can occur during a six-month stay.

Third and relatedly, the differences in the timing of the relevant administrative proceedings in *Henson* and the instant case cannot be overstated. *See* Greenwald Decl. ¶¶ 5-13. In *Henson*, the FWS represented to the court that the final "signature package" for the relevant documents would be ready within the timeframe of the stay, i.e., by December 2009. Among the documents was a Revised HCP/ITS that, when approved, would supersede the 1995 HCP/ITP. *Id.* ¶ 3.

All that State Defendants can promise here is the expectation to "have a first administrative draft [HCP] ready for presentation to the Board [of Forestry] at its October 2020 meeting." Stay Mot. at 4. As discussed above, there is a panoply of additional process over a multiple-year period (if at all) before the State secures a final ITP. *See supra* Background, Sec. III. A draft HCP for further consideration is a step towards securing an ITP, but it is just one step in a multiple-step (and multiple-year) process.

It is worth noting that even when a final HCP/ITS appeared imminent in *Henson*, a Revised HCP/ITP never was issued. *See* 75 Fed. Reg. at 29,500 (NMFS explaining that it has "yet to reach an agreement with Oregon Department of Forestry on completing a Habitat Conservation Plan for the Elliot State Forest Habitat Conservation Plan."); Greenwald Decl. ¶¶ 10-11. Importantly, the reason a final agreement was not reached was due to NMFS being "unable to conclude that the strategies would meet the conservation needs of our trust resources and provide for the survival and recovery of Oregon Coast (OC) coho salmon." *Id.* Thus, even after the end of a multiple-year process, there is considerable uncertainty as to whether ODF will be able to secure an ITP at all.[4]

---

[4] Accordingly, *Henson* is analogous in one respect: ODF never finalized an HCP and secured an ITP, which necessitated a citizen suit under ESA Section 9. Greenwald Decl. ¶¶ 9-10.

Fourth the *Henson* court found the likelihood of harm during the pendency of a stay to be limited. The court determined that "Defendants have demonstrated that ODF has no planned timber sales within any area protected by the 1995 HCP, in areas that are proposed for protection under the Draft Revised HCP/ITS, or within any known occupied spotted owl sites." *Henson*, 2009 U.S. Dist. LEXIS 55709, at *6; Greenwald Decl. ¶ 10. State Defendants have made no representations that the scale of logging activities in coho habitat is similarly limited. *Id.* ¶¶ 16, 20. In fact, they ignore altogether the scope and magnitude of ODF's continued operations. *Id.* ¶ 24. Without any restriction of logging activities during a stay, State Defendants will continue to plan and auction dozens of timbers sales in the Tillamook and Clatsop State Forests that are reasonably certain to cause take of coho salmon and will continue to do so for an indefinite time without lawful authority to do so. *See* Greenwald Decl. ¶ 28.

## CONCLUSION

For all the foregoing reasons, and those stated in the *Motion to Suspend Discovery Deadlines* (ECF82), Plaintiffs respectfully request that the Court grant their *Motion to Suspend* and deny State Defendants *Motion for Stay*. The interests of economy and fairness would be served by a more measured approach for addressing near-term impacts caused by the COVID-19 pandemic while continuing to move this case forward toward resolution on the merits.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2020, I filed the foregoing Plaintiffs' Response in Opposition to State Defendants' Motion to Stay, and will cause the foregoing to be served on counsel of record for the State Defendants and Defendant-Intervenors via the Court's ECF system.

Dated this 17th day of April, 2020        */s Amy R. Atwood*
                                             Amy R. Atwood