AMY R. ATWOOD (OSB #060407)
atwood@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
225 N. Killingsworth Street
Portland, OR 97217
(971) 717-6401

*Lead Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, CASCADIA WILDLANDS, and NATIVE FISH SOCIETY, | Case No: 3:18-cv-01035-MO |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| v. | *Oral Argument Requested* |
| NANCY HIRSCH, KATHERINE SKINNER, MICHAEL CAFFERATA, and DANIEL GOODY, in their official capacities, | |
| Defendants, | |
| and | |
| OREGON FOREST INDUSTRIES COUNCIL and TILLAMOOK COUNTY, | |
| Defendant-Intervenors. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

GLOSSARY OF TERMS ................................................................................................ vii

LIST OF EXHIBITS ................................................................................................ viii

MOTION FOR PARTIAL SUMMARY JUDGMENT ................................................................ 1

MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT .... 3

I.      **INTRODUCTION** ................................................................................................ 3

II.     **LEGAL BACKGROUND** ................................................................................ 4

III.    **STATEMENT OF FACTS** ................................................................................ 7

      A.    Oregon Coast Coho Salmon ................................................................ 7

      B.    Impacts of Forestry Activities in the State Forests to Coho and Complex Streams Habitat ................................................................ 10

      C.    The Impacts of ODF Logging and Road Management on Coho Salmon ................ 16

      D.    ODF's Extended Process to Obtain an ITP/HCP ................................ 18

IV.     **STANDARD OF REVIEW** ................................................................................ 21

V.      **ARGUMENT** ................................................................................................ 21

      B.    THE COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIM FOR RELIEF. ................................................................................................ 21

      C.    THROUGH THEIR ONGOING FORESTRY ACTIVITIES ON THE STATE FORESTS WITHOUT AN ITP/HCP, STATE DEFENDANTS ARE LIABLE FOR UNAUTHORIZED TAKE OF OREGON COAST COHO SALMON. ..... 22

          1.    State Defendants Can be Found Liable for Violating the Take Prohibition in Section 9 as applied to Coho in the Special Rule. ................................ 22

          2.    State Defendants' Are Continuously Authorizing Forestry Activities on the State Forests Which Are Killing and Harming Coho. ................................ 24

          3.    These Incidents Exemplify How State Defendants Routinely Plan Timber Sales that Foreseeably Lead to Coho Take. ................................ 35

          4.    State Defendants Continue to Plan Timber Sales on the State Forests that are Reasonably Certain to Cause Unauthorized Take. ................................ 39

D.    THE COURT SHOULD GRANT DECLATORY JUDGMENT TO PLAINTIFFS, AND ORDER PLAINTIFFS AND STATE DEFENDANTS TO MEET AND DEVELOP TERMS OF INTERIM INJUNCTIVE RELIEF.......... 44

A.  Plaintiffs are Entitled to Summary Judgment and Declaratory Relief............ 44

B.  Plaintiffs Request the Court Order Plaintiffs and State Defendants to Attempt to Jointly Stipulate to the Interim Injunctive Relief Measures, and Seek a Ruling from the Court if such Efforts are Unsuccessful................................. 44

CONCLUSION.................................................................................................... 45

CERTIFICATE OF COMPLIANCE ............................................................................ 46

## TABLE OF AUTHORITIES

### Cases

*Am. Whitewater v. Hydro, LLC*,
  No. 16-0047, 2021 U.S. Dist. LEXIS 115451 (W.D. Wash. June 18, 2021) ................... 38, 44

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................ 21

*Animal Prot. Inst. v. Holsten*,
  541 F.Supp.2d 1073 (D. Minn. 2008) .............................................................................. 41

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
  515 U.S. 687 (1995) .............................................................................................. 5, 24, 41

*Bennett v. Spear*,
  520 U.S. 154 (1997) .......................................................................................................... 6

*Cascadia Wildlands v. Kitzhaber*,
  911 F. Supp. 2d 1075 (D. Or. 2012) .......................................................................... 22, 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................ 21

*Ctr. for Biological Diversity v. Otter*, No. 14-258, 2016 U.S. Dist. LEXIS 3958 (D. Idaho Jan. 8,
  2016), *abrogated by* No. 14-258 (Jan. 24, 2018) ........................................................... 23

*Defs. of Wildlife v. Bernal*,
  204 F.3d 920, 925 (9th Cir. 2000) .................................................................................. 44

*Forest Conservation Council v. Rosboro Lumber Co.*,
  50 F.3d 781 (9th Cir. 1995) .................................................................................. 5, 37, 38

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ........................................................................................................ 22

*Gibbs v. Babbitt*,
  214 F.3d 483 (4th Cir. 2000) ............................................................................................ 5

*Loggerhead Turtle v. Cnty. Council*,
  896 F.Supp. 1170 (M.D. Fla. 1995) ................................................................................. 41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................................ 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................................................ 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  No. 01-064-SI, 2017 U.S. Dist. LEXIS 44026 (D. Or. Mar. 27, 2017), *aff'd in part,
  sub nom. appeal dismissed in part*, 886 F.3d 803 (9th Cir. 2018) ............................... 45

*Or. Nat'l Desert Ass'n v. Tidwell*,
  716 F.Supp.2d 982 (D. Or. 2010) .................................................................................... 41

*Pac. Rivers Council v. Brown*,
  No. 02-243, 2002 U.S. Dist. LEXIS 28121 (D. Or. Dec. 23, 2002) ........................................ 23

*Seattle Audubon Soc'y v. Sutherland*, No. 06-1608, 2007 U.S. Dist. LEXIS 31880 (W.D. Wash.
  May 2, 2007) ........................................................................................................................... 23, 24

*Sierra Club* v. *Morton*,
  405 U.S. 727 (1972) ...................................................................................................................... 22

*Sierra Club v. Yeutter*,
  926 F.2d 429 (5th Cir. 1991) ........................................................................................................ 41

*Strahan v. Coxe*,
  127 F.3d 155 (1st Cir. 1997) .................................................................................................. 23, 40

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ........................................................................................................................ 4

## **Statutes**

16 U.S.C. § 1532(16) ........................................................................................................................ 4

16 U.S.C. § 1532(20) ........................................................................................................................ 5

16 U.S.C. § 1532(6) .......................................................................................................................... 4

16 U.S.C. § 1533(d) .................................................................................................................... 5, 17

16 U.S.C. § 1536(a)(2) ...................................................................................................................... 6

16 U.S.C. § 1538(a)(1)(B) ........................................................................................................ passim

16 U.S.C. § 1538(a)(1)(G) ....................................................................................................... 1, 6, 45

16 U.S.C. § 1539(a)(1) ..................................................................................................................... 40

16 U.S.C. § 1539(a)(1)(B) ....................................................................................................... 1, 6, 46

16 U.S.C. § 1539(a)(2) ............................................................................................................ 1, 3, 46

16 U.S.C. § 1539(a)(2)(B)(ii) .......................................................................................................... 20

16 U.S.C. § 1539(a)(2)(B)(iv) ......................................................................................................... 20

16 U.S.C. § 1540(g)(1) ...................................................................................................................... 6

16 U.S.C. § 470f ................................................................................................................................ 6

16 U.S.C. §§ 1531-1544 .................................................................................................................... 3

28 U.S.C. § 2201 ............................................................................................................................. 44

42 U.S.C. § 4322 ............................................................................................................................. 18

## **Regulations**

50 C.F.R. § 222.102 ........................................................................................................................... 6

50 C.F.R. § 223.102 ............................................................................................... 37

50 C.F.R. § 223.102(e).......................................................................................... 45

50 C.F.R. § 223.102(c)..................................................................................... 1, 3, 7

50 C.F.R. § 223.203 ........................................................................................... 3, 17

50 C.F.R. § 223.203(a).................................................................................... passim

50 C.F.R. § 223.203(b)(1).......................................................................................... 6

## Rules

Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific
    Salmon, 56 Fed. Reg. 58,612 (Nov. 20, 1991) .......................................................... 4

Endangered and Threatened Species: Proposed Threatened Status for Three Contiguous ESUs of
    Coho Salmon Ranging From Oregon Through Central California, 60 Fed. Reg. 38,011
    (July 25, 1995) ................................................................................................... 9, 10

Public Scoping Meetings for Proposed Habitat Conservation Plan, 62 Fed. Reg. 55,824
    (Oct. 28 1997) ......................................................................................................... 18

Endangered and Threatened Species: Threatened Status for the Oregon Coast Evolutionarily
    Significant Unit of Coho Salmon, 63 Fed. Reg. 42,587 (Aug. 10, 1998).......................... 18, 19

Endangered and Threatened Species: Final Rule Governing Take of 14 Threatened Salmon and
    Steelhead Evolutionarily Significant Units (ESUs), 65 Fed. Reg. 42,422
    (July 10, 2000) ................................................................................................. 17, 18

Endangered and Threatened Species: Proposed Listing Determinations for 27 ESUs of West
    Coast Salmonids, 69 Fed. Reg. 33,102 (June 14, 2004) ................................................ 9, 10, 18

Endangered and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast
    Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs,
    70 Fed. Reg. 37,160 (June 28, 2005) ......................................................................... 8

Endangered and Threatened Species: Final Threatened Listing Determination, Final Protective
    Regulations, and Final Designation of Critical Habitat for the Oregon Coast Evolutionarily
    Significant Unit of Coho Salmon, 73 Fed. Reg. 7816 (Feb. 11, 2008) ............................ passim

Listing Endangered and Threatened Species: Completion of a Review of the Status of the Oregon
    Coast Evolutionarily Significant Unit of Coho Salmon; Proposal to Promulgate Rule
    Classifying Species as Threatened, 75 Fed. Reg. 29,489 (May 26, 2010) ......................... 9, 10

Listing Endangered and Threatened Species: Threatened Status for the Oregon Coast Coho
    Salmon Evolutionarily Significant Unit, 76 Fed. Reg. 35,755 (June 20, 2011) ............. 7, 10, 17

Fed. R. Civ. P. 56(a) ................................................................................................ 21

Fed. R. Civ. P. 56(c) ................................................................................................ 21

# GLOSSARY OF TERMS

| | |
|---|---|
| AOP | Annual Operations Plan |
| BOF | Oregon Board of Forestry |
| Coho | Oregon Coast coho salmon ESU |
| Coho-bearing Streams | Rivers, streams, or aquatic networks used by Coho for spawning, rearing, and/or migration |
| Complex Streams | Rivers, streams, or aquatic networks with slow-moving water, deep pools, ponds, and side channels |
| Defendants | State Defendants and Defendant-Intervenors |
| Defendant-Intervenors | Oregon Forest Industries Council and Tillamook County |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| ESU | Evolutionarily Significant Unit |
| Forestry Activities | Logging (or Timber Harvest) and Roads Management on the State Forests |
| FMP | Forest Management Plan |
| HCP | Habitat Conservation Plan |
| HCR | Hydrologically Connected Road |
| IP | Implementation Plan |
| ITP | Incidental Take Permit |
| LWD | Large Woody Debris |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service (also NOAA Fisheries) |
| Oregon Coast Range | Coastal Oregon Mountain Range |
| ODF | Oregon Department of Forestry |
| ODFW | Oregon Department of Fish & Wildlife |
| State Defendants | Nancy Hirsch, Katherine Skinner, Michael Cafferata, Daniel Goody |
| State Forests | Tillamook and Clatsop state forests |
| TSIR | Timber Sale Inspection Report |
| Type F Stream | Fish-bearing stream |
| WDNR | Washington Department of Natural Resources |

**LIST OF EXHIBITS**

Exhibit 08:    Jensen et al. (2009)    David W. Jensen et al., *Impact of Fine Sediment on Egg-To-Fry Survival of Pacific Salmon: A Meta–Analysis of Published Studies*, 17 Rev. in Fisheries Sci., 348–359 (2009)

Exhibit 09:    Quinn (2018)    Thomas P. Quinn, <u>The Behavior and Ecology of Pacific Salmon and Trout</u> (2nd ed. 2018)

Exhibit 10:    Wimberly (2002)    M.C. Wimberly, *Spatial Simulation of Historical Landscape Patterns in Coastal Forests of the Pacific Northwest*, 32 Can. J. Forest Rsch., 1316–1328 (2002)

Exhibit 11:    Swanson et al. (1987)    Frederick J. Swanson et al., *Mass Failures and Other Processes of Sediment Production in Pacific Northwest Forest Landscapes*, 57 <u>Streamside Mgmt: Forestry and Fishery Interactions</u>, 9–38 (E.O. Salo & T.W. Cundy eds., 1987)

Exhibit 12:    Naiman et al. (1992)    Robert J. Naiman et al., *Fundamental Elements of Ecologically Healthy Watersheds in the Pacific Northwest Coastal Ecoregion*, in <u>Watershed Management: Balancing Sustainability and Environmental Change</u>, 127–188 (R.J. Naiman ed., 1992)

Exhibit 13:    Recovery Plan    Nat'l Marine Fisheries Serv., West Coast Region, Final ESA Recovery Plan for Oregon Coast Coho Salmon (*Oncorhynchus kisutch*) (Dec. 2016)

Exhibit 14:    Tech Note 2    ODF, Forest Practices Technical Note Number 2, Version 2.0 – High Landslide Hazard Locations, Shallow, Rapidly Moving Landslides and Public Safety: Screening and Practices, 1 (Jan. 24, 2019)

Exhibit 15:    Montgomery (2001)    David R. Montgomery, *Slope Distributions, Threshold Hillslopes, and Steady-state Topography*, 301 AJS, 432–454 (2001)

Exhibit 16:    May (2002)    Christine L. May, *Debris Flows Through Different Forest Age Classes in the Central Oregon Coast Range*, 38 J. Am. Water Res. Ass'n, 1097–1113 (2002)

Exhibit 17:    Dietrich & Dunne (1978)    William E. Dietrich & Thomas Dunne, *Sediment Budget for a Small Catchment in Mountainous Terrain*, 29 Zietschrift fur Geomorphologie Suppl., 191–206 (1978)

Exhibit 18:    Montgomery & Dietrich (1994)    David R. Montgomery & William E. Dietrich, *A Physically Based Model for the Topographic*

|  |  | *Control on Shallow Landsliding*, 30 Water Res. Rsch., 1153–1171 (1994) |
| Exhibit 19: | Montgomery et al. (2000) | David R Montgomery et al*., Forest Clearing and Regional Landsliding*, 28 Geology, 311–314 (2000) |
| Exhibit 20: | Burroughs & Thomas (1977) | Edward R. Burroughs & Byron R. Thomas, Declining Root Strength in Douglas-fir After Felling as a Factor in Slope Stability (USDA Forest Serv. Rsch. Paper No. INT-190, 1977) |
| Exhibit 21: | Zeimer & Swanston (1977) | Robert R. Ziemer & Douglas N. Swanston, Root Strength Changes After Logging in Southeast Alaska (USDA Forest Serv. Rsch. Note No. PNW-306, 1977) |
| Exhibit 22: | Wu et al. (1979) | Tien H. Wu et al., *Strength of Tree Roots and Landslides on Prince of Wales Island, Alaska*, 16 Can. Geotech. J., 19–33 (1979) |
| Exhibit 23: | Reneau & Dietrich (1987) | Steven L. Reneau & William E. Dietrich, *Size and Location of Colluvial Landslides in a Steep Forested Landscape*, in <u>Erosion and Sedimentation in the Pacific Rim</u>, 39–48 (Int'l Ass'n Hydrological Sci. Publ'n No. 165, 1987) |
| Exhibit 24: | Terwilliger & Waldron (1991) | Valery J. Terwilliger & Lawrence J. Waldron, E*ffects of Root Reinforcement on Soil-Slip Patterns in the Transverse Ranges of Southern California*, 103 GSA Bull., 775–785 (1991) |
| Exhibit 25: | Robison et al. (1999) | E. George Robison et al., Storm Impacts and Landslides of 1996: Final Report (ODF Forest Prac. Monitoring Program Tech. Rep. No. 4, 1999) |
| Exhibit 26: | Guthrie (2002) | Richard H. Guthrie, *The Effects of Logging on Frequency and Distribution of Landslides in Three Watersheds on Vancouver Island, British Columbia*, 43 Geomorphology, 273–292 (2002) |
| Exhibit 27: | Brardinoni et al. (2003) | Francesco Brardinoni et al., *Complex Mass Wasting Response of Drainage Basins to Forest Management in Coastal British Columbia, 49 Geomorphology*, 109–124 (2003) |
| Exhibit 28: | Schmidt et al. (2001) | K.M. Schmidt et al., *The Variability of Root Cohesion as an Influence on Shallow Landslide Susceptibility in the Oregon Coast Range*, 38 Can. Geotechnical J., 995–1024 (2001) |
| Exhibit 29: | Turner et al. (2010) | T.R. Turner et al., *Landslide Densities Associated with Rainfall, Stand Age, and Topography on* |

|  |  | *Forested Landscapes, Southwestern Washington, USA*, 259 Forest Ecology Mgmt. v. 259, 2233 2244 (2010) |
|---|---|---|
| Exhibit 30: | Wu & Sidle (1995) | Weimin Wu & Roy C. Sidle, *A Distributed Slope Stability Model for Steep Forested Basins*, 31 Water Res. Rsch., 2097–2110 (1995) |
| Exhibit 31: | Ice (1985) | George Ice, Forty Years of Lessons Learned About the Impacts of Forest Practices on Watershed Hydrology and Water Quality, http://faculty.washington.edu/emer/eic/Forty%20Years%20of%20Lessons.htm (last accessed Aug. 20, 2021) |
| Exhibit 32: | Beschta (1978) | Robert L. Beschta, *Long-Term Patterns of Sediment Production Following Road Construction and Logging in the Oregon Coast Range*, 14 Water Res. Rsch., 1011–1016 (1978) |
| Exhibit 33: | Benda & Cundy (1990) | Lee Benda & Terrance W. Cundy, *Predicting Deposition of Debris Flows in Mountain Channels,* 27 Can. Geotech. J., 409–417 (1990) |
| Exhibit 34: | Everest & Meehan (1981) | Fred H. Everest & William R. Meehan, *Forest Management and Anadromous Fish Habitat Productivity*, Trans. 46th N. Am. Wildlife and Nat. Res. Conf., 521–530 (Wildlife Mgmt. Inst., 1981) |
| Exhibit 35: | Roberts & Church (1986) | Richard G. Roberts & Michael Church, *The Sediment Budget in Severely Disturbed Watershed, Queen Charlotte Ranges, British Columbia*, 16 Can. J. Forest Rsch., 1092–1106 (1986) |
| Exhibit 36: | Bilby et al. (1989) | Robert E. Bilby et al., *The Generation and Fate of Road-Surface Sediment in Forested Watersheds in Southwestern Washington*, 35 Forest Sci., 453–468 (1989) |
| Exhibit 37: | Montgomery & Buffington (1997) | David R. Montgomery & John M. Buffington, *Channel-Reach Morphology in Mountain Drainage Basins*, 109 GSA Bull., 596–611 (1997) |
| Exhibit 38: | Miller & Benda (2000) | Daniel J. Miller & Lee E. Benda, *Effects of Punctuated Sediment Supply on Valley-Floor Landforms and Sediment Transport*, 112 GSA Bull., 1814–1824 (2000) |
| Exhibit 39: | May & Lee (2004) | Christine L. May & Danny C. Lee, *The Relationships Among In-Channel Sediment* |

|  |  | *Storage, Pool Depth, and Summer Survival of Juvenile Salmonids in Oregon Coast Range Streams*, 24 N. Am. J. Fisheries Mgmt., 761–774 (2004) |
| --- | --- | --- |
| Exhibit 40: | Hoffman & Gabet (2007) | Daniel F. Hoffman & Emmanuel J. Gabet, *Effects of Sediment Pulses on Channel Morphology in a Gravel-bed River*, 119 GSA Bull., 116-125 (2007) |
| Exhibit 41: | Reid et al. (2016) | M.E. Reid et al., *Forecasting Inundation from Debris Flows that Grow Volumetrically During Travel, with Application to the Oregon Coast Range, USA*, 273 Geomorphology, 396-411 (2016) |
| Exhibit 42: | Buffington et al. (2002) | John M. Buffington et al., *Controls on the Size and Occurrence of Pools in Coarse-Grained Forest Rivers*, 18 River Rsch. and Applications, 507–531 (2002) |
| Exhibit 43: | Reid et al. (1981) | Leslie M. Reid et al., *Application of Sediment Budget Studies to the Evaluation of Logging Road Impact*, 20 J. Hydrology (New Zealand), 49–62 (1981) |
| Exhibit 44: | van Meerveld et al. (2014) | H. J. van Meerveld et al., *Controls on Sediment Production from an Unpaved Resource Road in a Pacific Maritime Watershed*, 50 Water Res. Rsch., 4803–4820 (2014) |
| Exhibit 45: | Trask River Watershed Analysis | E&S Environmental Chemistry, Inc., ODF & U.S.D.I. Bureau of Land Mgmt., Trask River Watershed Analysis (Aug. 2003) |
| Exhibit 46: | Wilson River Watershed Analysis | Duck Creek Associates, Inc., ODF, Wilson River Watershed Analysis (March 2008) |
| Exhibit 47: | Bilby & Ward (1991) | Robert E. Bilby & James W. Ward, *Characteristics and Function of Large Woody Debris in Streams Draining Old-Growth, Clear-Cut, and Second-Growth Forests in Southwestern Washington*, 48 Can. J. Fisheries and Aquatic Sci., 2499–2508 (1991) |
| Exhibit 48: | Montgomery et al. (1995) | David R. Montgomery et al., *Pool Spacing in Forest Channels*, 31 Water Res. Rsch., 1097–1105 (1995) |
| Exhibit 49: | Burnett et al. (2006) | Kelly M. Burnett et al., *Comparing Riparian and Catchment Influences on Stream Habitat in a Forested, Montane Landscape*, 48 Am. Fisheries Soc'y Symp., 175–197 (2006) |

Exhibit 50:    Gomi et al. (2005)    Takashi Gomi et al., *Sediment Dynamics in Small Forest Streams of the Pacific Northwest*, 41 J. Am. Water Res. Ass'n, 877–898 (2005)

Exhibit 51:    Brown & Krygier (1971)    George W. Brown & James T. Krygier, *Clear-Cut Logging and Sediment Production in the Oregon Coast Range*, 7 Water Res. Rsch., 1189–1198 (1971)

Exhibit 52:    Cederholm et al. (1982)    C.J. Cederholm et al., *Effects of Forest Road Erosion on Salmonid Spawning Gravel Composition and Populations of the Clearwater River, Washington*, in Habitat Disturbance and Recovery: Proceedings of a Symp., 1-17 (1982)

Exhibit 53:    Cedarholm & Reid (1987)    C. J. Cederholm & L. M. Reid, *Impact of Forest Management on Coho Salmon (Oncorhynchus kisutch) Populations of the Clearwater River, Washington: A Project Summary*, in <u>Streamside Management: Forestry and Fishery Interactions</u>, 373–398 (E.O. Salo & T.W. Cundy eds., 1987)

Exhibit 54:    Platts et al. (1989)    William S. Platts et al., *Changes in Salmon Spawning and Rearing Habitat from Increased Delivery of Fine Sediment to the South Fork Salmon River, Idaho*, 118 Trans. Am. Fisheries Soc'y, 274–283 (1989)

Exhibit 55:    Eaglin & Hubert (1993)    Gregory S. Eaglin & Wayne A. Hubert, *Management Briefs: Effects of Logging and Roads on Substrate and Trout in Streams of the Medicine Bow National Forest, Wyoming*, 13 N. Am. J. Fisheries Mgmt., 844–846 (1993)

Exhibit 56:    Coble (1961)    Daniel W. Coble, *Influence of Water Exchange and Dissolved Oxygen in Redds on Survival of Steelhead Trout Embryos*, 90 Trans. Am. Fisheries Soc'y, 469-474 (1961)

Exhibit 57:    Shumway et al. (1964)    Dean L. Shumway et al., *Influence of Oxygen Concentration and Water Movement on the Growth of Steelhead Trout and Coho Salmon Embryos*, 93 Trans. Am. Fisheries Soc'y, 342-356 (1964)

Exhibit 58:    Koski (1965)    K. Victor Koski, The Survival of Coho Salmon (*Oncorhynchus kisutch*) From Egg Deposition to Emergence in Three Oregon Coastal Streams (unpublished master's thesis, Oregon State University) (1965)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

Exhibit 59:    Tagart (1984)    J.V. Tagart, *Coho Salmon Survival from Egg Deposition to Fry Emergence*, in Proceedings of the Olympic Wild Fish Conf., 173-181 (1984)

Exhibit 60:    Chapman (1988)    D.W. Chapman, *Critical Review of Variables Used to Define Effects of Fines in Redds of Large Salmonids*, 117 Trans. Of the Am. Fisheries Soc'y, 1–21 (1988)

Exhibit 61:    Peterson    N. Phil Peterson & Thomas P. Quinn, *Persistence of
               & Quinn (1996a)    Egg Pocket Architecture in Redds of Chum Salmon (Oncorhynchus Keta)*, 46 Env'tl Biology of Fishes, 243-253 (1996a)

Exhibit 62:    Meyer (2003)    C. B. Meyer, *The Importance of Measuring Biotic and Abiotic Factors in the Lower Egg Pocket to Predict Coho Salmon Egg Survival*, 62 J. Fish Biology, 534–548 (2003)

Exhibit 63:    Greig et al. (2007)    S.M. Greig et al., *A Review of Factors Influencing the Availability of Dissolved Oxygen to Incubating Salmonid Embryos*, 21 Hydrological Processes, 323-334 (2007)

Exhibit 64:    Franssen et al. (2012)    Jan Franssen et al., *Asphyxiation and Entombment Mechanisms in Fines Rich Spawning Substrates: Experimental Evidence with Brook Trout (Salvelinus Fontinalis) Embryos*, 69 Can. J. Fisheries and Aquatic Sci., 587–599 (2012)

Exhibit 65:    Newcombe &    C. P. Newcombe & D. D. MacDonald,
               MacDonald (1991)    *Effects of Suspended Sediments on Aquatic Ecosystems*, 11 N. Am. J. Fisheries Mgmt., 72–82 (1991)

Exhibit 66:    Harr et al. (1975)    R. Dennis Harr et al*., Changes in Storm Hydrographs After Road Building and Clear-cutting in the Oregon Coast Range*, 11 Water Res. Rsch., 436–444 (1975)

Exhibit 67:    Jones    Julia A. Jones & G.E. Grant, *Peak Flow Responses
               & Grant (1996)    to Clear-cutting and Roads in Small and Large Basins, Western Cascades*, Oregon, 32 Water Res. Rsch., 959–974 (1996)

Exhibit 68:    Thomas    Robert B. Thomas & Walter F. Megahan, *Peak
               & Megahan (1998)    Flow Responses to Clear-cutting and Roads in Small and Large Basins, Western Cascades, Oregon: A Second Opinion*, 34 Water Res. Rsch., 3393-3404 (1998)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM
IN SUPPORT

Exhibit 69:     Beschta et al. (2000)     Robert L. Beschta et al., *Peak Flow Responses to Forest Practices in the Western Cascades of Oregon*, 233 U.S. J. Hydrology, 102-120 (2000)

Exhibit 70:     Jones et al. (2000)     Julia A. Jones et al., *Effects of Roads on Hydrology, Geomorphology, and Disturbance Patches in Stream Networks*, 14 Conservation Biology, 76–85 (2000)

Exhibit 71:     Lewis et al. (2001)     Jack Lewis et al., *Impacts of Logging on Storm Peak Flows, Flow Volumes and Suspended Sediment Loads in Caspar Creek, California*, 2 Land Use and Watersheds: Human Influence on Hydrology and Geomorphology in Urban and Forest Areas, 85-125 (Water Sci. & Applications Ser., 2001)

Exhibit 72:     Zégre (2008)     Nicolas P. Zégre, Local and Downstream Effects of Contemporary Forest Harvesting on Streamflow and Sediment Yield (unpublished Ph.D. dissertation, Oregon State University) (2008)

Exhibit 73:     Lisle & Lewis (1992)     Thomas E. Lisle & Jack Lewis, *Effects of Sediment Transport on Survival of Salmonid Embryos in a Natural Stream: A Simulation Approach*, 49 Can. J. Fisheries and Aquatic Sci., 2337–2344 (1992)

Exhibit 74:     Montgomery et al. (1996)     David R. Montgomery et al., *Stream-bed Scour, Egg Burial Depths, and the Influence of Salmonid Spawning on Bed Surface Mobility and Embryo Survival*, 53 Can. J. Fisheries and Aquatic Sci., 1061–1070 (1996)

Exhibit 75:     Seiler et al. (2002)     Dave Seiler et al., 2002 Wild Coho Forecasts for Puget Sound and Washington Coastal Systems, Wash. Dep't Fish & Wildlife Sci. Div. (2002)

Exhibit 76:     Lisle & Hilton (1992)     Thomas E. Lisle & Sue Hilton, *The Volume of Fine Sediment in Pools: An Index of Sediment Supply in Gravel-Bed Streams*, 28 Water Res. Bull., 371–383 (1992)

Exhibit 77:     Murphy (1995)     Michael L. Murphy, Forestry Impacts on Freshwater Habitat of Anadromous Salmonids in the Pacific Northwest and Alaska: Requirements for Protection and Restoration (NOAA Coastal Ocean Program Decision Analysis Series No. 7) (1995)

Exhibit 78:     2010 FMP     ODF, Nw. Or. State Forests Mgmt. Plan – Revised Plan (Apr. 2010) (excerpts)

| Exhibit 79: | WDNR ITP | Nat'l Marine Fisheries Serv., Permit for Incidental Take of Endangered/Threatened Species, Permit No. 1573 (June 5, 2006) |
| Exhibit 80: | WDNR HCP | Nat'l Marine Fisheries Serv., Northwest Region, Washington State Forest Practices Habitat Conservation Plan (June 5, 2006) (excerpts) |
| Exhibit 81: | 2001 FMP | ODF, Nw. Or. State Forests Management Plan (Jan. 2001) (excerpts) |
| Exhibit 82: | Salmon Protection Policy | ODF, State Forests Salmon Protection Policy, Gen. File No. 3-2-1-310 (Jan. 25, 2002) |
| Exhibit 83: | SAH Strategy | Salmon Anchor Habitats Strategy for Northwest Oregon State Forests (Mar. 2003) |
| Exhibit 84: | NW Combo Memo | Memorandum from Kate Skinner, Tillamook Dist. Forester, ODF, to Dan Corgan, Contracts Team Leader, State Forests Division, ODF, NW Combo Proposed Timber Sale & Pre-Operations Report (July 16, 2010) |
| Exhibit 85: | NW Combo Pre-Ops | ODF, Tillamook Dist., Pre-Operations Report – NW Combo (2008) |
| Exhibit 86: | Clarification Memo | ODF, FMP Riparian Strategy: Clarification Regarding Slope Stability and Landslides in the Context of Harvest – Identifying the Four Slope Buffers (Feb. 25, 2020) |
| Exhibit 87: | 2019 HLHL Update | ODF, HLHL Update – GIS Procedures (June 6, 2019) |
| Exhibit 88: | NW Combo Notice | ODF, Tillamook Dist., Notice of Timber Sale: NW Combo, 341-11-33 (2014) |
| Exhibit 89: | NW Combo Notes | ODF Inspection Report Notes on NW Combo Timber Sale (Dec. 14, 2010 – May 29, 2014) |
| Exhibit 90: | Dec. 2012 NW Combo Inspection Report | ODF, Tillamook Dist., Timber Sale Inspection Report – NW Combo (Dec. 11, 2012) |
| Exhibit 91: | Alder Joy Pre-Ops | ODF, Tillamook Dist., Pre-Operations Report – Alder Joy (May 2011) |
| Exhibit 92: | Odin's Blade Notice | ODF, Tillamook Dist., Notice of Timber Sale (Oct. 17, 2017) |
| Exhibit 93: | Odin's Blade Pre-Ops | ODF, Tillamook Dist., Pre-Operations Report – Odin's Blade (June 2016) |
| Exhibit 94: | Star White Notice | Notice of Timber Sale: Star White (Oct. 21, 2014) |
| Exhibit 95: | Star White Pre-Ops | Pre-Operations Report: Star White (Final) (June |

|  |  | 2013) |
| Exhibit 96: | Buren Email – 1 | Emails between Ty Williams, Astoria Dist. Assistant Dist. Forester, ODF, and Michael Buren, Geotechnical Specialist, ODF (Jan. 30, 2019 – Feb. 12, 2019) |
| Exhibit 97: | Buren Email – 2 | Email from Michael Buren, Geotechnical Specialist, ODF, to Dave Wells, Roads Specialist, ODF (May 5, 2014) |
| Exhibit 98: | 2019 Tillamook AOP | ODF, Tillamook District 2019 Annual Operations Plan, 18 (June 2018) |
| Exhibit 99: | Buren Email – Star White | Email from Michael Buren, Geotechnical Specialist, ODF, to Aaron Inman, Nat. Res. Specialist, ODF (Apr. 22, (2016) |
| Exhibit 100: | Buren Map 1 – Star White | Michael Buren, Map of Star White Timber Sale Slides, Lidar of 2007 (Apr. 22, 2016) |
| Exhibit 101: | Buren Map 2 – Star White | Michael Buren, Map of Star White Timber Sale Area 1, Lidar of 2007 (Apr. 30, 2014) |
| Exhibit 102: | Rocky Road Sale Results | ODF, State Timber Sales Results – Rocky Road, Sale No. 341-18-83 (Feb. 13, 2018) |
| Exhibit 103: | Rocky Road TSIR | ODF, Tillamook Dist., Timber Sale Inspection Report – Rocky Road (2018) |
| Exhibit 104: | Rocky Road Memo | Memorandum from Joe Travers, Tillamook Dist. Operations Manager, ODF, to Kate Skinner, Tillamook Dist. Forester, ODF (Nov. 17, 2017) |
| Exhibit 105: | Rocky Road Notes | Notes on Rocky Road Timber Sale from ODF Staff (Mar. 8, 2018 – June 5, 2019) |
| Exhibit 106: | Buren Email – Red Buzzard | Email from Michael Buren, Geotechnical Specialist, ODF, to James Neuman, Planning Forester, ODF (Aug. 10, 2015) |
| Exhibit 107 | Tillamook Estuaries | Tillamook Estuaries Partnership, 2012 Tillamook Culvert Assessment Project, Culvert #262 (Kilchis Forest Road at Whitney Creek) |
| Exhibit 108: | Harvestable Acres | ODF, Identifying Harvestable Acres on the Memo Tillamook District (undated) |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(a) and LR 56, Plaintiffs Center for Biological Diversity, Cascadia Wildlands, and Native Fish Society ("Plaintiffs") move for partial summary judgment on the merits of their Claim for Relief, ECF No. 61 (First Am. Compl. ("FAC")) ¶¶133–140, regarding the issue of liability only, bifurcated from remedy or injunctive relief.

In compliance with LR 7-1(a), the parties conferred in advance of Plaintiffs' filing of this Motion, ECF No. 110-2, and made a good faith effort to confer yet were unable to resolve the dispute.

Plaintiffs request an Order:

Declaring that the Defendants, State forestry officials ("State Defendants"), are violating Section 9 of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B); *id.* § 1538(a)(1)(G); and 50 C.F.R. § 223.203(a) ("Special Rule"), by: authorizing logging and roads in the Tillamook and Clatsop state forests on an ongoing and continuing basis, where such "Forestry Activities": (a) present a reasonably certain likelihood of delivering sediment to streams used by the Oregon Coast evolutionarily significant unit of coho salmon, a threatened species, 50 C.F.R. § 223.102(c) (Coho); and (b) prescribe the use of hydrologically connected roads adjacent to Coho-bearing Streams for logging operations or log-hauling.

If the Court grants this motion, Plaintiffs respectfully request the Court to order: (1) Plaintiffs and State Defendants, within 90 days, to file a joint stipulation and proposed order with conservation measures to protect Oregon Coast coho salmon from incidental take until State Defendants obtain an incidental take permit ("ITP") under Section 10 of the ESA, 16 U.S.C. § 1539(a)(1)(B); *id.* § 1539(a)(2), or (2) the parties to submit to the Court, within 90 days, a joint

stipulation and/or motion(s) for proposed further proceedings in this matter, including schedule(s) for any additional written or expert discovery or motions.

In support of this motion, Plaintiffs are filing the following memorandum of law, which is substantively the same as Plaintiffs' previous motion for partial summary judgment, ECF No. 110-002, with minor edits and corrections.[1] In addition, Plaintiffs are filing the declarations of Joyce Sherman, Ian Fergusson, Matt Erickson, Nicholas Wagner, Jennifer Fairbrother, Josh Laughlin, and Whitney Palmer, the Third Declaration of Noah Greenwald, and Exhibits 08-108. Plaintiffs incorporate by reference (but are not refiling) the prior declarations of Noah Greenwald, ECF Nos. 86, 106, Curtis Bradley, ECF No. 107, and Ron Byers, ECF No. 108, as well as Exhibits 001-07 in support of Plaintiffs' Response in Opposition to Defendants' Motion to Continue Stay of the Litigation Pending Completion of the HCP Process, ECF Nos. 106-1—106-7.

---

[1] Plaintiffs are providing Defendants with an Errata and can furnish a copy to the Court if it would useful. Substantive edits were in furtherance of accuracy, clarity, and brevity.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT                                                                                                    2

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.   INTRODUCTION

Plaintiffs move for an Order from this Court declaring that the State Defendants, Oregon Department of Forestry ("ODF") officials, are in violation of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531-1544, by continuing to auction timber sales on the Tillamook and Clatsop state forests ("State Forests") that are reasonably certain to cause "take" of Oregon Coast coho salmon ("Coho"), a threatened species, 50 C.F.R. § 223.102(c), without an Incidental Take Permit from the National Marine Fisheries Service ("NMFS"), 16 U.S.C. § 1539(a)(2), in violation of Section 9 of the ESA, *id.* § 1538(a)(1)(B), and NMFS's "Special Rule" applying the take prohibition to Coho, *id.* § 1538(a)(1)(G). 50 C.F.R. § 223.203. In addition, Plaintiffs request the Court order State Defendants to negotiate with Plaintiffs and develop the terms of interim injunctive relief to apply until ODF finalizes a Habitat Conservation Plan and receives an Incidental Take Permit from NMFS, approved by the Oregon Board of Forestry ("BOF"), that would authorize such activities and incidental take in accordance with the ESA.

As demonstrated below, and as confirmed by ODF's application for a federal permit to take Coho, ODF continues to auction timber sales which decades of scientific research conclusively shows lead to landslides and road failures that deliver harmful fine sediments to stream channels used by Coho for spawning, rearing, and migration ("Coho-bearing Streams"). These timber sales also utilize roads that deliver fine sediments to Coho-bearing Streams. Five such incidents are set forth below; each of these incidents, made evident by non-expert discovery, involved landslides and road failures that delivered fine sediment to Coho-bearing

Streams, thereby causing unauthorized incidental take that was foreseeable and would not have occurred but for the activities of State Defendants. *Infra* pp. 24-44.

State Defendants are engaged in an ongoing ITP/HCP-planning process, but even under the most optimistic scenario they remain years from completing an HCP and obtaining the legally required authorization for the take they continue to cause, which is an ITP. In the absence of declaratory and injunctive relief, State Defendants will continue to auction timber sales and authorize Forestry Activities that are reasonably certain to cause take of Coho in violation of the ESA. Consequently, this motion seeks resolution of the liability issue—which is beyond serious dispute, especially given ODF's recognition that it must obtain an ITP for its activities—and thus set the stage for developing interim measures to minimize such take until the ITP/HCP process is brought to conclusion.

## II.    <u>LEGAL BACKGROUND</u>

As explained by the Supreme Court, the "plain intent of Congress [in enacting the ESA] was to halt and reverse the trend towards species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) (citing the "take" prohibition and definition of "take").

A "species" under the Act includes "any subspecies of fish or wildlife or plants," or, pursuant to NMFS policy, any "evolutionarily significant unit" ("ESU"), i.e., stock, of Pacific salmonid. 16 U.S.C. § 1532(16); 56 Fed. Reg. 58,612 (Nov. 20, 1991). An "endangered" species is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species—like the Coho here—is one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its

range." *Id.* § 1532(20). While threatened species are not automatically protected against

unauthorized incidental take, *id*. §1538(a)(1)(B), when necessary for a threatened species'

conservation, NMFS can apply the Section 9 take prohibition by rule to any threatened species,

*id*. § 1533(d).

Section 9 of the ESA embodies Congress's "plain intent" to make species conservation

the purpose of the Act, by making it unlawful for "any" "person" to "take" any member of a

protected species without a permit from NMFS. *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir.

2000) (citing 16 U.S.C. § 1538(a)(1)(B)). The Act "broadly" defines take to mean to "harass,

harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any

such conduct." *Id*. § 1532(19); *Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515

U.S. 687, 704-05 (1995) ("*Sweet Home*"). The Ninth Circuit Court of Appeals has noted that the

ESA defines "take" in the "broadest possible manner, to include every conceivable way in which

a person can 'take' or attempt to 'take' any fish or wildlife." *Forest Conservation Council v.

Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995) (citation omitted)); *Sweet Home*, 515

U.S. at 705 (quoting S. Rep. No. 93-307 (1973) 7). Take need not be intentional and can occur

directly or indirectly. *Id.* at 704-07 (holding that actions that destroy the habitat of an endangered

species can be "take" as exemplified, e.g., by "the activities of birdwatchers where the effect of

those activities might disturb the birds and make it more difficult to hatch or raise their young")

(quotations marks and citations omitted).

NMFS has further defined "harm" in the "take" definition to mean:

…an act which actually kills or injures fish or wildlife. Such an act may include
significant habitat modification or degradation which actually kills or injures fish
or wildlife by significantly impairing essential behavioral patterns, including,
breeding, spawning, rearing, migrating, feeding or sheltering.

50 C.F.R. § 222.102. Section 9(a)(1)(G) of the ESA, 16 U.S.C. § 1538(a)(1)(G), further prohibits

violation of any regulation extending the take prohibition to any threatened species, such as the

Special Rule for Coho. 50 C.F.R. § 223.203(a).

That a party's actions will result in "take" of a protected species does not necessarily

mean that the action may not proceed. Section 10 of the ESA creates a permitting system

pursuant to which NMFS may issue an ITP authorizing projects or activities that will take listed

species, so long as: (a) the taking is "incidental" to an otherwise lawful activity, (b) the applicant

successfully develops an ITP/HCP, and (c) the proposed action satisfies several other criteria

designed to minimize and mitigate the impacts of the proposed activity on the listed species. 16

U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 223.203(b)(1) (activities which cause incidental take may be

exempted from the take prohibition under Section 10).

Before issuing an ITP, NMFS must: (1) comply with the National Environmental Policy

Act ("NEPA"), 42 U.S.C. §§ 4321-4347, by preparing an environmental impact statement

("EIS"), *id*. § 4322; (2) comply with Section 106 of the National Historic Preservation Act, 16

U.S.C. § 470f; conduct Tribal Consultations, ECF No. 106-2 (HCP Handbook) 19; (3) complete

intra-agency "formal consultation" under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2);

and (4) make Findings and Recommendations pursuant to Section 10, *id*. § 1539(a)(2)(B). ECF

No. 106-2, Ex.003 (HCP Handbook) 19.

The ESA authorizes "any person" to bring a "civil suit" to "enjoin any person . . . who is

alleged to be in violation of any provision of this chapter or regulation issued under the authority

thereof." *Id*. § 1540(g)(1). Congress provided that "district courts shall have jurisdiction, without

regard to the amount in controversy or the citizenship of the parties, to enforce any such

provision or regulation . . . ." *Id*.; *Bennett v. Spear*, 520 U.S. 154, 164-65 (1997).

III.    **STATEMENT OF FACTS**

There is no genuine dispute as to the following material facts.

A. **Oregon Coast Coho Salmon**

The Oregon Coast evolutionarily significant unit ("ESU") of coho salmon (Coho) is a federally protected species that is threatened by the harmful effects of State Defendants' Forestry Activities in the freshwater habitats in the State Forests where Coho spawn and spend up to half their lives. 50 C.F.R. § 223.102(c); 76 Fed. Reg. 35,755 (June 20, 2011). Uniquely adapted to the Coast Range and its "high precipitation levels," the Coho ESU occurs between Cape Blanco and the Columbia River. *Id.* Once extensive and abundant, Coho persist in many areas of the State Forests, according to distribution data maintained by the Oregon Department of Fish and Wildlife ("ODFW"), ECF No. 107 (Bradley Decl.) ¶14, and as shown in the figure, which is from ODF's Draft HCP, on the following page. ECF No. 106-3, Plaintiffs' Exhibit ("Ex.") 003 (HCP Handbook) 233:

Figure C1-1. Oregon Coast Coho (*Oncorhynchus kisutch*) Biogeographic Strata and Independent Populations



Coho adults begin their freshwater migration in the late summer and fall, spawn in mid-winter and then die. 70 Fed. Reg. 37,160, 37,161 (June 28, 2005). Eggs incubate in "redds," which are gravel beds dug by spawning adult females, for up to four months and then hatch as alevins. 69 Fed. Reg. 33,102, 33,108 (June 14, 2004). Many weeks later, after consuming yolk

sacs, alevins emerge from gravel beds as "fry" to rear for up to another 15 months, feeding on aquatic invertebrates, then migrate in spring to the ocean as "smolts." 69 Fed. Reg. at 33,102; 60 Fed. Reg. 38,011 (July 25, 1995). Coho typically spend two growing seasons in the ocean before returning to spawn. *Id.* at 38,012.

High-quality Coho spawning habitat consists of small streams with stable gravels free of fine sediments and cool, flowing, well-oxygenated water to support egg-to-fry survival. Ex.008 (Jenson et al. (2009)); 75 Fed. Reg. 29,489, 29,491 (May 26, 2010); Ex.009 (Quinn (2018)). Coho fry need such "Complex Streams"—streams with slow-moving water, deep pools, ponds, and side channels—to forage, avoid predation, and maintain stream position, including during floods. 75 Fed. Reg. at 29,491; Ex.009 (Quinn (2018)).

Complex Streams were once typical of the late-successional forests of the Oregon Coast Range. These forests went through ecological "disturbance" infrequently, usually in the form of large fires. Ex.010 (Wimberly (2002)). Thus, these forests would stabilize slopes and regulate delivery of fine sediment and large woody debris ("LWD"), a key element of Complex Streams. Ex.011 (Swanson et al. (1987)); Ex.012 (Naiman et al. (1992)); 75 Fed. Reg. at 29,496 (noting scientific "support [for] the conclusion that the effects of historic and on-going land management activities are still negatively influencing stream habitat complexity"). Late-successional forests are far below historic levels and still declining, including on the State Forests. Ex.010 (Wimberly (2002)).

Coho began to decline in the mid-1900s with the loss and degradation of Complex Streams from logging, in particular clearcutting, and logging roads as well as other threats, and plummeted to only about 21,000 fish by 1990. *Id.*; 73 Fed. Reg. 7816, 7825 (Feb. 11, 2008). Throughout the Coho's path toward "threatened" status, NMFS consistently identified

sedimentation from Forestry Activities as a primary threat. 60 Fed. Reg. at 38,024; 76 Fed. Reg.

at 35,766; 75 Fed. Reg. at 29,497 ("Historical and ongoing timber harvest and road building have

reduced stream shade, increased fine sediment levels, reduced levels of instream large wood, and

altered watershed hydrology."); 69 Fed. Reg. at 33,142 ("[s]edimentation from …timber harvest"

and "roadbuilding…is recognized as a primary cause of habitat degradation…"); 60 Fed. Reg. at

38,024 ("Logging activities, and the associated road networks, often result in soil erosion and

stream sedimentation such that spawning habitat is seriously degraded."). Today, the species'

population numbers remain far below historic levels and the recovery of Coho depends on

whether forestry-related impacts can be sufficiently minimized and mitigated. Ex.013 (Recovery

Plan) 9 ("Recovery … for [Coho] has one central overriding theme: to protect and restore the

freshwater and estuarine rearing habitats that support juvenile survival and overall

productivity"); 76 Fed. Reg. at 35,758 ("Managing watersheds in a manner that allows for

natural habitat forming processes to occur is the first step in ensuring that [Coho] have suitable

freshwater habitat."); *id.* at 35,760 ("we acknowledge that … restoration efforts can increase the

amount of woody debris in stream reaches and improve habitat complexity").

## B.  Impacts of Forestry Activities in the State Forests to Coho and Complex Streams Habitat

On an ongoing basis, the State Defendants auction timber sales with known hazards,

including sales with areas or units on high-risk terrain or "High Landslide Hazard Locations"

("HLHL"), which are areas "with characteristics (steepness, shape, and geology) that make it

subject to shallow, rapidly moving landslides," and includes "any headwall or draw in western

Oregon steeper than 70 percent." Ex.014 (Tech Note 2). ODF also maintains and prescribes

timber operators' use of roads with direct hydrologic connectivity to Coho-bearing Streams.

Thus, these activities result in delivery of fine sediments to streams utilized by Coho for spawning and rearing, leading to harm to and mortality of Coho.

According to ODF, terrain greater than 65 percent is "considered likely to have high landslide hazard locations in the field." *Id.* Vast percentages of the State Forests have slope angles that exceed 65 percent. Ex.015 (Montgomery (2001)); Ex.016 (May (2002)). Because stream channels are so dense in the Oregon Coast Range, shallow landslides need travel only short distances to enter stream networks, where they become "debris flows." Debris flows are fluidized mixtures of wood, sediment, and other debris that travel rapidly downhill through the channel network, gaining volume in the process. Ex.017 (Dietrich & Dunne (1978)); Ex.018 (Montgomery & Dietrich (1994)); Ex.019 (Montgomery et al. (2000)). The photograph on the following page, from ODF's Draft HCP, shows large wood, boulders, and coarse and fine sediments at the confluence of a "debris flow track" and a "Type-F" stream, i.e., a stream classified as fish-bearing, including Coho, based on ODFW data, ECF No. 106-6, Ex.003 (Draft HCP) 214, 253:



Indeed, decades of studies have conclusively shown that logging, particularly

clearcutting, dramatically increases the frequency and density of landslides and debris flows by

removing the roots of trees which reinforce and stabilize slopes. Ex.020 (Burroughs & Thomas

(1977)); Ex.021 (Ziemer & Swanston (1977)); Ex.022 (Wu et al. (1979)); Ex.023 (Reneau &

Dietrich (1987)); Ex.024 (Terwilliger & Waldron (1991)); Ex.025 (Robison et al. (1999));

Ex.026 (Guthrie (2002)); Ex.027 (Brardinoni et al. (2003)); Ex.028 (Schmidt et al. (2001));

Ex.029 (Turner et al. (2010)). This photograph also depicts a debris flow track:



ECF No. 106-6, Ex.003 (Draft HCP) 253.

As root strength declines after logging and hydrologic changes result from roads, even

common storms generate extensive landsliding. Ex.019 (Montgomery et al. (2000)). Studies of

"failed" slopes have modeled how landslides and debris flows are triggered more easily after logging, and at lower rates of rainfall and soil saturation, than before. Ex.030 (Wu & Sidle (1995)); Ex.028 (Schmidt et al. (2001)). There is no genuine dispute about these facts which are supported by multiple studies from the past 50 years, including studies from ODF and others that were conducted in the Oregon Coast Range. Ex.025 (Robison et al. (1999)); Ex.019 (Montgomery et al. (2000)).

For example, a 1985 survey of studies found that landslides in logged terrain occurred two to four times more frequently than unlogged areas. Ex.031 (Ice (1985)). Another study found that landslides triggered by logging roads resulted in erosion rates several hundred times greater than forested areas. Ex.011 (Swanson et al. (1987)). A study after the 1996 storms in the Oregon Coast Range found that median soil strength due to loss of root reinforcement was about an order of magnitude lower in clear-cut and industrial forests than in forested sites. Ex.028 (Schmidt et al. (2001)); Ex.025 (Robison et al. (1999)). A 2000 study of clear-cuts in the Oregon Coast Range found that a decade after logging, the rate of landslides in logged stands was over 10 times baseline rates. Ex.019 (Montgomery et al. (2000)). Following a severe rainstorm in 2007 with record flooding, Weyerhaeuser scientists mapped shallow landslides in forest stands of various ages and areas of highest rainfall intensities in southwestern Washington, and found that landslide densities were highest in clear-cut terrain, and decreased as new stands grew. Ex.029 (Turner et al. (2010)).

The well-documented increase in landslides and debris flow frequency and density in clear-cuts results in increased delivery of fine sediments to streams. Ex.032 (Beschta (1978)). Studies in the Oregon Coast Range found that debris flows carry large quantities of harmful fine sediments, as well as wood and other debris, gaining volume and moving 280 to 290 meters on

average—and often over 500 meters (the equivalent of about five football fields)—during runout, Ex.016 (May (2002)), before depositing in Coho-bearing Streams. Ex.032 (Beschta (1978)); Ex.033 (Benda & Cundy (1990)). A study of 53 debris flows following a large storm event in 1996 found that debris flows with 300-meter runout lengths (i.e., over 325 yards, or the length of about three football fields) can deliver approximately 1500 cubic meters of sediment to channel networks (nearly 53,000 cubic feet), while longer debris flows can deliver over 200 cubic meters (approximately 7,000 cubic feet). Ex.016 (May (2002)).

Sediment deliveries of such quantities overwhelm the capacity of streams to transport them downstream, burying spawning gravel beds and entombing Coho eggs and alevin, profoundly altering channel characteristics, creating braided morphology with erodible banks and wide, unstable channels, and eliminating Complex Streams. Ex.034 (Everest & Meehan (1981)); Ex.035 (Roberts & Church (1986)); Ex.036 (Bilby et al. (1989)); Ex.037 (Montgomery & Buffington (1997)); Ex.038 (Miller & Benda (2000)); Ex.039 (May & Lee (2004)); Ex.040 (Hoffman & Gabet (2007)); Ex.008 (Jenson et al. (2009)); Ex.041 (Reid et al. (2016)); Ex.042 (Buffington et al. (2002)). The harmful effects of sedimentation from landslides is worsened by ODF-prescribed use of hydrologically connected roads (HCRs) for hauling logs which chronically bleed sediment to Coho-bearing Streams. Ex.043 (Reid et al. (1981)); Ex.044 (van Meerveld et al. (2014)); Ex.045 (Trask River Watershed Analysis); Ex.046 (Wilson River Watershed Analysis). These effects are exacerbated by ODF's oft-prescribed "modified clearcutting" or "regeneration" silvicultural methods, which remove nearly all trees from the parcel and eliminate and reduce delivery of large woody debris (LWD). Ex.047 (Bilby & Ward (1991)); Ex.048 (Montgomery et al. (1995)); Ex.049 (Burnett et al. (2006)); Ex.050 (Gomi et al. (2005)).

C.  **The Impacts of ODF Logging and Road Management on Coho Salmon**

Decades of studies show that increases in fine sediments produced by ODF-prescribed Forestry Activities, including clear-cutting on high-risk slopes and roads management, lead to direct mortality of salmon embryos and alevins. Ex.051 (Brown & Krygier (1971)); Ex.052 (Cederholm et al. (1982)); Ex.053 (Cedarholm & Reid (1987)); Ex.054 (Platts et al. (1989)); Ex.055 (Eaglin & Hubert (1993)). Logging-related fine sediments fill the interstitial spaces in gravel, suffocating embryos and alevin by reducing oxygenated water, and trapping and "entombing" redds, leading to mortality and harm. Ex.056 (Coble (1961)); Ex.057 (Shumway et al. (1964)); Ex.058 (Koski (1965)); Ex.059 (Tagart (1984)); Ex.060 (Chapman (1988)); Ex.061 (Peterson & Quinn (1996a)); Ex.062 (Meyer (2003)); Ex.063 (Greig et al. (2007)); Ex.008 (Jensen et al. (2009)); Ex.064 (Franssen et al. (2012)).

Elevated fine sediments not only reduce survival of embryos and alevins, but also impact fry and adults. Increased turbidity during rain events reduces the ability of fry to forage and even causes direct physiological stress and mortality of many fish species, including Coho. Ex.065 (Newcombe & MacDonald (1991)).

Logging and roads management impair Coho habitat further by increasing winter stream flows and reducing summer flows. Ex.066 (Harr et al. (1975)); Ex.053 (Cederholm & Reid (1987)); Ex.067 (Jones & Grant (1996)); Ex.068 (Thomas & Megahan (1998)); Ex.069 (Beschta et al. (2000)); Ex.070 (Jones et al. (2000)); Ex.071 (Lewis et al. (2001)); Ex.038 (Miller & Benda (2000)); Ex.072 (Zégre (2008)). Removal of vegetation through clearcutting and construction of roads increase peak flows during winter rains, Ex.066 (Harr et al. (1975)); Ex.071 (Lewis et al. (2001)); Ex.072 (Zégre (2008)), leading to the scouring of redds with high mortality of embryos and alevins. Ex.073 (Lisle & Lewis (1992)); Ex.074 (Montgomery et al. (1996)), and flushing of

fry from their territories, again leading to mortality. Landslides and debris flows can bury streams in so much material that streams go subsurface during summer low flows, also causing mortality of redds, alevins, and fry and significantly impairing pools and other rearing habitats. Ex.039 (May & Lee (2004)). Summer low flows have been identified as a major limiting factor for Coho abundance, Ex.075 (Seiler et al. (2002)), meaning ODF-prescribed logging and road management are not only causing mortality and harm to Coho, but also limiting the species' recovery.

ODF-prescribed logging and roads management also lead to the simplification of Complex Streams, as landslides and debris flows and reduced input of large-woody debris reduce pools and side channels used by Coho fry during rearing, further resulting in mortality and harm. Ex.076 (Lisle & Hilton (1992)); Ex.077 (Murphy (1995)); Ex.009 (Quinn (2018)).

When listing Coho as threatened, NMFS specifically noted its "significant concerns" over the lack of protective measures for Coho and Complex Streams in Oregon's Forest Practices Act and revised, 2010 Forest Management Plan. Ex.078 (2010 FMP); 76 Fed. Reg at 35,770 (noting remaining "significant concerns" over the ability of the Oregon Forest Practices Act and regulations "to adequately protect water quality and salmon habitat"); *id*. at 35,768 ("We are as yet unable to conclude that the . . . Northwest Oregon Forest Management Plan[] provide[s] for [Coho] habitat that is capable of supporting populations that are viable during both good and poor marine conditions."). The agency deemed it "necessary and advisable" to Coho conservation to use its authority to promulgate the Special Rule. 50 C.F.R. § 223.203; 16 U.S.C. § 1533(d). The Special Rule extends the take prohibition to activities that are "most likely to cause harm" to Coho. 65 Fed. Reg. 42,422, 42,472 (July 10, 2000); 73 Fed. Reg. at 7818; 76 Fed. Reg. at 35,770.

Logging and constructing roads on unstable areas that are "susceptible to mass wasting and surface erosion," and removing "large woody debris and 'sinker logs' or riparian shade canopy" from streams, are some of these activities that are "mostly likely to cause harm" to Coho. 73 Fed. Reg. at 7830; 65 Fed. Reg. at 42,472. As NMFS first advised over 20 years ago, those engaging in these activities must obtain an ITP from NMFS pursuant to Section 10(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B), or risk violating Section 9. 73 Fed. Reg. at 7830 ("non-Federal entities" engaging in logging and road-building may obtain ITPs from NMFS); 69 Fed. Reg. at 33,169 ("activities potentially requiring a section 10(a)(1)(B) [ITP] include … logging[ and] road building"); 65 Fed. Reg. at 42,473 ("Persons or entities who … injure or kill protected fish are encouraged to immediately adjust that activity to avoid take … and seek NMFS' authorization for … an ESA section 10 incidental take permit… ."); 63 Fed. Reg. 42,587, 42,590 (Aug. 10, 1998). In 2006, the Washington Department of Natural Resources ("WDNR") obtained an ITP from NMFS that authorizes take of salmonids from Forestry Activities on Washington state and private forestlands for 50 years. Ex.079 (WDNR ITP); Ex.080 (WDNR HCP) (excerpts).

**D.  ODF's Extended Process to Obtain an ITP/HCP**

Oregon's attempts to procure an ITP for the State Forests has been marked by myriad obstacles and extensive delay. ODF first produced a draft HCP in 1997, and submitted it to NMFS for review and development of a draft EIS under NEPA, 42 U.S.C. § 4322. Ex.078 (FMP) 505-509; Ex.081 (2001 FMP); 63 Fed. Reg. at 42,590; 62 Fed. Reg. 55,824 (Oct. 28 1997). However, NMFS staff raised concerns about a lack of measures to protect stream functions and water quality. ECF No. 86-4 (Email from J. Lockwood to M. Schnee & R. Holloway (Dec. 6, 2001)) ("Although we appreciate the time and energy ODF now is putting into this HCP … that

sufficient analysis and documentation has not been completed to logically begin preparation of the DEIS."). Meanwhile, the BOF adopted the Northwest Oregon State Forests Management Plan in 2001. Ex.081 (2001 FMP). In early 2002, ODF issued the State Forests Salmon Protection Policy, an amalgamation of "state forest statutory, regulatory, planning, and volunteer salmon take avoidance measures." Ex.082 (Salmon Protection Policy).

In 2003, ODF adopted a new "anchor habitat approach," ostensibly to protect Coho, called the "Salmon Anchor Habitats Strategy," which identified 17 watersheds as "the core of salmon recovery efforts" on the State Forests. Ex.083 (SAH Strategy). From 2001 to 2008, while the federal listing of Coho was challenged in court, development of an HCP for the State Forests was given low priority.[2] After Coho were officially relisted as a threatened species, ODF abandoned the ITP/HCP process, and in April 2010, adopted a revised Forest Management Plan for the State Forests with a "take-avoidance" strategy instead. Ex.078 (2010 FMP).

Thus, although ITP/HCPs "are particularly important" in Oregon—as "about 65 percent of the habitat in the range of the Oregon coast ESU is in non-Federal ownership," 63 Fed. Reg. at 42,590—23 years after NMFS first listed Coho as a threatened species under the ESA, ODF has yet to complete an HCP and procure an ITP to authorize incidental take from Forestry Activities known to result in take of Coho.

Plaintiffs therefore notified ODF of their intent to bring suit under the citizen-suit provision of the ESA in February 2014. ECF No. 86-5. Plaintiffs re-notified State Defendants of their intent to bring suit in April 2017 and again in April 2018. ECF Nos. 86-6, 86-7. In June 2018, Plaintiffs filed this lawsuit. Shortly thereafter, in October 2018, the BOF directed ODF to

_____

[2] *See* 73 Fed. Reg. at 7816 (summarizing listing background).

begin work on an HCP. ECF No. 106-3, Ex.003 (Draft HCP) 23. ODF produced a draft HCP for

the BOF in December 2020 and submitted it to the Services in March 2021. *Id*.

 In the Draft HCP, ODF admits that incidental take of Coho occurs due to several

"stressors", including mortality and impairment of Coho-bearing Streams from sedimentation

and reduced large woody debris (LWD). *Id*. at 101-108, 231-242; *supra* pp. 12-13 (photographs

of fine sediment deposit at confluence of debris flow track and fish-bearing stream). ODF states

that "removing or altering forested areas that may provide habitat for listed . . . species," a

necessary part of State Forests management, "may be considered take" under the ESA. ECF No.

106-3, Ex.003 (Draft HCP) 35.

 Therefore, ODF explained, it is developing an HCP to obtain ITPs, and thus "[m]eet the

regulatory requirements" of the ESA. *Id*. at 24, 25; ECF No. 106-6, Ex.006 (Staff Report) 3

(noting an ITP would "reduce legal risks"). The Draft HCP seeks ITPs that would provide legal

"cover" under the ESA for take of all listed species affected from logging and road-system

management on State forestlands throughout western Oregon, including take of Coho from

forestry activities on the State Forests, for 70 years. ECF No. 106-3, Ex.003 (Draft HCP) 29.

 Yet, the State Defendants' HCP remains years from completion under the best-case

scenario. *See* ECF No. 109 (Resp. to 4th Stay Mot.) 5-9. Any ITP "may only issue" if ODF's

final HCP "will minimize impacts to the maximum extent practicable," and "the taking will not

appreciably reduce the likelihood of the survival and recovery of the species in the wild." ECF

No. 106-5, Ex.003 (Draft HCP) 89 (citing 16 U.S.C. § 1539(a)(2)(B)(ii), (iv)).

 Meanwhile, State Defendants' logging activities continue, ECF No. 106-5 (Schedule

Books); ECF No. 106 (2nd Greenwald Decl.) ¶¶8-10, causing take of Coho in patent violation of

Section 9 of the ESA.

IV.    <u>**STANDARD OF REVIEW**</u>

A motion for partial summary judgment, Fed. R. Civ. P. 56(a), shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party, however, "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248; LR 56(b) ("a party must assert any evidentiary objections in its response"). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

V.    <u>**ARGUMENT**</u>

A.    <u>**THE COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIM FOR RELIEF.**</u>

Plaintiffs are three non-profit environmental protection organizations who seek to conserve Coho and to protect their members' interests in Coho and its freshwater habitats in the State Forests. Declarations of Josh Laughlin, Jennifer Fairbrother, Ron Byers, Ian Fergusson, Joyce Sherman, Matt Erickson; ECF No. 106 (2nd Greenwald Decl.) ¶¶8, 13; ECF No. 86 (1st Greenwald Decl.) ¶¶14-21, 23-26. Plaintiffs' members' concrete aesthetic, recreational, scientific, and spiritual interests in Coho are being injured and will continue to suffer such injuries absent action by the Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs' members are submitting declarations in support of this motion explaining how State Defendants' activities are causing harm to Coho and their interests in Coho, and to their ability to enjoy, live in, and visit the areas where the Forestry Activities authorized by State Defendants occur to view, fish, and study Coho, and to recreate in Coho habitat. Declarations of Laughlin, Fairbrother, Byers, Fergusson, Sherman, Erickson; ECF No. 106 (2nd Greenwald Decl.) ¶¶8, 13; ECF No. 86 (1st Greenwald Decl.) ¶¶14-21, 23-26. This is more than sufficient to establish standing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (explaining environmental plaintiffs establish injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity'") (quoting *Sierra Club* v. *Morton*, 405 U.S. 727, 735 (1972)).

### B. THROUGH THEIR ONGOING FORESTRY ACTIVITIES ON THE STATE FORESTS WITHOUT AN ITP/HCP, STATE DEFENDANTS ARE LIABLE FOR UNAUTHORIZED TAKE OF OREGON COAST COHO SALMON.

#### 1. State Defendants Can be Found Liable for Violating the Take Prohibition in Section 9 as applied to Coho in the Special Rule.

Under Oregon law, timber harvest and road construction or maintenance in the State Forests is subject to the ongoing decisionmaking authority of State Defendants. ODF manages the State Forests pursuant to three-tiered management plans which govern the activities of the State Defendants and specify the locations and acreages of timber sales, and measures, if any, to avoid take of Coho. *Cascadia Wildlands v. Kitzhaber*, 911 F.Supp.2d 1075, 1079-80 (D. Or. 2012). It is illegal for any party to remove timber from the State Forests without the ODF authorization, acting pursuant to management, implementation, and annual operations plans ("AOP"), and operators may proceed only in accordance with sale contracts, operations plans, written plans, and ODF prescriptions as conditions precedent to logging. *Id.*

The State Defendants are thus "persons" who may be held liable for planning and authorizing timber sales which do not comply with ESA requirements and are reasonably certain to result in take when sold, *id.* at 1085; 16 U.S.C. § 1532(13); 50 C.F.R. § 223.203(a), without an ITP/HCP. *Seattle Audubon Soc'y v. Sutherland*, No. 06-1608, 2007 U.S. Dist. LEXIS 31880 (W.D. Wash. May 2, 2007) (holding state foresters could be liable for take by approving forest applications which was a condition precedent to logging); *Pac. Rivers Council v. Brown*, No. 02-243, 2002 U.S. Dist. LEXIS 28121, at *12 (D. Or. Dec. 23, 2002) (holding plaintiffs had standing to proceed with cause of action seeking to enjoin state forester from directly authorizing timber sales that were reasonably likely to result in take of coho salmon); *Strahan v. Coxe*, 127 F.3d 155, 163-64 (1st Cir. 1997) (holding state officials liable for issuing commercial fishing licenses which were likely to harm endangered whales); *Ctr. for Biological Diversity v. Otter*, No. 14-258, 2016 U.S. Dist. LEXIS 3958, at *32-33 (D. Idaho Jan. 8, 2016), *abrogated by* No. 14-258, slip op. (Jan. 24, 2018) ("*Center v. Otter*") (holding state fish and game officials liable for Section 9 violations from issuing trapping licenses where plaintiffs showed four incidents of incidental take of Canada lynx).

As in these and additional cases, Plaintiffs here allege that State Defendants are violation of Section 9 from auctioning timber sales prescribing Forestry Activities that are reasonably certain to result in unauthorized take of Coho. Plaintiffs challenge the ongoing Forestry Activities of the State Defendants as a whole, and need not establish that any particular timber sale or sales will be reasonably likely to result in take—rather, they properly challenge the ongoing activities of the State Defendants in authorizing timber sales and logging roads with risky terrain features and prescriptions that are reasonably certain to result in take of Coho. *Strahan*, 127 F.3d at 163-64.

**2.**    **State Defendants' Are Continuously Authorizing Forestry Activities on the State Forests Which Are Killing and Harming Coho.**

State Defendants' forestry activities are the proximate cause of take of Coho, including through killing and harming members of the species. *Cascadia Wildlands*, 911 F.Supp.2d at 1084 (citing *Sweet Home*, 515 U.S. at 700 n.13; *Seattle Audubon*, 2007 U.S. Dist. LEXIS 31880, at *11) ("It is well accepted that proximate cause is an element of ESA Section 9 claims."); 50 C.F.R. § 223.203(a); 73 Fed. Reg. at 7830 (activities most likely to cause harm to Coho to include "[a]ctivities that . . . could potentially 'harm' salmon" include logging, "road construction in riparian areas" and areas that are "susceptible to mass wasting and surface erosion," and the "removal of large woody debris and 'sinker logs' or riparian shade canopy").

State Defendants have conceded that their Forestry Activities lead to take of Coho. *Supra* p. 20. For this reason, ODF is developing an HCP to "[m]eet the regulatory requirements of the federal . . . ESA," ECF No. 106-6, Ex.006 (Staff Report) 36 (noting an ITP/HCP would "reduce legal risks" among other benefits). ODF has acknowledged that "take avoidance policies alone do not constitute a meaningful long-term conservation benefit for listed species." *Id*. at 2; ECF No. 106-3, Ex.003 (Draft HCP) 103 (noting that while conservation measures can "minimize management-related erosion and sedimentation, complete elimination of management . . . related impacts is not possible").

Each of the following five incidents, evident from materials produced in written discovery, involve delivery of fine sediments to Coho-bearing Streams that was fairly traceable to the actions of State Defendants. Each incident was the foreseeable result of specific timber sales that prescribed: the removal of most trees from all or a portion of sale areas on high-risk slopes, and thus reduced large woody debris; logging of riparian areas in the steep convergent terrain where landslides and debris flows initiate; construction of roads on high-risk slopes;

and/or use of hydrologically connected roads and road segments (HCRs) for log-haul. The resulting incidents and take of Coho were foreseeable—indeed, some of the *actual* consequences were expressly *foreseen* by ODF personnel during timber sale planning. Yet, operations proceeded, with the permission of State Defendants, and fine sediments were delivered to Coho-bearing Streams as a result. Without State Defendants' authorizations, a condition precedent to the logging, none of these activities could have occurred.

These incidents prove that the unauthorized take alleged by Plaintiffs is occurring, and that State Defendants are a proximate cause. ECF No. 58 (H'rg Trans.) 4 (noting "it's an appropriate part of a complaint against a state" to "recite what has happened in the past as a step towards proving the imminence of future harm").

**NW Combo Landslide**

The NW Combo timber sale was a 552-acre sale from the 2011 Tillamook District AOP, which consisted of seven areas including five clear-cuts and two partial cuts. Ex.084 (2010 NW Combo Memo) 4; Ex.085 (NW Combo Pre-Ops) 2. In the pre-operations report for the sale, ODF documented "high landslide hazard locations ["HLHLs"] scattered throughout the sale," Ex.085 (NW Combo Pre-Ops) 10, and adjacent to the West Fork, North Fork Wilson River, a Coho-bearing Stream. *Id.* at 9. ODF models and uses data showing HLHL, generally slopes greater than 70 percent steepness. Ex.086 (Clarification Memo) 7; Ex.087 (2019 HLHL Update) 2. HLHLs are generally 30 feet or longer and have a slope steepness of at least 70 percent. Ex.086 (Clarification Memo) 7 (defining HLHL slope thresholds). Despite the known risk of triggering landslides that would significantly impair Coho-bearing Streams, NW Combo was auctioned on

September 14, 2010, Ex.088 (NW Combo Notice) 2, and logging operations began a few months later. Ex.089 (NW Combo Notes) 2.

In Fall 2012, a new spur road across a steep slope above the West Fork, North Fork Wilson River and up to Area 5 triggered a landslide. Ex.090 (NW Combo TSIR) 2. An ODF inspection report recommended ceasing operations, as "the slide area has continued to show signs of instability," *id*., but operations continued.

At some point after May 2014, when trees had been hauled away, Ex.089 (NW Combo Notes) 29, the clear-cut above the spur road triggered a landslide that became a debris flow and slid down to the West Fork, North Fork Wilson River, destroying a portion of the road and depositing a large amount of sediments into Coho-bearing habitat. Ex.084 (NW Combo Memo) 12; *see also* Ex.090 (NW Combo TSIR) 4 (documenting site conditions during active operations on NW Combo, including an unstable "cut area" where "[the overlaying soils [we]re progressively sloughing off" and of seeing "2-4 cubic yards of soil slough off and tumble down the cut-face"—an activity which "can be expected to continue during wet periods"). This diagrammed Google Earth image from August 2016 shows the slide:



*See* Palmer Decl. ¶¶5-6; Bradley Decl.

**Alder Joy Landslide**

  Alder Joy was a 375-acre timber sale from the Tillamook District's 2012 AOP located in the headwaters of the Trask River basin. Ex.091 (Alder Joy Pre-Ops) 2. Alder Joy consisted of four clear-cuts directly adjacent to the South Fork Trask River and a tributary, Joyce Creek. *Id*. at 8-9. The pre-operations report slope stability assessment summary noted potential hazard of landslide delivery to Coho-bearing Streams—specifically, the South Fork of the Trask River and Joyce Creek. *Id.* at 6, 8. The report identified HLHL hazards with "risk to stream" as "likely" in two units and confirmed "present" in the other two, yet logging proceeded. *Id.*

  A landslide directly impacting Coho-bearing Streams resulted. *Id.*; ECF No. 86 (1st Greenwald Decl.) ¶¶23-25. The photographs below, taken April 15, 2020, show a landslide above the South Fork Trask River and initiated in Area 1 of the sale:



ECF No. 86 (1st Greenwald Decl.) ¶¶23-25, ECF No. 108 (Byers Decl.) ¶27 (Attachments). As the photographs below show, this slide traversed steeply downslope, across the road, and down to the South Fork Trask River, a Coho-bearing Stream:



ECF No. 86 (1st Greenwald Decl.) ¶¶8-9. The following satellite image captured on June 18, 2020 shows the landslide in Area 1. Palmer Decl. ¶¶5, 7; ECF No. 107 (Bradley Decl.) ¶15. The

blue lines indicate Coho-bearing Streams according to ODFW data. ECF No. 107 (Bradley

Decl.) ¶14.



Thus, the Alder Joy timber sale resulted in a landslide that delivered fine sediments to a

Coho-bearing Stream.

**Odin's Blade**

Odin's Blade was a timber sale auctioned by the Tillamook District on October 17, 2017.

Ex.092 (Odin's Blade Notice) 2. It consisted of six clear-cuts totaling 639 acres. Ex.093 (Odin's

Blade Pre-Ops) 2. Plaintiffs identified Odin's Blade sale as among those likely to result in take

of Coho. ECF No. 86-6 (2017 NOI) 15; ECF No. 86-07 (2018 NOI) 14; ECF No. 1 (Compl.) p.

38.

The pre-operations report for Odin's Blade warned of a likelihood of "aquatic adjacent

upland unstable slopes" hazards in three of the proposed sale's clear-cuts, and confirmed present

in one, as well as "inner gorge" hazards identified as "present" or "likely" in all but one of the six sale areas.  The pre-op confirmed the presence of Coho-bearing habitat adjacent to areas, in the West Fork, North Fork Wilson River and Jones Creek, and within the Cedar Creek Aquatic Anchor. Ex.093 (Odin's Blade Pre-Ops) 9.

On May 7, 2021, Nick Wagner, a Native Fish Society member, observed a landslide in a clear-cut from a timber sale area he later determined was part of Odin's Blade. Wagner Decl. ¶¶9-19. The landslide appeared to have travelled across the West Fork Road and into the West Fork North Fork Wilson River—where Coho spawn—as shown in the below photo. *Id*. ¶¶10-11.



Thus, the Odin's Blade timber sale triggered a landslide that delivered fine sediments to a Coho-bearing Stream.

**Star White Landslide**

Star White was an 809-acre timber sale consisting of four clear-cuts in the Kilchis River

basin that was auctioned by the Tillamook District in October 2014. Ex.094 (Star White Notice);

Ex.095 (Star White Pre-Ops). All areas were located along the Middle Fork Kilchis Aquatic

Anchor, Ex.095 (Star White Pre-Ops) 5, an "area[] intended to provide locales where populations

will receive a higher level of protection in the short-term until additional suitable habitat is

created across the landscape." Ex.078 (FMP) 266. This sale's pre-operation report noted a

"debris flow stream" (or debris flow track) in Area 1. Ex.095 (Star White Pre-Ops) 5; Ex.096

(Buren Email – 1) 3 ("Just to clarify, debris flow prone streams (or 'debris flow tracks' as we

normally say) are conduits for flow of a failed unstable slope.")). Mike Buren, ODF's

"Geotechnical Specialist" (or "Geotech") identified two sites with "upland unstable slopes" and a

third site with a "recent slide" with an "inner gorge below." Ex.097 (Buren Email – 2).[3] This

ODF diagram illustrates these features:



Ex.086 (Clarification Memo) 4. Area 1 was adjacent to Whitney Creek, which is blocked by a

culvert in "poor" condition where the creek meets Kilchis River Road, which is ODF-

maintained, and hence does not currently support Coho. Ex.098 (2019 Tillamook AOP) 19. Yet,

Area 1 was within an Aquatic Anchor and only a quarter mile above the Kilchis River, where

Coho are present. Ex.095 (Star White Pre-Ops). In their 2014 NOI, Plaintiffs identified Star

White as likely to cause Coho take. ECF No. 86-6 (2014 NOI) 17. Yet, the Star White sale

proceeded.

---

[3] A "geotechnical specialist" or "geotech" is a State-licensed engineer or geologist. ECF No.
106-6 (Draft HCP) 245 (citing ORS Chapter 672).

After a storm in early December 2015, two road-related landslides and two in-buffer landslides occurred in Area 1 of the Star White sale. Ex.099 (Buren Email – Star White); Ex.100 (Buren Map 1: Star White) (lidar maps of Star White landslides). The road-related slides were about 400 feet apart on a haul road in Area 1, and deposited debris and sediment directly into Whitney Creek. Ex.099 (Buren Email – Star White); Ex.095 (Star White Pre-Ops); Ex.101 (Buren Map 2 – Star White).

The slides are shown in the diagrammed image below. Palmer Decl. ¶¶5, 8. The following satellite image was taken using Google Earth data from August 2016:



*Id.*; ECF No. 107 (Bradley Decl.). ODF Geotech Mike Buren determined the landslides were triggered by a new road being constructed on "very steep slopes" and weighted with "side-cast" and decked logs. Ex.099 (Buren Email – Star White) 4. According to Mr. Buren, the in-buffer landslide was related to drainage from a spring at "the base of a small headwall formed by an older legacy road failure." *Id.* at 3; *see also* Ex.096 (Buren Email – 1) 2, 3 (noting Area 1 of the

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT                                                                                              33

then-proposed Star White sale involved upland unstable slopes and two recent landslides,
including one recent slide above an inner gorge and in proximity to a Type-F stream, and hence
involved a "High" risk of failure "assuming a timber harvest/thinning" necessitating
modifications including buffering the recent slide and inner gorge).

In 2021, an additional landslide was discovered by Native Fish Society member Matt
Erickson. Erickson Decl. ¶12. This landslide appears to have occurred on the same slope as the
large landslide initiating at the road, and to have directly impacted Whitney Creek. *Id.* It likely
occurred sometime in Winter 2020-21. *Id.* ¶¶17-19.



Thus, the Star White timber sale appears to have triggered multiple landslides that
delivered fine sediments to an Aquatic Anchor during Coho spawning season.

**Rocky Road/East Fork Trask River Road Sedimentation**

The Rocky Road timber sale was a 464-acre timber sale in the Trask River basin from the Tillamook District 2017 AOP, auctioned on February 13, 2018. Ex.102 (Rocky Road Sale Results) 2; Ex.104 (Rocky Road Memo) 3. It consisted of three clear-cuts adjacent to the East Fork, South Fork Trask River (an Aquatic Anchor), Headquarters Camp Creek, and Boundary Creek, all of which are used by Coho for spawning and rearing. Ex.104 (Rocky Road Memo), 7-8. Plaintiffs identified the Rocky Road timber sale as among those likely to result in take of Coho. ECF No. 1 (Compl.) p. 38 (Table); ECF No. 61 (First Amend. Compl.) ¶4; ECF No. 86-7 (2018 NOI) 16; ECF No. 86-6 (2017 NOI) 15. Nevertheless, the Tillamook ODF District auctioned Rocky Road on February 13, 2018, and operations began on April 11, 2018. Ex.103 (Rocky Road TSIR) 4.

Log-hauling down the East Fork Trask River Road started the next day, April 12, 2018, but was shut down later that day after sedimentation issues were detected. Ex.105 (Rocky Road Notes) 3. Sedimentation along East Fork Trask River Road was documented again in March 2019. *Id*. at 8; *id.* at 10-11 (discussing excessive "blading" atop two inches of rock on portion of East Fork Trask River Road); *id*. (notes dated Mar. 11, 2019) (noting that "haul was shut down" due to sediment delivery to a "fish stream" where "heavy plowing took place and road rock was displaced"); *id*. (noting log-hauling resumed following site visit).

Thus, log-hauling in connection with the Rocky Road timber sale resulted in sedimentation of an Aquatic Anchor during the Coho spawning season.

### 3.   These Incidents Exemplify How State Defendants Routinely Plan Timber Sales that Foreseeably Lead to Coho Take.

As demonstrated by these five incidents, State Defendants regularly plan and auction timber sales on the State Forests with specific prescriptions—like clear-cutting and road-building

on high-risk slopes, and debris flow tracks, in riparian areas and steep and convergent terrain where landslides and debris flows originate, and the use of HCRs for log-hauling—prescriptions that, when placed in proximity to Coho-bearing Streams, foreseeably lead to take. ECF No. 58, (H'rg Trans.) 4 (noting "it's an appropriate part of a complaint against a state" to "recite what has happened in the past as a step towards proving the imminence of future harm").

NW Combo, Alder Joy, Star White, and Rocky Road each involved one or more areas with high-risks or HLHLs, i.e., areas of at least 70 percent steepness and a "relatively high probability of failing and damaging" streams. Ex.078 (FMP) 258, *id*. at 553 (defining "high-risk" sites to include headwalls or draws steeper than 70 percent and "abrupt slope breaks"); Ex.086 (Clarification Memo) 7 n.4 (defining HLHLs); Ex.108 (Harvestable Acres Memo) 5 (explaining inner gorge areas are subject to timber harvest yet "grossly underestimated," and noting the need to survey all unknown streams (i.e., on the Tillamook District), as "[i]t is extremely important to know where these streams are on the landscape so we can accurately assess these issues and the acreage reductions associated with them"). Star White and Odin's Blade involved clearcutting unstable upland slopes. *Supra* pp. 29-34; Ex.025 (Robison et al. (1999)) 2-3. Star White and Rocky Road were in Aquatic Anchors, i.e., sub-watersheds with "high quality habitat for salmonid species of concern" that are purportedly subject to higher standards to protect Coho. Ex.078 (FMP) 848. ODF specialists documented these risks during sale planning. *Id*. at 257. Yet, the sales went ahead, and high-risk areas and HLHLs were clear-cut, and fine sediments were delivered to aquatic systems—as predicted—without modifications to avoid the foreseeable take of Coho that resulted. *Id.* at 258.

These incidents all stemmed from timber sales that prescribed "modified clearcutting" on slopes that are adjacent to Coho-bearing Streams. ECF No. 106 (2nd Greenwald Decl.) ¶¶5-8.

The exception is the Star White landslide, which occurred about a quarter mile (.25 miles) up Whitney Creek from the Kilchis River, an Aquatic Anchor. Ex.095 (Star White Pre-Op) 6; Ex.107 (Tillamook Estuaries) 2. Whitney Creek would be Coho-bearing but for a blocked culvert in "poor" condition at its confluence with the Kilchis River. *Id*.[4]

Thus, the landslides and debris flows that occurred as a result of these incidents resulted in delivery of fine sediments to Coho-bearing Streams. These fine sediments caused burial of Coho spawning beds and rearing habitats—in turn, killing or displacing eggs, alevins and fry, and overwhelming stream transport capacity, Ex.037 (Montgomery and Buffington (1997)), producing thick deposits of coarse-grained, unsorted sediments, filling and widening channels, burying spawning beds, and causing pools to lose surface area and depth. *Id.*; Ex.034 (Everest & Meehan (1981)); Ex.042 (Buffington et al. (2002)); Ex.036 (Bilby et al. (1989)). Roads constructed or used for these timber sales only added to the problems of increased sediment delivery to streams. Ex.070 (Jones et al. (2000)).

Not only were all these effects plainly foreseeable at the time ODF authorized these activities, but it is reasonably certain that such activities resulted in take of Coho. With the proximity of these high-risk slopes to Coho-bearing Streams, these sales resulted in take through the suffocation and death of Coho eggs and alevin by significant impairing the ability of young Coho to engage in essential behaviors including breeding, feeding, sheltering and otherwise significantly modifying and degrading Coho habitat. 50 C.F.R. § 223.102. Indeed, the events described above "actually" resulted in harm to Coho. *Forest Conservation Council*, 50 F.3d at 784-85 (explaining "courts have concluded that the Secretary juxtaposed the terms 'actually' and

---

[4] These incidents are just a few of the possible examples Plaintiffs were able to document from the parties' written discovery. Palmer Decl. ¶¶9-10.

'potentially' to specify the degree of certainty that harm would befall a protected species, as opposed to the timing of the injury."). This is because "some injury to wildlife occur[ed], either in the past, present, or future," then "the injury requirement of the … definition" of "harm" was "satisfied." *Id*.; *Am. Whitewater v. Hydro, LLC*, No. 16-0047, 2021 U.S. Dist. LEXIS 115451, at *9 (W.D. Wash. June 18, 2021) ("Harm to individual members is sufficient to establish an unlawful take for purposes of an ESA Section 9 case.").

Moreover, ODF strategies to avoid this Coho take failed. This may be because the "[G]eotech cannot always perform an on-site inspection" of steep headwalls next to streams and rivers. Ex.108 (Harvestable Acres Memo) 2. State Defendants make "a lot of calls" without site visits by the Geotech, "because [Buren] can't possibly go to every location we find in an AOP year." *Id*. Usually "only the less obvious areas…are looked at," leaving the "HLHL risk to fish." *Id*.

Or, it may be because only areas identified as "high risk" (or HLHLs) are even afforded such scrutiny at all. A moderate-risk site, one with a "potential to deliver" to aquatic systems, but one of a "low likelihood," Ex.078 (FMP) 257, receives "further assessment" only when necessary to determine "condition and significance of the aquatic resource." *Id*.[5] If the aquatic resource is not "significantly degraded" or part of a "salmonid emphasis area," no modifications are required, even if a moderate-risk slope has failed before. *Id.* For instance, a slope evaluated as "moderate risk" was approved for clear-cutting, even though it was "very obvious" it had

---

[5] A site is "low risk" when it has "minimal or no likelihood of delivery to an aquatic system." *Id*. ODF Geotechnical Specialist Mike Buren describes low-risk sites as "locations that don't have a relatively high probability of failing and damaging" the "aquatic system resource," where the resource is an aquatic system, "but which have some probability." Ex.106 (Buren Email – Red Buzzard).

previously failed and "scour[ed] [its] way to the water." Ex.106 (Buren Email – Red Buzzard) 2 (explaining geotechnical assessments of "risks," i.e., "the presence of a hazard (ie. unstable slope) plus a resource (ie. aquatic system)" and that "without one of these" present (a hazard or a resource) then there is no "risk").

When these areas *are* "looked at" to assess risks, the site-by-site approach leaves much to the subjective discretion of the State Defendants. Ex.086 (Clarification Memo) 2 (noting "[t]he FMP does not give a clear presentation of how these strategies are implemented across the landscape" and "leaves much to the Geotechnical Specialist and Foresters to evaluate on a harvest unit basis"); *id*. at 6 ("The actual determination of risk [for slope stability] is based on professional experience as opposed to some form of analytical slope stability analysis using soil strength parameters.").

Regardless of the reasons underlying ODF's chronic failure to avoid take of Coho, it is evident that State Defendants are authorizing Forestry Activities on a continuing basis with sale prescriptions and terrain features that are "actually" resulting in death of Coho and significantly impairing streams used by Coho for spawning, rearing, and migration. This take is both foreseeable and would not occur on these State Forests without State Defendants' authorizations and according to ODF's terms.

**4.** **State Defendants Continue to Plan Timber Sales on the State Forests that are Reasonably Certain to Cause Unauthorized Take.**

As the five incidents above show, ODF plans timber sales that prescribe clear-cutting or logging roads on high-risk slopes, in steep and convergent terrain below headwalls and on unstable upland slopes and debris flow tracks, and use of certain routes for log-hauling along HCRs. When risks are found, the sales with risks either proceed regardless, or efforts to avoid or mitigate those impacts are ultimately insufficient. The State Defendants auctioned these sales

and others like them, in specifically the manner that is likely to result in a violation of federal

law. *Strahan*, 127 F.3d. at 164. State Defendants cannot refute these facts, which are illustrated

by the five examples above, particularly at a time when ODF is, once again, preparing an HCP to

secure an ITP that would cover take of Coho on the State Forests.

State Defendants will likely argue that Plaintiffs must meet a stricter burden and prove

that *each* of their planned timber sales are certain to result in take. This is incorrect for many

reasons. Plaintiffs are challenging the "activities" of the State Defendants—specifically, "ODF's

forest management activities, including timber harvest, stand management," etc., ECF No. 106-3,

Ex.003 (Draft HCP) 23—i.e., State Defendants' Forestry Activities carried out in capacity as

officials whose plans and authorizations are conditions precedent to logging the State Forests. *Id*.

at 27 (describing "Covered Activities"). These are the "activities" being proposed for eventual

take coverage through an ITP. *Id*.; ECF No. 106-5, Ex.002 (HCP Handbook) 18, (describing

ITP/HCPs). Indeed, these are the "activities" authorized in the WDNR ITP, Ex.079 (WDNR

ITP) 3 (describing "covered activities" to include "forest practices activities in Washington state,

subject to the provisions of the . . . Forest Practices HCP"); *id.* at 4 (authorizing incidental take

from covered activities over the 50-year term of the ITP, including listed coho salmon ESU, "in

the form of harm harassment, kill and injury"), and the Elliot State Forest HCP (since rescinded).

ECF No. 86-1 (Elliott HCP) at 11, 19 (describing incidental take from ODF's "management

activities" to include "timber harvest, reforestation, young growth management, and related

activities"). Moreover, "activity" is the plain language of Section 10, which provides for the

issuance of ITPs. 16 U.S.C. § 1539(a)(1) (NMFS "may permit . . . any taking otherwise

prohibited . . . if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful *activity*") (emphasis added).

Consistent with these authorities and the conclusions reached by many courts, State Defendants here are properly sued for Section 9 liability in connection with their ongoing Forestry Activities; Plaintiffs are not required to limit their liability arguments to specific timber sales, permits, and other individual acts. *Sweet Home*, 515 U.S. at 704-07 (identifying as one example of take "the activities of birdwatchers where the effect of those activities might disturb the birds and make it more difficult to hatch or raise their young") (quotations marks and citations omitted); *Sierra Club v. Yeutter,* 926 F.2d 429, 438–39 (5th Cir. 1991) (finding federal agency U.S. Forest Service's "practice of even-aged management" of timber stands resulted in the taking of red-cockaded woodpeckers in violation of the ESA); *Loggerhead Turtle v. Cnty. Council*, 896 F.Supp. 1170, 1180–81 (M.D. Fla. 1995) (holding that county's authorization of vehicular beach access during turtle mating season exacted a taking of turtles in violation of the ESA); *Animal Prot. Inst. v. Holsten*, 541 F.Supp.2d 1073, 1080 (D. Minn. 2008) (finding that state agency's licensure of trapping and regulations concerning trap uses caused unauthorized take of Canada Lynx); *Pac. Rivers Council*, 2002 U.S. Dist. LEXIS 28121, at *11 (finding that an Oregon state forester's authorization of logging operations could be a cause of take); *Or. Nat'l Desert Ass'n v. Tidwell*, 716 F.Supp.2d 982, 1005 n.8 (D. Or. 2010) (finding "that [the] Forest Service may be held liable for authorizing grazing that results in unlawful take").

Even if that were the standard, Plaintiffs would meet it. Several of the sales that foreseeably caused the incidents described above *were* specifically identified by Plaintiffs as reasonably certain to cause take. *Supra* pp**.** 29 (Odin's Blade), 31 (Star White), 34 (Rocky Road). In addition, based on the written discovery provided by State Defendants (and/or to the public),

Plaintiffs have identified seven sales from recent AOPs with prescriptions and features that are reasonably certain to cause Coho take. ECF No. 106 (2nd Greenwald Decl.) ¶¶8-11.

For example, the newly re-scheduled Coast Bill timber sale includes an area that is directly above Area 1 of Alder Joy, which resulted in a landslide and Coho take, and includes an unharvested section of Area 1 of Alder Joy which is directly along the South Fork Trask River and Joyce Creek, both Coho-bearing, as shown in the following map:



*Id.* ¶¶9-10 (Figure 1); ECF No. 107 (Bradley Decl.); ECF No. 108 (Byers Decl.). Six additional

sales from the Draft 2022 AOPs present the same and similar risks. ECF No. 106 (2nd

Greenwald Decl.) ¶11. These sales will not proceed without State Defendants' authorization, and

pursuant to their binding prescriptions and ODF's ongoing regulatory oversight, and per the

terms of timber sale contracts with ODF. It is foreseeable, and reasonably certain, that these sales

also will result in take of Coho. Plaintiffs have established by a preponderance of the evidence that take of Coho will continue to occur. *Am. Whitewater*, 2021 U.S. Dist. LEXIS 115451, *10 (holding Tribe established take of protected salmon by a preponderance of the evidence from water diversions at hydropower facility) (citing *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000)).

State Defendants are the proximate cause of take. The Court should grant summary judgment to Plaintiffs on the issue of liability and enter declaratory judgment.

### C. THE COURT SHOULD GRANT DECLATORY JUDGMENT TO PLAINTIFFS, AND ORDER PLAINTIFFS AND STATE DEFENDANTS TO MEET AND DEVELOP TERMS OF INTERIM INJUNCTIVE RELIEF.

#### 1. Plaintiffs are Entitled to Summary Judgment and Declaratory Relief.

Plaintiffs respectfully request the Court grant partial summary judgment to Plaintiffs on the issue of liability, and hold that the State Defendants' ongoing Forestry Activities in the State Forests, including their ongoing sales of timber and roads management with certain prescriptions and terrain features, are reasonably certain to result in unauthorized take of Coho in violation of Section 9 of the ESA. Plaintiffs respectfully request that the Court enter declaratory judgment to Plaintiff pursuant to 28 U.S.C. § 2201.

#### 2. Plaintiffs Request the Court Order Plaintiffs and State Defendants to Attempt to Jointly Stipulate to Interim Injunctive Relief Measures, and Seek a Ruling from the Court if such Efforts are Unsuccessful.

To tailor injunctive relief, Plaintiffs request the Court Order State Defendants to meet with Plaintiffs and develop a joint stipulation, if possible, with proposed terms of injunctive relief, and, within 90 days of such Order, submit such joint proposed stipulation to the Court for approval and/or proposed schedule(s) for additional discovery, motions, and/or trial, or other further proceedings in this matter, with the objective of narrowing the remaining issues and reaching final disposition. *E.g.*, *Center v. Otter*, 2016 U.S. Dist. LEXIS 3958, at *32-33 (in

Section 9 case, ordering state defendants "to propose a plan to protect" endangered species from incidental take and submit it to the court within 90 days); *id.* ("ideally, the parties may be able to meet together and propose a joint stipulated plan to the Court."). As they are familiar with the issues, the Plaintiffs and State Defendants could negotiate the terms of interim relief that is "tailored to remedy the specific harm" until State Defendants finalize an HCP and procure an ITP. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 01-064-SI, 2017 U.S. Dist. LEXIS 44026, at *8 (D. Or. Mar. 27, 2017), *aff'd in part, sub nom. appeal dismissed in part*, 886 F.3d 803 (9th Cir. 2018).

If the Plaintiffs and State Defendants are unsuccessful, Plaintiffs respectfully submit that the Court could at that time order submission of a proposed schedule(s) for further proceedings, including schedules for additional discovery, motions, and further proceedings, a schedule for briefing the proper scope of interim injunctive relief in the event the parties are unable to develop a joint plan. *Center v. Otter*, 2018 U.S. Dist. LEXIS 3958, *33 (ordering parties to propose a joint stipulated plan to the Court which "will determine the terms of the injunction"); *id.* (if the parties are not able to propose a joint plan, "the Court will determine the terms of the injunction").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court to issue an Order granting summary judgment as to State Defendants' liability, granting declaratory relief to Plaintiffs, and declaring that State Defendants are violating Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B); *id.* § 1538(a)(1)(G); and 50 C.F.R. § 223.203(a) by: authorizing logging and roads in the Tillamook and Clatsop state forests on an ongoing and continuing basis, where such activities: (a) present a reasonably certain likelihood of delivering sediment to streams used by

the Oregon Coast evolutionarily significant unit of coho salmon, a threatened species, 50 C.F.R.

§ 223.102(e); or (b) prescribe the clearcutting on high-risk slopes (HLHLs), the use or

construction of roads on high-risk slopes (HLHLs), and/or the use of hydrologically connected

roads (HCRs) adjacent to Coho-bearing Streams for logging operations or log-hauling.

 In addition, Plaintiffs respectfully request the Court to Order: (1) Plaintiffs and State

Defendants, within 90 days, to file a joint stipulation and proposed order with conservation

measures to protect Oregon Coast coho salmon from incidental take until State Defendants

obtain an ITP under Section 10 of the ESA, 16 U.S.C. § 1539(a)(1)(B); *id*. § 1539(a)(2), or (2)

the parties to submit to the Court, within 90 days, a joint stipulation and/or motion(s) for

proposed further proceedings in this matter, including proposed schedule(s) for any additional

written or expert discovery or motions.

## <u>CERTIFICATE OF COMPLIANCE</u>

 This brief complies with the applicable word-count limitation under LR 7-2(b) because it

contains 10,995 words, including headings, footnotes, and quotations, but excluding the caption,

table of contents, table of authorities, signature block, exhibits, declarations, and certificates of

counsel.

DATED: August 21, 2021     Respectfully submitted,


        <u>s/ Amy R. Atwood</u>
        Amy R. Atwood (OSB #060407)
        atwood@biologicaldiversity.org
        Tel: (971) 717-6401
        225 N. Killingsworth St.
        Portland, OR 97217
        CENTER FOR BIOLOGICAL DIVERSITY

Oliver J. H. Stiefel (OSB# 135436)
oliver@crag.org
Tel: (503) 227-2212
3141 E. Burnside St.
Portland, OR 97214
CRAG LAW CENTER

Maura C. Fahey (OSB #133549)
maura@crag.org
Tel: (503) 525-2722
3141 E. Burnside St.
Portland, OR 97214
CRAG LAW CENTER

*Attorneys for All Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2021, I filed the foregoing: Plaintiffs' Motion for

Partial Summary Judgment and Memorandum in Support; declarations of Joyce Sherman, Ian

Fergusson, Matt Erickson, Nicholas Wagner, Jennifer Fairbrother, Josh Laughlin, and Whitney

Palmer; the Third Declaration of Noah Greenwald; and Exhibits 08-108, using the Court's ECF

system, which will cause these filings to be served on the following counsel for State Defendants

and Defendant-Intervenors:

<u>Attorneys for Defendants</u>
Darsee Staley, darsee.staley@doj.state.or.us
Deanna J. Chang, deanna.j.chang@doj.state.or.us
OREGON DEPARTMENT OF JUSTICE

<u>Attorneys for Defendant-Intervenors Oregon Forest Industries Council</u>
Kirk B. Maag, kirk.maag@stoel.com
Crystal S. Chase, crystal.chase@stoel.com
Ryan P. Steen, rpsteen@stoel.com
STOEL RIVES LLP

<u>Attorneys for Defendant-Intervenors Tillamook County</u>
Jessica Schuh, jschuh@schwabe.com
Jay T. Waldron, jwaldron@schwabe.com
SCHWABE, WILLIAMSON & WYATT


Dated this 20th day of August, 2021.          */s Amy R. Atwood*
                                              Amy R. Atwood